UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORTH ATLANTIC OPERATING
COMPANY, INC.; NATIONAL
TOBACCO COMPANY, L.P.

                 Plaintiffs,                  Case No. 17-10964
                                                Honorable Linda V. Parker

v.

EBAY SELLER DEALZ_F0R_YOU,
*et al.*,

                 Defendants.
_____/

## OPINION AND ORDER GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFFS' MOTION FOR CONTEMPT [ECF NO. 102]

On March 28, 2017, Plaintiff North Atlantic Operating Company, Inc.

("NAOC") and Plaintiff National Tobacco Company, L.P. ("NTC") (collectively

"Plaintiffs") filed this lawsuit against ninety-nine defendants. In their Complaint,

Plaintiffs claim that Defendants have been manufacturing, distributing, and selling

counterfeit versions of Plaintiffs' ZIG-ZAG® brand cigarette paper products in

Michigan and nationwide. Plaintiffs allege that the products are inferior cigarette

paper products, "sold without any known quality control or authorization." (ECF

No. 1 at Pg ID 5.) The Complaint includes the following counts: (1) federal

trademark infringement; (2) false designation of origin, unfair competition, and

trademark and trade dress infringement; (3) copyright infringement; (4) improper

use under Mich. Comp. Laws § 429.42; (5) unfair competition under Mich. Comp. Laws § 445.903; and (6) common law unfair competition. (*Id.* at Pg ID 75-85.)

On March 28, 2017, Plaintiffs filed an Emergency *Ex Parte* Motion for Temporary Restraining Order ("TRO"), Preliminary Injunction, and Other Relief. (ECF No. 3.) The hearing on the TRO occurred on April 26, 2017, and this Court granted Plaintiffs' TRO on May 3, 2017. (ECF No. 16.) After proper notice and service, on June 13, 2017, this Court held a hearing on the preliminary injunction. On June 14, 2017, this Court entered a Preliminary Injunction Order enjoining the remaining Defendants[1] from buying, selling, distributing or manufacturing counterfeit ZIG-ZAG® products. (ECF No. 58.)

Presently before the Court is Plaintiffs' motion for contempt against Defendants Sam Chawla and eBay Seller schawla5 ("Chawla Defendants") for

---

[1] The following Defendants agreed to be bound by the preliminary injunction prior to the hearing: Jonas Ng; eBay Seller Lingchawong_USA; Darren Yau; Quantum Shipping; eBay Seller quantumshipment; Amazon Seller Help Feed My Kids; Ross Livaccari; Deb's Beauty Supply; eBay Seller mira.hair.care; Amazon Seller Lowest Priced Tests; JC (a.k.a. Jeffrey Cole); eBay Seller Waterpipeworld; Ryan Parisian; eBay Seller Highlifepapers; eBay Seller Bigr1974; Robert Wilson; eBay Seller californiarollin; eBay Seller plurfectsales; Amazon Seller Items2yourdoor; Preston Lipe; eBay Seller 8givemeliberty8; A.H; Rouhif Mossili; eBay Seller ah19612015; Amazon Seller R.M Store; AM.H/Smoking Acssories; Amazon Seller AM.H; Rafat Sawaged; eBay Seller rafatsawaged91; Matt Peyman; and eBay Seller nationalpleasures. (*See* ECF Nos. 34-38, 46, 50-53, 55-56.) Since the hearing, a number of Defendants have stipulated to a permanent injunction. (*See* ECF Nos. 69, 72, 75, 80, 83, 85, 89, 91, 93, & 118.)

"willfully selling at least 50 cartons of confirmed counterfeit ZIG-ZAG® Orange[2], in counterfeit packaging that states: "Distributed by North Atlantic Operating Company, Inc."" (ECF No. 102 at Pg ID 2827.) A hearing on the motion for contempt was held on February 26, 2018. Defendant Chawla appeared by telephone. At the conclusion of the hearing, the Court instructed Plaintiffs to provide a brief in support of its claim for damages and permitted Defendant Chawla to respond. On March 12, 2018, Plaintiffs filed their supplement brief for damages, and Defendant Chawla filed his response[3] on March 27, 2018. (ECF Nos. 112 & 116.)

## I.      Factual & Procedural Background

Plaintiffs are the exclusive U.S. licensees of the ZIG-ZAG® brand cigarette paper products. (*Id.* at ¶ 13.) The ZIG-ZAG® brand cigarette paper products are offered in different varieties, based on factors such as thickness, quality of paper, and size. (*Id.* at ¶ 218.) One of the ZIG-ZAG® products that Plaintiffs distribute in the U.S. are ZIG-ZAG® 1 ¼ Size French Orange ("ZIG-ZAG® Orange"). (*Id.* at ¶ 219.) ZIG-ZAG® Orange products are subjected to high quality control stands when manufactured in France and imported into the U.S. (*Id.* at ¶ 221-23.) After a

---

[2] Defined as ZIG-ZAG® 1 ¼ Size French Orange cigarette paper products and packaging.
[3] There are two docket entries, Nos. 116 and 117, indicating Defendant Chawla filed a response. However, the entries, although docketed on different days, are the same.

rigorous inspection, NAOC sells the ZIG-ZAG® Orange products to their direct accounts, which are mostly wholesale distributors throughout the U.S. (*Id.* at ¶ 224.)

All authentic ZIG-ZAG® Orange cigarette paper products distributed by NAOC display the following valid and subsisting trademarks that are used on all ZIG-ZAG® products: U.S. Registration Nos. 610, 530; 1,127,946; 2,169,540, and 2,169,549. (*Id.* at ¶ 227.) Only NAOC has the rights to distribute cigarette paper products with the ZIG-ZAG® trademarks in the U.S. (*Id.* at ¶ 228.) NAOC also adds its own trademarks for products distributed in the U.S.: U.S. Registration Nos. 2,664,694; 2,664, 695; 2,610,473; and 2,635,446.

Similarly, NAOC owns the federal copyright registration for the NAOC copyright. (*Id.* at ¶ 234.) This copyright appears on all authentic ZIG-ZAG® Orange products distributed in the United States by NAOC. Also appearing on the packaging of ZIG-ZAG® products distributed in the United States are the ZIG-ZAG® and NAOC trademarks; gold-fill lettering and design elements; particular French phrases such as "Qualite superieure"; and the statements "Made in France" or "Imported French." (*Id.* at ¶ 238.) NAOC alleges that it has developed substantial goodwill and reputation due to the high quality of the ZIG-ZAG® brand cigarette paper products in the United States. (*Id.* at ¶ 231.)

NAOC began investigating the distribution of counterfeit ZIG-ZAG® Orange products in 2016. (*Id.* at ¶ 243.) During the course of the investigation, Plaintiffs determined upon information and belief that Defendants have been selling counterfeit ZIG-ZAG® Orange products "over the Internet to wholesalers, retailers, and to individual consumers for significant profits, at prices that distributors of authentic products cannot possibly compete with." (*Id.* at ¶ 253.) Plaintiffs allege that Defendants are not authorized or licensed to sell any products with the ZIG-ZAG® or NAOC® trademarks. (*Id.* at ¶ 257.)

Plaintiffs learned of the counterfeit sales through the use of investigators working on behalf of NAOC. (*Id.* at ¶ 263.) These purchases were made with various sellers on online marketplaces such as eBay.com ("eBay"), Amazon.com ("Amazon"), and Bonanza.com ("Bonanaza"). (*Id.*) Payments with the eBay and Bonanza sellers was made through PayPal. (*See id.* at ¶¶ 267, 271.) Plaintiffs allege that the sale of counterfeit products constitutes willful conduct by the Defendants. Further, Plaintiffs allege this reputation has been damaged by the manufacturing and distribution of counterfeit products by Defendants.

After the issuance of the TRO on May 3, 2017, Plaintiffs served all Defendants on May 10, 2017. (ECF No. 23.) Specifically, Plaintiffs served the Chawla Defendants at support@nririshtay.com and schawla5@yahoo.com and through FedEx at 4324 Main Street, Bridgeport, CT 06606, an address listed for

Liberty Tax Service, Defendant Sam Chawla's business. (Victoria Danta Decl., at ¶ 10, ECF No. 103-3 at Pg ID 2866.)

According to Plaintiffs, service was effective because Defendant Chawla contacted Plaintiffs' counsel from his email account, schawla5@yahoo.com. (*Id.*) In the email, Defendant Chawla referred to the lawsuit by case number and inquired as to the status of his frozen accounts. (*Id.*) He later contacted Plaintiffs' counsel by phone, from the same phone number associated with his eBay and Amazon accounts, inquiring as to the allegations in the complaint and upcoming deadlines. (ECF No. at Pg ID 2847; Danta Decl., at ¶ 12, ECF No. 103 at Pg ID 2867.)

On June 13, 2017, the Court held a hearing on the preliminary injunction. The Chawla Defendants did not appear or oppose the motion, despite receiving notice. (ECF NO. 25.) The Court granted Plaintiffs' request for preliminary injunction on June 13, 2017. The Preliminary Injunction Order stated as follows:

> **IT IS HEREBY ORDERED** that, pursuant to Federal Rule of Civil Procedure 65, the remaining Defendants, their respective agents, servants, employees, and officers, and all other persons in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, are hereby enjoined and restrained, pending the final resolution of this action, from directly or indirectly, anywhere in the world:
>
> 1. Manufacturing, making, buying, purchasing, importing, shipping, delivering, advertising, marketing, promoting, offering to sell, selling, or otherwise distributing or

disposing of, in any manner, any counterfeit or infringing ZIG-ZAG® brand cigarette paper products, including but not limited to ZIG-ZAG® 1 ¼ Size French Orange ("ZIG-ZAG® Orange"), or any cigarette paper products bearing:

    a.  Infringing or counterfeit versions of the ZIG-ZAG® Trademarks[4], the NAOC® Trademarks[5], the NAOC© Copyright[6], and/or the ZIG-ZAG® Orange Trade Dress[7], which appear alone or in combination on all cartons and booklets of ZIG-ZAG® Orange cigarette paper products distributed by North Atlantic in the United States; or

    b.  The false statement that such products are "Distributed by North Atlantic Operating Company, Inc." or otherwise under the control or supervision of North Atlantic, when they are not;

    2.  Manufacturing, making, buying, purchasing, importing, shipping, delivering, advertising, marketing, promoting, offering to sell, selling, or otherwise distributing or disposing of, in any manner, any purported North

---

[4] Defined as the marks of U.S. Registration Nos. 610,530 (ZIG-ZAG (stylized)); 1,127,946 (ZIG-ZAG (Word Mark)); 2,169,540 (Smoking Man Design (Circle Border)); 2,169,549 (Smoking Man Design (No Border)).

[5] Defined as the marks of U.S. Registration Nos. 2,664,694 and 2,664,695 (NORTH ATLANTIC OPERATING COMPANY INC. and Gear Design); and 2,610,473 and 2,635,446 (NORTH ATLANTIC OPERATING COMPANY (Word Mark)).

[6] Defined as the work of the federal copyright registration for the visual material/computer graphic titled "North Atlantic Operating Company, Inc." (VAu 464-855).

[7] Defined as the distinctive design elements comprising the overall look and feel of ZIG-ZAG® Orange packaging (booklets and cartons), including at least the following: (1) ZIG-ZAG® and NAOC® Trademarks, (2) NAOC© Copyright, (3) gold-fill lettering and design elements, (4) French phrases such as "Qualite Superieure" and "Braunstein Freres France," and (5) the express statements that the products are "Made in France" or "Imported French", or "Distributed by North Atlantic Operating Company, Inc."

Atlantic products that are not actually produced, imported, or distributed under North Atlantic's control or supervision, or approved for sale in the United States by North Atlantic in connection with the ZIG-ZAG® Trademarks, the NAOC® Trademarks, the NAOC© Copyright, or the ZIG-ZAG® Orange Trade Dress;

3. Committing acts calculated to cause purchasers to believe that counterfeit or infringing ZIG-ZAG® cigarette paper products, including counterfeit ZIG-ZAG® Orange, originate with North Atlantic when they do not;

4. In any way infringing or damaging the ZIG-ZAG® or NAOC® Trademarks, the NAOC© Copyright, or the ZIG-ZAG® Orange Trade Dress, or the value or goodwill associated therewith;

5. Otherwise unfairly competing with North Atlantic;

6. Attempting, causing, or assisting in any of the above-described acts, including but not limited to, enabling others in the above-described acts or passing on information to allow them to do so;

7. Destroying, altering, deleting, or otherwise disposing of any documents, records, or electronically stored information concerning the manufacturing, making, buying, purchasing, importing, shipping, delivering, advertising, marketing, promoting, offering to sell, selling, or other distribution or disposal of any product that has been, or is intended to be, sold in packaging containing, displaying, or bearing the ZIG-ZAG® or NAOC® Trademarks, the NAOC© Copyright, or the ZIG-ZAG® Orange Trade Dress;

8. Forming or causing to be formed any corporation or other entity that engages in the above-described acts;

9. Accessing, using, linking to, transferring, selling, exercising control over, or otherwise owning the eBay

seller accounts, Amazon seller accounts, or Bonanza seller accounts shown in T.R.O. <u>Attachment 1</u>, or any other online marketplace, e-commerce, or merchant account that is, or could be, the means by which Defendants manufacture, make, buy, purchase, import, ship, deliver, advertise, market, promote, offer to sell, sell, or otherwise distribute or dispose of, in any manner, any counterfeit or infringing ZIG-ZAG® Orange products;

10. Accessing, using, linking to, transferring, selling, exercising control over, or otherwise owning the PayPal accounts associated with the names and e-mail addresses shown in T.R.O. <u>Attachment 1</u>, or any other online payment processing or financial account that is, or could be, the means by which Defendants manufacture, make, buy, purchase, import, ship, deliver, advertise, market, promote, offer to sell, sell, or otherwise distribute or dispose of, in any manner, any counterfeit or infringing ZIG-ZAG® Orange products; and

11. Accessing, transferring, or disposing of any assets, subject to any Defendant's provision of an accounting of assets over $1,000 and uncontradicted, documentary proof that such particular assets are not proceeds of such Defendant's counterfeiting activities.

(ECF No. 58 at Pg ID 2488-92.)  The Chawla Defendants were served with the

Preliminary Injunction Order on June 15, 2017.  (ECF No. 63.)

According to Plaintiffs, the Chawla Defendants have continued to buy and

sell counterfeit ZIG-ZAG® Orange.  (ECF No. 102 at Pg ID 2830.)  In November

2017, Plaintiffs' investigators contacted Defendant Chawla, at the phone number

associated with the eBay and PayPal accounts, to purchase counterfeit ZIG-ZAG®

Orange.  (John Hood Decl., at ¶ 11, ECF No. 104 at Pg ID 28881.)  On December

9

7, 2017, Plaintiffs' investigators contacted Defendant Chawla to purchase additional counterfeit ZIG-ZAG® Orange. (Hood Decl., at ¶ 25, ECF No. 104 at Pg ID 2890.) Upon receipt of the counterfeit goods, Plaintiffs' investigators shipped the product to NAOC's headquarters for a quality control inspection. (ECF No. 104 at Pg ID 2889, 2891.) Steve Gnadinger, Manager of Product Integrity at NTC, concluded that the products received from Defendant Chawla were counterfeit. (Steve Gnadinger Decl., at ¶ 7-8, ECF No. 105 at Pg ID 2908-09.)

At the time of the filing of the motion, the Chawla Defendants had sold at least fifty (50) cartoons and twelve hundred (1,200) booklets of counterfeit ZIG-ZAG® Orange to Plaintiffs' undercover investigators. (*Id*.; *see also* Hood Decl., at ¶¶ 11, 19, 21, 25, & 31, ECF No. 104 at Pg ID 2888-91.) On November 9, 2017, the Chawla Defendants sold ten (10) cartons containing two hundred and forty (240) booklets, and on December 12, 2017, they sold forty (40) cartons containing nine hundred and sixty (960) booklets. (*Id*.; *see also* Gnadinger Decl. at ¶¶ 6-7, 30-33 ECF No. 105 at Pg ID 2908.) Also, Defendant Chawla stated to the undercover investigators that he could get as many counterfeit cartons as needed. Additionally, he sold these counterfeit products for prices below $34.00 per carton—authentic cartons cannot be purchased for less than $34.00. (*Id*.; *see also* Gnadinger Decl., at ¶ 29, ECF No. 105 at Pg ID 2912.)

On February 5, 2018, Defendant Sam Chawla sent a letter to the clerk's office informing that he was unable to appear at the February 7, 2018 hearing. (ECF No. 108.) On February 8, 2018, this Court issued an order rescheduling the hearing to February 26, 2018 and permitted Defendant Chawla to participate by telephone. (ECF No. 109.) At the February 26, 2018 hearing, this Court found the Chawla Defendants in contempt of this Court's June 13, 2017 Preliminary Injunction Order. Plaintiffs filed a supplemental brief for damages on March 12, 2018, and on March 27, 2018, Defendant Chawla filed a response stating that he cannot afford to pay the damages Plaintiffs seek.

## II.    Applicable Law & Analysis

### A. Contempt

A decision on a motion for contempt lies within the sound discretion of the court. *See Elec. Workers Pension Trust Fund of Local Union # 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003). While the Supreme Court has advised courts to use their contempt power "sparingly," it also has stated that "the power to punish for contempt is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911); *see also Gary's Elec. Serv.*, 340 F.3d at 378. Contempt proceedings are used to "enforce the message that court orders and judgments are to be

complied with in a prompt manner." *Gary's Elec. Serv.*, 340 F.3d at 378. In civil contempt proceedings, judicial sanctions may be imposed for either or both of two purposes: to coerce the defendant into compliance with the Court's order and to compensate the movant for the losses sustained. *Id*. at 379 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)).

To hold a litigant in contempt, the movant must produce clear and convincing evidence to show a violation of a definite and specific order of the court requiring the litigant to perform or refrain from performing a particular act or acts with knowledge of the court's order. *Id*. (citing *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987)). "Once the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is presently unable to comply with the court's order." *Id*. (emphasis in original). To meet the burden of production in the Sixth Circuit, contemnors must show "'categorically and in detail" ' why they are unable to comply with the Court's order. *Id*. (quoting *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716 720 (6th Cir. 1996)). The court must consider whether the contemnor took all reasonable steps within his power to comply with the court's Order. *Id*.

In the exhibits attached to their contempt motion and at the February 26, 2018 hearing, the Court found that Plaintiffs established by clear and convincing evidence, the following:

1. The Chawla Defendants were served with the preliminary injunction on June 15, 2017.

2. Plaintiffs' investigators contacted Defendant Chawla from the number associated with his eBay and Paypal accounts to purchase counterfeit ZIG-ZAG® products.

3. The Chawla Defendants knowingly sold ten (10) cartons containing two hundred and forty (240) booklets of counterfeit ZIG-ZAG® Orange in Stamford, CT on November 9, 2017.

4. The Chawla Defendants knowingly sold forty (40) cartons containing nine hundred and sixty (960) booklets of counterfeit ZIG-ZAG® Orange in Stamford, CT on December 12, 2017.

5. The Chawla Defendants sold the counterfeit products below $34.00.

6. Sam Chawla indicated to Plaintiffs' investigators that he could get as many ZIG-ZAG products as needed.

7. Plaintiffs' investigators concluded that the products purchased from the Chawla Defendants were counterfeit.

Defendant Chawla continuously stated throughout the hearing that he did not understand the Court's Preliminary Injunction Order. However, the Court notes that Defendant Chawla had been in contact with Plaintiffs' counsel on at least two occasions inquiring about the allegations in the complaint and upcoming deadlines. Surely, if Defendant Chawla was unclear of the Court's order, he could have contacted Plaintiffs' counsel as he had done in the past. The Court does not credit Defendant Chawla's statement that he did not understand the Court's Order. The Preliminary Injunction Order clearly and specifically stated what Defendant Chawla was prohibited from doing, and he knowingly and intentionally violated the Court's Order. *See Adcor Indust. v. BevCorp, LLC*, 411 F. Supp. 2d 778, 800 (N.D. Ohio Nov. 10, 2005) (citing *Polo Fashions, Inc. v. Stock Buyers Int'l Inc.*, 760 F.2d 698, 700 (6th Cir. 1985)).

### B. Damages

Plaintiffs request compensatory damages, pursuant to 15 U.S.C. § 1117(a) [8], reflecting: (1) the Chawla Defendants' gross profits or revenues derived from the

---

[8] Pursuant to 15 U.S.C. § 1117(c), before final judgment, the plaintiff may elect to recover statutory damages or actual damages and profits:

> In a case involving the use of a counterfeit mark (as defined in section 34(d) (15 U.S.C. 1116(d)) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any

sale of the counterfeit products in violation of the Preliminary Injunction Order, (2)

Plaintiffs' loss profits because of the Chawla Defendants' contempt, and (3)

reasonable costs and attorneys' fees for investigating, bringing, and prosecuting the

contempt motion. Plaintiffs also seek treble damages pursuant to 15 U.S.C. §

1117(b).

### 1. Gross Profits/Revenues

Section 1117(a) provides, in relevant part:

> Profits; damages and costs; attorney fees. When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) [15 USCS § 1125(a) or (d)], or a willful violation under section 43(c) [15 USCS § 1125(c)], shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 USCS §§ 1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

"[I]t has been repeatedly assumed that, in a proceeding for civil contempt for

disobedience to an injunction granted in an infringement suit, the profits derived

from the violation of the injunction are recoverable." *Leman v. Krentler-Arnold*

*Hinge Last Co.*, 284 U.S. 448, 457 (1932); *see also Nat'l Drying Mach. Co. v.*

*Ackoff*, 245 F.2d 192, 194 (3d Cir. May 1, 1957); *Howard Johnson Co. v. Khimani*,

892 F.2d 1512, 1519 (11th Cir. 1990) (finding that using the Lanham Act as a

such use in connection with the sale, offering for sale, or
distribution of goods or services . . . .

framework is appropriate for determining compensatory damages for a civil contempt award). Further, damages should be remedial and/or coercive, not punitive. *Stryker v. Davol, Inc.*, 75 F. Supp. 2d 741, 743 (W.D. Mich. July 29, 1999).

Plaintiffs seek the Chawla Defendants' gross profits and revenues from June 2017, when the Court entered the Preliminary Injunction Order, through December 2017, when Plaintiffs filed the instant motion. Plaintiffs argue that they face difficulties establishing Defendant Chawla's profits and sales and rely on *Time Warner Entm't Co., L.P. v. Golden Touch, Inc.*, 2:98-cv-06071 (C.D. Cal. Apr. 19, 1999) (*See* ECF No. 112-1.) However, that case is distinguishable from the facts of this case. In *Time Warner*, the invoices defendants provided omitted monthly sales. Finding the evidence submitted regarding defendants' sales unreliable and that defendants deflated their level of counterfeiting activity, the court awarded plaintiffs compensatory damages based on defendants' average monthly revenues.

Unlike *Time Warner*, other than the sales on November 9, 2017 and December 12, 2017, there was no other evidence that the Chawla Defendants had violated the Court's Preliminary Injunction Order. Specifically, the Court found Defendant Chawla in contempt for his conduct occurring on November 9, 2017 and December 12, 2017. No other contempt finding was made. Moreover, at the February 26, 2018 hearing, Plaintiffs did not show by clear and convincing

evidence that Defendant Chawla engaged in any contemptuous conduct any time other than on November 9, 2017 and December 12, 2017. Therefore, Plaintiffs' damages are limited to their actual damages from the sales occurring on November 9, 2017 and December 12, 2017, which totaled fifty cartons of counterfeit products.

Accordingly, Plaintiffs maintain that the Chawla Defendants earned revenues of $20.80 per counterfeit carton, which represents the weighted average price of the counterfeit cartons sold to Plaintiffs. As such, the Chawla Defendants shall pay Plaintiffs $1,040 (50 x $20.80) for earned revenues. If Plaintiffs seek additional damages for earned revenues, they must show by clear and convincing evidence that Defendant Chawla violated the Court's June 13, 2017 Preliminary Injunction Order.

### 2. Plaintiffs' Lost Profits

Plaintiffs are entitled to recover for lost profits pursuant to § 1117(a). According to Plaintiffs, earned profits for authentic ZIG-ZAG® Orange is $23.46 per carton. The lost profits Plaintiffs incurred because of the Chawla Defendants' sale of counterfeit products (50 cartons x $23.46) is estimated to be $1,173. Therefore, the Chawla Defendants shall pay Plaintiffs $1,173 for lost profits.

### 3. Treble Damages

Plaintiffs seek treble damages pursuant to § 1117(b),

> In assessing damages under subsection (a) for any violation of section 32(1)(a) of this Act [15 USCS § 1114(1)(a)] or section 220506 of title 36, United States Code, in a case involving use of a counterfeit mark or designation (as defined in section 34(d) of this Act [15 USCS § 1116(d)]), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of—
>
> (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 34(d) of this Act [15 USCS § 1116(d)]), in connection with the sale, offering for sale, or distribution of goods or services; or

However, because the Lanham Act is used as a framework, particularly in prejudgment cases such as this one, the Court is not bound by the statutory language and declines to award treble damages.

### 4. Reasonable Attorneys' Fees and Costs

Plaintiffs seek attorney fees in the amount of $40,691.00 for 78.60 hours. Plaintiffs' also seek investigatory fees in the amount of $6,970.21. 15 U.S.C. § 1117(a) and (b) expressly provide for the recovery of reasonable attorney's fees and costs in exceptional cases for the prevailing party. *See also Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006). Plaintiffs are the prevailing party because the Court found the Chawla Defendants in contempt of the Court's June 13, 2017 Preliminary Injunction Order.

Additionally, the Court finds that this case is "exceptional." The Sixth Circuit has held that "a case is not exceptional unless 'the infringement was malicious, fraudulent, willful, or deliberate.'" *Audi AG*, 469 F.3d at 551 (quoting *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004)). The Sixth Circuit has also stated, however, that "[i]t does not … follow that a case will always be 'exceptional' for purposes of awarding attorney fees where the relevant conduct is found to be willful, fraudulent, and deliberate. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997) (quoting 15 U.S.C. § 1117(a)); *see also Coach, Inc. v. Goodfellow*, 717 F.3d 498, 505 (6th Cir. 2013). In *Coach*, the court of appeals held that "[t]he district court was well within its discretion in finding that [the defendants'] intentional, deliberate, or willful ignorance of actual notice of infringing activity made out an 'exceptional case,' permitting award of attorney's fees to the prevailing party under the Lanham Act." 717 F.3d at 506. There, Coach informed the defendant of the infringing activity and his potential liability in January 2010, yet a year and a half later, he still was engaging in the infringing conduct. *Id*. at 504. Similarly, the Chawla Defendants willfully ignored the Court's Order.

In determining the award of attorneys' fees, the Court "must first arrive at the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *U.S. Structures, Inc.*, 130 F.3d at 1193.

Further, the Court should exclude any unnecessary or redundant hours. *Id.*

Finally, "the resulting sum should be adjusted to reflect the 'result obtained.'" *Id.*

"The key requirement for an award of attorney's fees is that the documentation

offered in support of the hours charged must be of sufficient detail and probative

value to enable the court to determine with a high degree of certainty that such

hours were actually and reasonably expended in the prosecution of the litigation."

*Inwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 553 (6th Cir. 2008). "[T]he

district court is required to give a clear explanation" for its award calculation.

*Moore v. Freeman*, 355 F.3d 558, 566 (6th Cir. 2004).

### a. Calculation of the Lodestar Amount

### i. Reasonable Hourly Rate

"To determine a reasonable hourly rate, courts use as a guideline the

prevailing market rate, which is defined as 'the rate that lawyers of comparable

skill and experience can reasonably expect to command within the venue of the

court of record.'" *Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d

686, 715 (6th Cir. Aug. 1, 2016) (citing *Geier v. Sundquist*, 372 F.3d 784, 791 (6th

Cir. 2004)). To determine the reasonable rate amount for purposes of this

contempt order, the Court will use its discretion and apply the prevailing market

rate for the Eastern District of Michigan. *See, e.g.*, *Husted*, 831 F.3d at 715-16

("Thus, the appropriate rate is not necessarily the exact rate of a particular firm, but

the market rate in the venue sufficient to encourage competent lawyers in the relevant community to undertake legal representation."); *Anglo-Danish Fibre Indus. v. Columbia Rope Co.*, No. 01-2133, 2003 U.S. Dist. LEXIS, at \*7 (W.D. Tenn. Jan. 28, 2003) (applying the prevailing rate of that of the venue); *accord Horace v. Pontiac*, 624 F.2d 765, 770 (6th Cir. 1980); *Louisville Black Police Officers Org., Inc. v. Louisville*, 700 F.2d 268, 277-78 (6th Cir. 1982). Plaintiffs rely on the State Bar of Michigan's "2017 Economics of Law Practice Attorney Income and Billing Rate Summary Report" and the "American Intellectual Property Law Association Law Practice 2017 Report of the Economic Survey" ("AIPLA"). The Court will use the AIPLA because it better reflects the rates of IP attorneys. *See Husted*, 831 F.3d at 716 ("A district court may look to 'a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests.'").

The rates of Plaintiffs' attorneys are as follows: (1) Marcia Ballard - $745-$755; (2) Victoria R. Danta - $565-$595; (3) Maria R. Sinatra - $335-$435; (4) Lyndsay S. Ott - $325; and (5) Brian Wassom - $430. Plaintiffs also seek fees for their paralegal Delia Green at a rate of $335. Attorneys Ballard, Danta, and Sinatra base their rates on the prevailing market rates of the New York City metropolitan area, where their firm is located. According to the AIPLA, in New York, the median rate for a partner is $540, and the median rate for an associate is $413.

However, in Michigan, which the AIPLA considers "Other Central," the median rate for a partner is $378, and the median rate for an associate is $260. For purposes of this contempt motion, the Court will use its discretion and apply the median rates for Michigan/"Other Central" as the prevailing market rate.

## ii. Reasonable Hours Expended

Next, the Court must determine whether the billed hours were reasonable. In its discretion, the Court may reduce the award if it finds that some of the fees were unreasonable, excessive, or redundant. *See Anglo-Danish Fibre Indus., Ltd.*, 2003 U.S. Dist. LEXIS 10386, at *3.

> The question is not whether a party prevailed on a particular motion, nor whether, in hindsight, the time expended was strictly necessary to obtain relief achieved; instead, the question is whether a reasonable attorney would believe the work to be reasonably expended in pursuit of success at the time when the work was performed.

*Trentham v. Hidden Mt. Resorts, Inc.*, No. 08-cv-23, 2010 U.S. Dist. LEXIS 145380, at *6-7 (E.D. Tenn. Sept. 2, 2010) (citation omitted). As such, the plaintiff must demonstrate that the amount of hours claimed is reasonable. *Id.*

According to the billing records, Marcia Ballard, partner, expended 13.10 hours relating to the contempt proceeding. (ECF No. 113-4 at Pg ID 3024-25.) However, the December 22, 2017 billing entry, "contempt motion for Chawla; communications relating to same," appears to be unreasonable in light of the

motion having been filed on December 21, 2017. Additionally, "communications relating to the same" is unclear. Therefore, the Court will reduce Ms. Ballard's hours expended from 13.10 to 11.6.

Based on the billing records, Victoria R. Danta expended 37.1 hours[9] relating to the contempt proceeding. (ECF No. 113 at Pg ID 3006.) However, the Court finds Ms. Danta's hours excessive. Ms. Danta billed approximately 12.3 hours for drafting and editing the contempt motion. Those hours do not include the 6.5 hours Ms. Ballard, Ms. Ott, and Mr. Wassom collectively expended on editing the contempt motion. In light of the additional 6.5 hours, other attorneys expended on performing the same task, the Court finds the 12.3 hours excessive and will deduct 5 hours from the time Ms. Danta spent drafting and editing the contempt motion.

Additionally, Ms. Danta and Ms. Sinatra billed a total of 5.7 hours for drafting an outline for the contempt hearing. The 5.7 hours expended drafting an outline for a hearing that was largely based on the motion and its attachments is excessive and unreasonable. As such, the Court will exclude the 3.4 hours expended by Ms. Danta. Therefore, the Court will reduce Ms. Danta's hours from 37.1 to 28.7.

---

[9] Due to the slight discrepancy in Ms. Danta's hours, the total number of fees Plaintiffs request is 79 hours.

Maria R. Sinatra expended 11.30 hours relating to the contempt motion. (ECF No. 113 at Pg ID 3005.) The Court is excluding two of the December 21, 2017 billing entries described as "[a]ttending to Chawla contempt motion" because they are not sufficiently detailed. *See Anglo-Danish Fibre Indus.*, 2013 U.S. Dist. 10386, at * 19 ("Attorneys must 'maintain billing time records that are sufficiently detailed to enable the courts to review the reasonableness of the hours expended.' . . . [E]ntries that 'provide little guidance in ascertaining the purpose of the work during the time claimed do not merit an award.'") (internal citations omitted).

Additionally, the Court finds excessive the 4.5 hours billed for drafting and editing Hood's and Gnadinger's declarations, particularly because the same declarations were submitted previously on March 28, 2017. Although the Court recognizes the declarations were modified for purposes of the contempt motion, the modifications do not warrant 4.5 hours of time. The Court will reduce the hours to 2.5. Therefore, Ms. Sinatra's hours will be reduced from 11.30 to 8.9.

Lyndsay S. Ott stated that she expended 16.40 hours relating to the contempt motion. (ECF No. 114 at Pg ID 3039.) The billing entries for December 6, 2017, February 27, 2018 and one of the entries for February 28, 2018 and March 6, 2018 will be excluded because they either are not sufficiently detailed or do not appear to be related to the contempt motion. *See Anglo-Danish Fibre Indus.*, 2013 U.S. Dist. 10386, at * 19. The December 6, 2017 billing entry refers to a telephone

conference with the magistrate's chambers and an email to Ms. Danta. (ECF No. 114-4 at Pg ID 3074.) The February 27, 2018 billing entry states "[r]eview email correspondence regarding Ryan Connolly." (*Id.*) One of the February 28, 2018 billing entries provides "[e]mail correspondence to Venable team regarding DHGate." (*Id.*) Finally, one of the March 6, 2018 billing entries states "[a]ttention to returned mailings." Based on those descriptions, the Court is not in a position to determine if those hours were related to the contempt motion. Therefore, the Court will exclude 1.3 hours. Accordingly, Ms. Ott's expended hours will be reduced from 16.40 to 15.1.

Also according to the attorneys' fees affidavit, Brian Wassom, partner, expended 0.50 hours relating to the contempt motion. (ECF No. 114 at Pg ID 3039.) The Court finds Mr. Wassom's time expended reviewing and commenting on the contempt motion is reasonable.

Finally, Plaintiffs' seek fees for their paralegal, Delia R. Green, for 0.60 hours expended for reviewing ECF notices, downloading documents and updating the pleadings record, all of which the Court finds are related to the contempt motion and reasonable.

Upon determining that 13.6 hours were either unreasonable, excessive, or not sufficiently detailed, the Court finds that Plaintiffs expended 63.7 hours relating to the contempt motion. Applying the AIPLA's rate for partners in

Michigan, the Court finds that Marcia Ballard and Brian Wassom collectively expended 12.1 hours at a rate of $378, totaling $4,573.80. Applying the AIPLA's rate for associates in Michigan, the Court finds that Victoria R. Danta, Maria R. Sinatra, and Lyndsay S. Ott collectively expended 52.7 hours at a rate of $260, totaling $13,702. Ms. Green expended 0.60 hours at a reduced rate of $167.50, totaling $100.50. Accordingly, Plaintiffs' attorneys' fees total $18,376.30.

### b. Adjustment of Lodestar Amount

Upon determining the lodestar amount, in its discretion, the Court may adjust the award upward or downward to reflect a reasonable award. "This lodestar figure may then be increased or decreased based on a variety of factors, such as skill and time required, novelty of the questions involved, fixed or contingent fee basis, results obtained, and/or relationship between attorney and client." *Veteran Med. Prods. v. Bionix Dev. Corp*., No. 5-cv-655, 2010 U.S. Dist. LEXIS 24147, at *9 (W.D. Mich. Mar. 16, 2010) (citing *Maxwell v. Angel-Etts of Cal.*, 53 F. App'x 561, 568 (Fed. Cir. Dec. 13, 2002)). Although the Court reviewed Plaintiffs' billing records line by line and reduced the hours because they were either excessive, unreasonable or not sufficiently detailed, in totality the Court finds 63.7 hours relating to this contempt motion unreasonable. *See e.g.*, *Nat'l Bus. Dev. Servs. v. Am. Credit Educ. & Consulting, Inc*., No. 07-11140, 2007 U.S. Dist. LEXIS 92994, at *9-11 (E.D. Mich. Dec. 19, 2007) (reducing attorneys'

fees upon a finding that an unreasonable amount of time was allocated); *see also Trentham*, 2010 U.S. Dist. LEXIS, at *6-7 ("[T]he question is whether a reasonable attorney would believe the work to be reasonably expended in pursuit of success at the time when the work was performed.")

Plaintiffs attempt to request 79 hours for attorneys' fees for five attorneys, including two partners, for work relating to this contempt motion is unreasonable. Finding that the contempt motion did not require a significant level of skill or time, or present any level of difficulty, the Court will adjust the lodestar amount downward to reflect a reasonable award. Ultimately, the Court will reduce the total number of hours collectively billed by Ms. Danta, Ms. Sinatra, and Ms. Ott from 52.7 hours to 26.35 at a rate of $260, totaling $6,851. The attorneys' fees for Ms. Ballard and Mr. Wassom will remain at $4,573.80. Likewise, the paralegal fees for Ms. Green will remain at $100.50. In total, the Court will award $11,525.30 in attorneys' fees.

### c. Expenses

Finally, Plaintiffs request $6,970.21 in investigatory fees. The Court finds that the investigatory costs all relate to the two buys that occurred on November 9, 2017 and December 12, 2017. (*See* ECF No. 113-5 at Pg ID 3028-33.) The investigators incurred fees for their time, travel, and meetings with Defendant

Chawla. Accordingly, the Court finds that the investigatory costs in the amount of $6,970.21 are reasonable.

## III. Conclusion

Accordingly, for the foregoing reasons the Chawla Defendants are in contempt of the Court's June 13, 2017 Preliminary Injunction Order. The Chawla Defendants shall pay Plaintiffs (1) $1,040 for earned revenues, (2) $1,173 for lost profits; (3) $11,525.30 for reasonable attorneys' fees; and (4) $6,970.21 in costs.

**IT IS ORDERED** that Plaintiffs' motion for contempt (ECF No. 102) is **GRANTED, in part, and DENIED, in part**; and

**IT IS FURTHER ORDERED** that the Chawla Defendants are in contempt of the Court's June 13, 2017 Preliminary Injunction Order and shall pay Plaintiffs: (1) $1,040 for earned revenues; (2) $1,173 for lost profits; (3) attorneys' fees in amount of $11,525.30; and (4) costs in the amount of $6,970.21; and

**IT IS FURTHER ORDERED** that if the Chawla Defendants continue to violate this Court's June 13, 2017 Preliminary Injunction Order, they shall pay $1,000 for each violation in addition to reasonable attorneys' fees and costs.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: June 19, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, June 19, 2018, by electronic and/or U.S. First Class mail.

s/ R. Loury         <br>
Case Manager