# EXHIBIT 2

1) *Coach Servs. v. Wireless Star, Inc*., No. 12-11223, 2013 U.S. Dist. LEXIS 40361 (E.D. Mich. Feb. 11, 2013)

2) *Coach, Inc. v. Bros. Gas & Mart, Inc.,* No. 12-cv-10609, 2013 U.S. Dist. LEXIS 49944 (E.D. Mich. Apr. 8, 2013)

3) *Coach, Inc. v. Chouman's Ass'n*, No. 11-cv-15665, 2012 U.S. Dist. LEXIS 181896, at *7-9 (E.D. Mich. Dec. 26, 2012)

4) *Coach, Inc. v. Da Hook Up Ltd.,* No. 10-cv-11710 (E.D. Mich. July 11, 2011)

5) *Coach, Inc. v. O'Brien*, No. 10-cv-6071, 2012 U.S. Dist. LEXIS 52565 (S.D.N.Y. Apr. 13, 2012)

6) *Fila U.S.A. v. Run Run Trading Corp.,* No. 95 Civ. 7144, 1996 WL 271992 (S.D.N.Y. May 21, 1996)

7) *Goulas v. Maxmo, Inc.,* No. 14-cv-10993, 2014 WL 2515217 (E.D. Mich. June 4, 2014)

8) *North. Atl. Operating Co., Inc. v. Evergreen Dist., LLC*, No. 13-cv-4974-ERK-VMS (E.D.N.Y. Jan. 5, 2015)

9) *North Atl. Oper. Co., Inc. v. ABC Mini Market*, No. 12-cv-12063-FDS (D. Mass. Oct. 22, 2013)

10) *North Atl. Oper. Co., Inc., et al. v. Walter C. Scott et al*., No. 16-12076-TGB-DRG (E.D. Mich. Sept. 28, 2018)

11) *North Face Apparel Corp. v. Moler*, No. 12-cv-6688, 2015 U.S. Dist. LEXIS 93133 (S.D.N.Y. July 16, 2015)

12) *Otter Prods., LLC v. Berrios*, No. 13-cv-4384, 2013 U.S. Dist. LEXIS 147139 (C.D. Cal. Oct. 10, 2013)

18052939

**1**

 Positive
As of: February 9, 2018 4:55 PM Z

# *Coach Servs. v. Wireless Star, Inc.*

United States District Court for the Eastern District of Michigan, Southern Division

February 11, 2013, Decided; February 11, 2013, Filed

CIVIL ACTION NO. 12-11223

**Reporter**
2013 U.S. Dist. LEXIS 40361 *; 2013 WL 1181903

COACH SERVICES, INC, et al., Plaintiffs, v. WIRELESS STAR, INC., et al., Defendants.

**Subsequent History:** Adopted by, Motion granted by, Judgment entered by, in part *Coach Servs. v. Wireless Star, Inc., 2013 U.S. Dist. LEXIS 39206 ( E.D. Mich., Mar. 21, 2013)*

## Core Terms

infringement, damages, RECOMMENDATION, entry of default, default

**Counsel:** [*1] For Coach Services, Inc., Coach, Inc., Plaintiffs: Jacob Joseph Sadler, Warner Norcross & Judd LLP (Grand Rapids), Grand Rapids, MI; Kristina M. Araya - NOT SWORN, Warner Norcross & Judd LLP, Grand Rapids, MI; Katherine Lynn Brooks, Warner Norcross & Judd LLP, Southfield, MI.

Jimmy Bynum, Defendant, Pro se, Hamtramck, MI.

**Judges:** MARK A. RANDON, UNITED STATES MAGISTRATE JUDGE. HONORABLE MARK A. GOLDSMITH.

**Opinion by:** MARK A. RANDON

## Opinion

### REPORT AND RECOMMENDATION TO GRANT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

#### I. RECOMMENDATION

For the reasons stated below, this Magistrate Judge **RECOMMENDS** that a Judgment in favor of Plaintiffs Coach, Inc. and Coach Services, Inc. (collectively, "Coach") be entered against Wireless Star, Inc.

("Wireless Star") in the amount of Two Million Dollars ($2,000,000.00) plus costs and attorney fees.

#### II. BACKGROUND AND PROCEDURAL HISTORY

Coach is an American leather goods company which sells *inter alia*: designer purses, handbags, wallets, shoes and jewelry. Coach filed suit against Jimmy Bynum and Wireless Star (collectively "Defendants") alleging Defendants sold counterfeit Coach merchandise (Dkt. 1). Summonses were issued for Defendants and they were served on March 26, 2012: Bynum was personally [*2] served with a summons and complaint on behalf of himself and as an officer of Wireless Star (Dkts. 7, 8). On April 30, 2012, Bynum filed a *pro se* Answer (Dkt. 10); Wireless Star did not Answer Coach's Complaint.

The Clerk entered a default against Wireless Star on September 10, 2012 (Dkt. 21); Coach moved for entry of a default judgment on September 21, 2012, pursuant to *Fed. R. Civ. P. 55(b)(2)*. Despite the passage of several months since the entry of default, Wireless Star has neither appeared nor responded to Coach's motion for entry of default judgment.

This matter is before the Court on Coach's Motion for Default Judgment as to Wireless Star (Dkt. 24). Judge Mark A. Goldsmith referred the motion to this Magistrate Judge for a report and recommendation under *28 U.S.C. § 636(b)(1)(B)* (Dkt. 14).

#### III. ANALYSIS

##### A. Service was Proper

This Magistrate Judge finds Coach properly served Wireless Star. The Federal Rules of Civil Procedure permit service on a corporation "by delivering a copy of

2013 U.S. Dist. LEXIS 40361, *2

the summons and of the complaint to an officer [of the corporation]." *Fed. R. Civ. P. 4(h)(1)(B).*

## B. The Amount of Damages Requested is Reasonable

"Once a default is entered against a defendant, that party **[*3]** is deemed to have admitted all of the well pleaded allegations in the complaint, except for those relating to damages." *Microsoft Corp. v. McGee, 490 F.Supp.2d 874 (S.D. Ohio 2007)* (citing *Antoine v. Atlas Turner, Inc., 66 F.3d 105, 110-111 (6th Cir.1995)).* "Where the factual allegations of the complaint provide a sufficient legal basis for an entry of a default judgment, the court then conducts an inquiry to ascertain the amount of damages." *Coach, Inc. v. Cellular Planet, 2010 U.S. Dist. LEXIS 45087, 2010 WL 1853424 at *3 (S.D. Ohio May 7, 2010).*

This Magistrate Judge has reviewed Coach's Complaint and Declaration (Dkts. 1, 24-3) and finds they provide a sufficient legal basis for entry of a default judgment against Wireless Star for: trademark infringement, trade dress infringement, trademark dilution, false designation of origin and false advertising under the Lanham Act (*15 U.S.C. §§ 1114, 1116, 1117, 1125(a) and (c)*); copyright infringement under the United States Copyright Act (*17 U.S.C. § 501 et seq.*); unfair business practices under the Michigan Consumer Protection Act (*Mich. Comp. Laws § 445.903*); and unfair competition, copyright infringement and unjust enrichment under Michigan common law.

Coach's request **[*4]** for $2,000,000.00 in damages is also reasonable. Coach's Declaration states that on February 21, 2012, during the execution of a search warrant, "seventeen counterfeit 'Coach' items were observed and seized" from Wireless Star at its location on Joseph Campau Street in Hamtramck, Michigan (Dkt. 24-3, ¶¶ 14-15). Statutory damages for trademark infringement are available for up to $200,000.00 per counterfeit trademark infringed, regardless of willfulness, and enhanced up to $2,000,000.00 per mark if the infringement is willful. *15 U.S.C. § 1117(c).* Accordingly, Coach would be entitled to receive up to $3,400,000.00 in statutory damages (17 infringing products multiplied by $200,000.00). *See Microsoft v. McGee, 490 F.Supp.2d 874, 882 (S.D. Ohio 2007)*("statutory damages are appropriate in default judgment cases because the information needed to prove actual damages is within the infringers' control and is not disclosed."). This is less than the $2,000,000.00 in damages Coach requests.

## IV. CONCLUSION

For the reasons stated above, this Magistrate Judge **RECOMMENDS** that Coach's motion be **GRANTED** and Judgment be entered in favor of Coach and against Wireless Star for Two Million Dollars ($2,000,000.00) **[*5]** plus costs and attorney fees.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in *28 U.S.C. § 636(b)(1)* and *Fed.R.Civ.P. 72(b)(2).* Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981).* The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs., 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).* Pursuant to *E.D. Mich. LR 72.1(d)(2),* a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended **[*6]** by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

/s/ Mark A. Randon

MARK A. RANDON

UNITED STATES MAGISTRATE JUDGE

Dated: February 11, 2013

End of Document

**2**

ⓘ Cited
As of: February 9, 2018 4:56 PM Z

## *Coach, Inc. v. Bros. Gas & Mart, Inc.*

United States District Court for the Eastern District of Michigan, Southern Division

April 8, 2013, Decided; April 8, 2013, Filed

Civil Action No. 12-cv-10609

**Reporter**
2013 U.S. Dist. LEXIS 49944 *; 2013 WL 1414435

COACH, INC., and COACH SERVICES, INC., Plaintiffs, vs. BROTHERS GAS & MART, INC., CRISTINA A. ANGELES, HUSSEIN A. BAZZI, and JOHN DOES 1-10, Defendants.

## Core Terms

infringement, counterfeit, defaults, trademark, statutory damages, products, electronically, email, attorney's fees, pleadings, entry of default, investigative, violations, default judgment, individually, damages, costs

**Counsel:** [*1] For Coach, Inc., Coach Services, Inc., Plaintiffs: Katherine Lynn Brooks, Warner Norcross & Judd LLP, Southfield, MI; Jacob Joseph Sadler, Warner Norcross & Judd LLP (Grand Rapids), Grand Rapids, MI.

**Judges:** PAUL D. BORMAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** PAUL D. BORMAN

## Opinion

### OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT (Dkt. No. 19)

Plaintiffs Coach, Inc. and Coach Services, Inc. ("Plaintiffs") filed the Complaint in this matter on February 10, 2012, alleging trademark violations under the Lanham Act, *15 U.S.C. §§ 1114, 1125(a)* and *(c)*, copyright infringement under the United States Copyright Act, *17 U.S.C. § 501, et seq.*, violations of the Michigan Consumer Protection Act, *Mich. Comp. Laws § 445.903*, and common law unfair competition and unjust enrichment claims. (Dkt. No. 1.) The named Defendants are Brothers Gas & Mart, Inc., Cristina Angeles, Hussein A. Bazzi, and John Does 1-10

("Defendants").

Plaintiffs filed a Certificate of Service reflecting service on Defendant Brothers Gas & Mart, Inc., on February 28, 2012. (Dkt. No. 8.) The certificate reflected that Hassan Bazzi [1] accepted personal service on behalf of Defendant Brothers Gas & Mart, Inc., on February 22, 2012. Plaintiffs [*2] filed Certificates of Service for Defendants Hussein A. Bazzi and Cristina M. Angeles on March 20, 2012, reflecting that both of these Defendants were individually served with a Summons and Complaint on March 10, 2012, and March 12, 2012, respectively. (Dkt. Nos. 9, 10.)

Defendants have not filed a notice of appearance. However, they are represented by counsel. Plaintiffs admit that they were served with an Answer to the Complaint, which was signed by attorney Thomas H. Stidham. (Pls.' Br. in Supp. of Mot. for Default Judgment at 4.) However, Defendants' Answer was never electronically filed on the Court's CM/ECF docket, as required under the Eastern District of Michigan Local Rules. *See E.D. Mich. LR 5.1(a)* (stating that all papers presented for filing "must be filed electronically.").

On April 24, 2012, after receiving the un-filed Answer, Plaintiffs' counsel contacted attorney Stidham, stating: "the court rules require that you electronically file these answers. Please do so as soon as possible." (Pls.' Mot., Ex. 3, April 24, 2012 email.) Attorney Stidham [*3] responded to Plaintiffs' counsel on April 26, 2012, claiming that he had "encountered an issue with [his] Pacer registration and [was] working to correct same." (Pls.' Mot., Ex. 4, April 26, 2012 email.)

On May 21, 2012, the Court issued an Order to Show Cause why this case should not be dismissed for failure to prosecute. (Dkt. No. 11.) Plaintiffs' counsel forwarded

---

[1] This may be a misspelling of Defendant Hussein Bazzi's first name by the process server, but it is not clear from the pleadings.

the Court's Show Cause Order to attorney Stidham, requesting that he "immediately electronically file [his] answer as required by the federal rules or we will respond with a request that a default be entered." (Pls.' Mot., Ex. 5, May 21, 2012 email.) Defendants did not file an Answer or any other pleadings with the Court. On June 5, 2012, Plaintiffs' counsel again emailed attorney Stidham and informed him that Plaintiffs were filing Requests for Clerk's Entry of Default. (Pls.' Mot., Ex. 6, June 5, 2012 email.) The Court Clerk entered defaults against the three Defendants on June 5, 2012. (Dkt. Nos. 16, 17, and 18.)

On June 29, 2012, Plaintiffs filed the instant Motion for Entry of Default Judgment. (Dkt. No. 19.) Defendants did not file a response. Attorney Stidham did, however, appear and argue on behalf of Defendants [*4] at the December 6, 2012, hearing on Plaintiffs' Motion.

For the reasons stated below, the Court will GRANT Plaintiffs' Motion.

## I. BACKGROUND

A default has been entered in this case and all Plaintiffs' well-pleaded allegations are deemed admitted by Defendants. *Ford Motor Co. v. Cross, 441 F.Supp.2d 837, 846 (E.D. Mich. 2006).*

Defendants Cristina Angeles and Hussein Bazzi conduct business through Defendant Brothers Gas & Mart, Inc., via a retail establishment located at 13605 Fenkell Street in Detroit, Michigan. Plaintiffs' Intellectual Property Coordinator, Dayanara Perez, provided the following facts via a signed declaration attached to Plaintiffs' Motion. (Pls.' Mot., Ex. 2, Perez Decl.)

Plaintiffs manufacture and sell various products under the Coach brand through specialty retail stores, department stores, catalogs, and the Internet. (Perez Decl. ¶ 4.) Plaintiffs use a variety of unique and protected marks in connection with the manufacture and sale of their Coach products. (Perez Decl. ¶ 5.)

In January 2012, the Detroit Consumer Affairs Division of the Detroit Police Department notified a Coach representative that suspected counterfeit Coach items were being sold at Brothers Gas & Mart, [*5] Inc. (Perez Decl. ¶ 15.) Coach representatives, along with Detroit police and members of the Department of Homeland Security, investigated Defendants' store and "observed numerous items being displayed and offered for sale, which were purportedly manufactured by

Coach." (*Id.*) Twenty counterfeit "Coach" items, which infringed 10 different Coach trademarks and one Coach copyright, were seized. (Perez Decl. ¶¶ 15-16.)

Plaintiffs allege that Defendants knowingly and intentionally infringed the Coach trademarks by offering the counterfeit items for sale. (Compl. ¶ 29.) Plaintiffs also seek to hold Defendants Angeles and Bazzi personally liable.

## II. LEGAL STANDARD

Where damages are for an uncertain amount, a party must apply to the Court for a default judgment. Entry of default judgment by the Court is governed by *Federal Rule of Civil Procedure 55(b)(2)*. The rule states that, in entering a default judgment:

> [t]he court may conduct hearings or make referrals — preserving any federal statutory right to a jury trial — when, to enter or effectuate judgment, it needs to:
> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
>
> (D) investigate [*6] any other matter.

Under *Federal Rule of Civil Procedure 54(c)*, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

## III. ANALYSIS

An entry of default admits Defendants' liability, but "the amount of damages must be proven." *Antoine v. Atlas Turner, Inc., 66 F.3d 105, 110 (6th Cir. 1995)* (citation omitted). The entries of default against Defendants thus establishes their liability for the trademark, trade dress, copyright, and state-law claims alleged in the Complaint. Plaintiffs now seek $2,000,000 in statutory damages, as well as attorney's fees and $220.08 in investigative costs.

### A. Statutory Damages

Plaintiffs seek statutory damages pursuant to *15 U.S.C. § 1117(c)*, which provides that "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits .

. ., an award of statutory damages . . . ." The statute provides that a plaintiff seeking statutory damages in a trademark infringement case may be awarded "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers [*7] just . . . ." *15 U.S.C. § 1117(c)(1)*. Where the use of the counterfeit mark was willful, a plaintiff may receive "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." *15 U.S.C. § 1117(c)(2)*.

The Perez declaration states that "approximately 20 counterfeit 'Coach' items were observed and seized from Defendants' store." (Perez Decl. ¶ 15.) Ms. Perez further states that the products infringed ten different Coach trademarks, and one Coach copyright. (Perez Decl. ¶ 16.)

Plaintiffs contend that Defendants can be liable for up to $2,000,000 per counterfeit mark per good, because the defaults entered in this matter establish that Defendants acted willfully. (Compl. ¶ 32.) Plaintiffs thus claim that the Court may award up to $20,000,000 for Defendants' violations and still be within the amount allowable under the statute. However, Defendants seek "only" $2,000,000. Plaintiffs argue that this amount would send a strong message of deterrence to potential infringers, and would adequately compensate Plaintiffs for their damages.

The Court finds that given the evidence set forth in the Perez Declaration — that [*8] Defendants willfully infringed ten different Coach trademarks and one Coach copyright — an award of $500,000 in statutory damages is reasonable. This amount is consistent with statutory damages awarded in similar cases. *See e.g., Coach, Inc. v. Da Hook Up Ltd.*, No. 10-11710 (E.D. Mich. July 11, 2011) (awarding statutory damages of $1,200,000 on default judgment, where defendants had twenty to thirty counterfeit "Coach" handbags and at least ten pairs of counterfeit "Coach" shoes and boots).

Under the Lanham Act, corporate officers and employees can be held individually liable for the actions of the corporation "when the employee or corporate officer personally takes part in the infringing activity or directs others to do so." *Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC, No. 07-13523, 2009 U.S. Dist. LEXIS 90393, 2009 WL 3199882, at *11 (E.D. Mich. Sept. 30, 2009)* (Zatkoff, J.); *see also Coach, Inc. v. Younes Corp., Inc., No. 11-11559, 2012 U.S. Dist. LEXIS 144516, 2012 WL 4757925, at *2 (E.D. Mich.*

*Oct. 5, 2012)* (Cook, J.); *Hair Assocs., Inc. v. Nat'l Hair Replacement Servs. Inc., 987 F. Supp. 569, 590 (W.D. Mich. 1997)* (holding that "a corporate officer's active participation in infringing activity is sufficient to subject him or her [*9] to joint and several liability for trademark infringement with the corporation."); *Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996)* (holding that a person "who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." (citation omitted)).

As noted *supra*, the defaults entered in this case establish that Defendants Bazzi and Angeles acted intentionally, or with willful blindness, when they offered counterfeit Coach products for sale at the Brothers Gas & Mart, Inc., retail location. (Compl. ¶ 32.) Defendants are therefore individually liable for the Lanham Act violations.

**B. Defense Counsel's Arguments/Failure to Plead**

At the December 6, 2012 hearing, Defendants' attorney, Thomas Stidham, argued that Defendant Angeles should not be held individually liable because she was not "a moving, active conscious force behind the defendant corporation's infringement." *See Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 913 (E.D.N.Y. 1988)* (citation and punctuation omitted). Attorney Stidham also argued that Defendant Bazzi should not be held liable [*10] because he is merely an employee of Defendant Brothers Gas & Mart, Inc., not a corporate officer or shareholder, and that, based on the sale price of the counterfeit "Coach" products and the number of convenience stores that carry similar items, the employees did not know that the products were counterfeit. In support of these defenses, attorney Stidham stated at the hearing that the counterfeit products at Defendants' store were sold for $15 to $20 each. However, attorney Stidham did not bring any sales records to the hearing, nor did he supply any to Plaintiffs' counsel.

At the December 6, 2012 hearing, attorney Stidham's only requested relief was permission to file the Answer via the CM/ECF system, denial of Plaintiffs' Motion for Default Judgment, or alternatively, an evidentiary hearing to determine the individual liability of Defendants Angeles and Bazzi. Attorney Stidham has not filed a motion to set aside the defaults in this matter, and also did not invoke *Federal Rule of Civil Procedure*

55(c) [2] at the December 6, 2012 hearing, or make any attempt to satisfy the three "good cause" factors under Rule 55(c). See Dassault Systemes, SA v. Childress, 663 F.3d 832, 838-39 (6th Cir. 2011) [*11] (providing that a court reviewing a motion to set aside a default should consider "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious."). The Court does not find that attorney Stidham's proffered defense regarding Defendants' lack of knowledge based on the price of the bags constitutes a "meritorious defense." As Eastern District of Michigan Judge Julian Abele Cook noted in Coach, Inc. v. Younes Corp. Inc., supra, "it is enough for the purpose of the Lanham Act that the defendant failed to inquire further because he was afraid of what the inquiry would yield. Willful blindness is knowledge enough." 2012 U.S. Dist. LEXIS 144516, 2012 WL 4757925 at *2 (quoting Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir. 1989) (punctuation omitted)). Regarding Defendant Angeles, courts in this District have held that a corporate officer can be held individually liable for Lanham Act violations where the officer "had the right and ability to supervise the infringing activity and also had a direct financial interest in such activities." Days Inn Worldwide, supra, at *12 (citation omitted). Defendant Angeles was the President of Defendant Brothers Gas [*12] & Mart, Inc., and certainly had both the authority to supervise her employees who sold the counterfeit "Coach" products, and a financial interest in the sale of the products.

The Court further finds that Defendants' counsel's actions, or lack thereof, in the instant matter demonstrate a reckless disregard for these proceedings, which also weighs against setting aside the defaults and allowing the case to proceed. See Shepard Claims Service, Inc. v. William Darrah & Assoc., 796 F.2d 190, 194 (6th Cir. 1986) (noting that a default should not be set aside where "the conduct of a defendant . . . display[s] either an intent to thwart [the] judicial proceedings or a reckless disregard for the effect of its conduct on those proceedings."); see also Yeschick v. Mineta, 675 F.3d 622, 629 (6th Cir. 2012) (noting that "[c]lients are held accountable for their attorneys' acts and omissions.").

Attorney Stidham stated at the December 6, 2012 hearing, that he was unable to file an Answer or any other pleading in this matter because his registration for

the Court's CM/ECF electronic filing system [*13] is not complete. At the same time, attorney Stidham claimed that he was working with Eastern District of Michigan Judge George Caram Steeh to submit CM/ECF filings in a different case, but he never contacted this Court regarding any filings in this matter. Furthermore, attorney Stidham admitted at the hearing that other attorneys in his office had joined him on this case and filed pleadings using CM/ECF, but that never occurred in the nearly 10 months between the filing of the Complaint and the December 6, 2012 hearing on Plaintiffs' Motion for Default Judgment. Attorney Stidham also admitted that, despite his inability to file any pleadings electronically, he never delivered a courtesy copy of the Answer or any other pleading to this Court, as required under this Court's motion practice guidelines.

Furthermore, attorney Stidham was aware of the Court's Show Cause Order directed to Plaintiffs' counsel, and of Plaintiffs' counsel's intent to file defaults in this matter, because Plaintiffs' counsel informed him of both in an email. (Pls.' Mot., Ex. 5, May 21, 2012 email.) Nevertheless, after receiving Plaintiffs' counsel's email, attorney Stidham still did not contact this Court, [*14] nor did he request any other attorneys in his office who could access the docket via the CM/ECF system to file any pleadings in this case.

At the December 6, 2012 hearing, attorney Stidham requested, in part, that he be allowed to electronically file an Answer to the Complaint in this matter. Defendants have always been allowed to file an Answer in this case; no order of the Court has disallowed them from doing so. Defendants have simply failed to plead at all, apparently due to attorney Stidham's incomplete CM/ECF registration, and failure to contact the Court or any attorney in his office to arrange an alternate means for electronic filing.

The remaining relief requested by Attorney Stidham at the December 6, 2012 hearing will be denied for the reasons stated above.

## C. Attorney's Fees and Costs

Plaintiffs seek attorney's fees for Defendants' trademark infringement, pursuant to 15 U.S.C. § 1117, or for Defendants' copyright infringement under 17 U.S.C. § 505 (providing that "the court in its discretion may allow the recovery of full costs by or against any party[,]" and allowing "a reasonable attorney's fee to the prevailing

---

[2] Fed. R. Civ. P. 55(c) provides: "[t]he court may set aside an entry of default for good cause . . . ."

party as part of the costs."). Where a defendant willfully infringes [*15] copyrights and trademarks, an award of attorney's fees is appropriate. See *Microsoft Corp. v. Compusource Distributors, Inc., 115 F. Supp. 2d 800, 812 (E.D. Mich. 2000)*.

While Defendants' attorney has drafted an Answer to the Complaint in this matter, he has not filed it as required under the Eastern District of Michigan Local Rules. Defendants have not filed any responsive pleadings or otherwise appeared in this matter. An award of attorney's fees is therefore warranted, as Defendants are thus deemed to have admitted the willful violations alleged in the Complaint. See *Ford Motor Co., 441 F. Supp. 2d at 846*.

Plaintiffs assert that their counsel, Warner Norcross & Judd LLP, will submit an affidavit substantiating the attorney hours spent on this case after entry of default judgment by the Court.

Plaintiffs also seek investigative costs of $220.08, related to the investigation of the counterfeit items recovered from Defendants' store. (Perez Decl. ¶ 19.)

Although they are not specifically provided for under *§ 1117(c)*, Courts have awarded investigation fees in similar cases. See *Da Hook Up, supra; see also Fila U.S.A., Inc. v. Run Run Trading Corp., No. 95 CV 7144, 1996 U.S. Dist. LEXIS 6893, 1996 WL 271992, at *4 (S.D.N.Y. May 21, 1996)*. [*16] Accordingly, Plaintiffs will be awarded investigative fees in the amount of $220.08.

## IV. CONCLUSION

For the reasons stated above, the Court will:

(1) GRANT Plaintiffs' Motion for Default Judgment, and

(2) ORDER that Plaintiffs are awarded statutory damages in the amount of $500,000, investigative fees in the amount of $220.08, and attorney's fees in an amount to be determined upon submission of Plaintiffs' billable hour statements.

SO ORDERED.

/s/ Paul D. Borman

PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated: April 8, 2013

End of Document

**3**

 Positive

As of: February 9, 2018 4:57 PM Z

# *Coach, Inc. v. Chouman's Ass'n*

United States District Court for the Eastern District of Michigan, Southern Division

December 26, 2012, Decided; December 26, 2012, Filed

Civil Action No. 11-cv-15665

**Reporter**

2012 U.S. Dist. LEXIS 181896 *; 2012 WL 6705412

COACH, INC., and COACH SERVICES, INC., Plaintiffs, vs. CHOUMAN'S ASSOCIATION, INC., d/b/a WIXOM FUEL STOP, KAMAL CHOUMANE, and JOHN DOES 1-10, Defendants.

## Core Terms

infringement, Coach, default, counterfeit, trademarks, statutory damages, damages, attorney's fees, products, costs, investigative

**Counsel:** [*1] For Coach, Inc., Coach Services, Inc., Plaintiffs: Katherine Lynn Brooks, Warner Norcross & Judd LLP, Southfield, MI; Jacob Joseph Sadler, Warner Norcross & Judd LLP (Grand Rapids), Grand Rapids, MI.

**Judges:** PAUL D. BORMAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** PAUL D. BORMAN

## Opinion

### OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT (Dkt. No. 14)

Plaintiffs Coach, Inc. and Coach Services, Inc. ("Plaintiffs") filed the Complaint in this matter on December 28, 2011, alleging trademark violations under the Lanham Act, *15 U.S.C. §§ 1114, 1116, 1117, 1125(a)* and *(c)*, copyright infringement under the United States Copyright Act, *17 U.S.C. § 501, et seq.*, violations of the Michigan Consumer Protection Act, *Mich. Comp. Laws § 445.903*, and common law unfair competition and unjust enrichment claims. (Dkt. No. 1.) The named Defendants are Chouman's Association, Inc., Kamal Choumane, and John Does 1-10 ("Defendants").

Certificates of Service reflecting service on Defendants Chouman's Association, Inc., and Kamal Choumane, were filed on January 23, 2012. (Dkt. Nos. 7 and 8.) The certificates showed that Defendant Kamal Choumane was personally served with the Summons and Complaint on January 10, 2012, at 29330 [*2] Wixom Road in Wixom, Michigan. (Dkt. No. 7.) Defendant Kamal Choumane was also served on behalf of Defendant Chouman's Association, Inc., on the same date at the same address. (Dkt. No. 8.) Defendants have not filed a notice of appearance or any responsive pleading in this matter.

On March 12, 2012, Plaintiffs requested and received defaults against Defendants. (Dkt. Nos. 10, 11, 12 and 13.) On June 8, 2012, Plaintiffs filed the instant Motion for Entry of Default Judgment. (Dkt. No. 14.) Defendants did not file a response. The Court held a hearing on October 31, 2012. Defendants did not appear at the hearing.

For the reasons stated below, the Court will GRANT Plaintiffs' Motion.

## I. BACKGROUND

A default has been entered in this case and all Plaintiffs' well-pleaded allegations are deemed admitted by Defendants. *Ford Motor Co. v. Cross, 441 F. Supp. 2d 837, 846 (E.D. Mich. 2006)*.

Plaintiffs are engaged in the marketing and sale of leather and mixed material products, including purses and handbags. Plaintiffs only sell their products through their own specialty retail stores, department stores, catalogs, and the website *www.coach.com*. Plaintiffs' products include a variety of trademarks and [*3] trade dresses, which are registered and have acquired

incontestable status. [1] (Compl. ¶¶ 14, 15.) Plaintiffs have successfully marketed their products worldwide, and their annual global sales exceed $3 billion. (Compl. ¶ 13.) Plaintiffs' marks are "famous marks" pursuant to *15 U.S.C. § 1125(c)(1)*. [2] (Compl. ¶ 18.) Plaintiffs also hold registered copyrights for some of their marks. (Compl. ¶¶ 24-26.)

Defendant Kamal Choumane, a Michigan resident, is the President and controlling **[*4]** shareholder of Defendant Chouman's Associates, Inc. Defendants own and operate a retail establishment in Wixom, Michigan, known as the Wixom Fuel Stop. Defendants' store is not a licensed retailer of Coach products.

On November 23, 2011, the Department of Homeland Security contacted Plaintiffs and informed them that suspected counterfeit Coach items were being offered for sale at Defendants' store. A Coach representative thereafter went to Defendants' store and observed handbags, scarves, and wallets displayed for sale that were purportedly manufactured by Coach, which bore various Coach trademarks. (Compl. ¶ 28(b).) The items were inspected and determined to be counterfeit. In addition to the counterfeit items on display, the Coach representative discovered several dozen more counterfeit handbags, wallets, and scarves, in an upstairs office of Defendants' store.

Prior to the entry of the defaults in this matter, Plaintiffs engaged Defendants in settlement negotiations. Plaintiffs state in their brief that preliminary discovery between the parties did occur, even though Defendants never filed an appearance, but Defendants' discovery responses were "halfhearted" and unsatisfactory, and **[*5]** negotiations between the parties broke down. (Pls.' Mot. Br. at 4.) Defendants did not appear at the October 31, 2012 hearing on this matter.

---

[1] Under *15 U.S.C. § 1065*, a valid, registered trademark that is used continuously for five consecutive years after registration, which has not been challenged, is deemed incontestable. *See also Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 n. 1 (6th Cir. 1988)* (noting that an incontestable mark is assumed to be totally valid unless one of five defenses has been raised regarding its validity).

[2] "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *15 U.S.C. § 1125(c)(2)(A)*. The owner of a famous mark is entitled to specific remedies in a trademark infringement action, set forth under *15 U.S.C. § 1125(c)(5)*.

## II. LEGAL STANDARD

Where damages are for an uncertain amount, a party must apply to the Court for a default judgment. Entry of default judgment by the Court is governed by *Federal Rule of Civil Procedure 55(b)(2)*. The rule states that, in entering a default judgment:

> [t]he court may conduct hearings or make referrals — preserving any federal statutory right to a jury trial — when, to enter or effectuate judgment, it needs to:
> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
> (D) investigate any other matter.

Under *Federal Rule of Civil Procedure 54(c)*, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

## III. ANALYSIS

While Defendants' default admits their liability, "the allegations in the complaint with respect to the amount of the damages are not deemed true." *Vesligaj v. Peterson, 331 Fed. Appx. 351, 355 (6th Cir. 2009)*. Thus, an entry of default establishes only Defendants' "liability and the amount of damages must be proven." **[*6]** *Antoine v. Atlas Turner, Inc., 66 F.3d 105, 110 (6th Cir. 1995)* (citation omitted). Plaintiffs seek $8,000,000 in statutory damages, $8,730 in attorney's fees, and $231.75 in investigative costs.

### A. Statutory Damages

Plaintiffs admit that, because Defendants refuse to answer Plaintiffs' discovery requests, Plaintiffs are unable to determine actual damages in terms of Defendants' profits and damages to Plaintiffs' reputation. (Pls.' Mot. Br. at 3.) Instead, Plaintiffs seek statutory damages pursuant to *15 U.S.C. § 1117(c)*, which provides that "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits . . ., an award of statutory damages . . . ." Under the statute, Plaintiffs are entitled to "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just . . . ." *15 U.S.C. § 1117(c)(1)*.

Where the use of the counterfeit mark was willful, Plaintiff may receive "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." _15 U.S.C. § 1117(c)(2)_.

Plaintiffs [*7] have attached to their Motion the Declaration of Dayanara Perez, the Intellectual Property Coordinator at Plaintiff Coach, Inc. (Pls.' Mot., Ex. 2, Perez Decl. ¶ 2.) Ms. Perez states that "approximately seventy-five counterfeit 'Coach' items were observed and seized from Wixom Fuel Stop." (Perez Decl. ¶ 15.) The Perez Declaration also includes photographs of some of the infringing products, including the display that was used in the Wixom Fuel Stop. (Perez Decl. 16.)

Plaintiffs contend that Defendants can be liable for up to $2,000,000 per counterfeit mark per good, because the default entered in this matter establishes that Defendants' infringement was willful. Plaintiffs argue that Defendants counterfeited 10 different trademarks on three types of goods, and are therefore potentially liable for up to $26,000,000 in statutory damages.

Plaintiffs assert that $8,000,000 is reasonable because it is within the allowable statutory damages. Plaintiffs claim that this amount would also send a strong message of deterrence to potential infringers, and would adequately compensate Plaintiffs for their damages.

_Section 1117(c)_ was added to the Lanham Act because, under previous versions of the law, [*8] a civil litigant may not have been able to recover "if a sophisticated, large-scale counterfeiter has hidden or destroyed information about his counterfeiting." S. Rep. 104-177, at 10 (1995). Thus, statutory damages filled a "gap" in the law, where proving actual damages was difficult due to an infringer's deceptive record-keeping activities. _See Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 110 (2d Cir. 2012)_. The amounts set forth under the statute "are appropriate given the extent of damage done to business goodwill by infringement of trademarks." S. Rep. 104-177, at 10.

Ms. Perez's Declaration states that the seized products bore 10 different Coach trademarks. (Perez Decl. ¶ 16.) Plaintiffs' $8,000,000 figure therefore clearly does not exceed the $2,000,000 limitation per mark per product for willful violations set forth under _§ 1117(c)(2)_. Nevertheless, the Court finds that, given the evidence presented in the Perez Declaration, $1,500,000 in statutory damages constitutes a just award in this matter. This amount is supported by the evidence presented to the Court, and it adequately accounts for

Defendants' profits and Plaintiffs' reputational damages. Furthermore, [*9] this amount is in keeping with similar cases. See e.g., Coach, Inc. v. Da Hook Up Ltd., No. 10-11710 (E.D. Mich. July 11, 2011) (awarding statutory damages of $1,200,000).

Defendant Kamal Choumane may be held individually liable for Plaintiffs' Lanham Act claims. "It is well-established law that employees and corporate officers can be held individually liable under the Lanham Act when the employee or corporate officer personally takes part in the infringing activity or directs others to do so." _Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC, No. 07-13523, 2009 U.S. Dist. LEXIS 90393, 2009 WL 3199882, at *11 (E.D. Mich. Sept. 30, 2009)_ (Zatkoff, J.); see also _Coach, Inc. v. Younes Corp., Inc., No. 11-11559, 2012 U.S. Dist. LEXIS 144516, 2012 WL 4757925, at *2 (E.D. Mich. Oct. 5, 2012)_ (Cook, J.); _Hair Assocs., Inc. v. Nat'l Hair Replacement Servs., Inc., 987 F. Supp. 569, 590 (W.D. Mich. 1997)_ (holding that "a corporate officer's active participation in infringing activity is sufficient to subject him or her to joint and several liability for trademark infringement with the corporation."). "Even a lack of participation in the infringement will not insulate a corporate officer from liability where he had the right and ability to supervise the [*10] infringing activity and also had a direct financial interest in such activities." _Days Inn Worldwide, supra_ (citation omitted).

Plaintiffs allege that Defendant Kamal Choumane is the President and controlling shareholder of Defendant Chouman's Associates, Inc. (Compl. ¶ 8), and that he acted "knowingly and intentionally or with reckless disregard or willful blindness to Coach's rights, or with bad faith, for the purpose of trading on the goodwill and reputation of the Coach Marks and Coach products." (Compl. ¶ 31.) These allegations are sufficient to show that Defendant Choumane actively participated in the infringing activity, and/or "had the right and ability to supervise the infringing activity and also had a direct financial interest in such activities." _Days Inn Worldwide, supra._ Plaintiff Choumane is thus individually liable under the Lanham Act.

## B. Attorney's Fees and Costs

Plaintiffs seek attorney's fees for Defendants' trademark infringement, pursuant to _15 U.S.C. § 1117_, or for Defendants' copyright infringement under _17 U.S.C. § 505_ (providing that "the court in its discretion may allow the recovery of full costs by or against any party[,]" and

allowing "a reasonable attorney's [**11] fee to the prevailing party as part of the costs."). Where a defendant willfully infringes copyrights and trademarks, an award of attorney's fees is appropriate. *See Microsoft Corp. v. Compusource Distributors, Inc., 115 F. Supp. 2d 800, 812 (E.D. Mich. 2000).*

Defendants have failed to answer the complaint or otherwise enter any pleading in this matter. Plaintiffs have requested and received a default. Defendants are thus deemed to have admitted the willful violations alleged in the Complaint. *See Ford Motor Co., 441 F. Supp. 2d at 846.* An award of attorney's fees is therefore warranted.

Plaintiffs claim that their counsel, Warner Norcross & Judd LLP, have accrued approximately $8,730 in fees, and continue to accrue additional fees. Plaintiffs request that the Court enter default judgment and allow Plaintiffs to seek legal fees and costs after the conclusion of the case. The Court will permit Plaintiffs to recover appropriate attorney's fees.

Plaintiffs also seek investigative costs of $231.75, related to the investigation of the counterfeit items recovered from Defendants' store. (Perez Decl. ¶ 19.) Although they are not specifically provided for under *§ 1117(c)*, Courts have awarded [**12] investigation fees in similar cases. *See Da Hook Up, supra; see also Fila U.S.A., Inc. v. Run Run Trading Corp., No. 95 CV 7144, 1996 U.S. Dist. LEXIS 6893, 1996 WL 271992, at *4 (S.D.N.Y. May 21, 1996).* Accordingly, Plaintiffs will be awarded investigative fees in the amount of $231.75.

## IV. CONCLUSION

For the reasons stated above, the Court will:

    (1) GRANT Plaintiffs' Motion for Default Judgment, and

    (2) ORDER that Plaintiffs are awarded:

        (a) statutory damages in the amount of $1,500,000,

        (b) investigative fees in the amount of $231.75, and

        (c) attorney's fees in an amount to be determined upon submission of Plaintiffs' billable hour statements.

SO ORDERED.

/s/ Paul D. Borman

PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated: 12-26-12

Detroit, Michigan

**End of Document**

**4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)**

- - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| COACH, INC. and COACH SERVICES, INC., | : |
| Plaintiffs, | : **Case No. 2:10-cv-11710** |
| - against - | : |
| DA HOOK UP LTD., | : Honorable Sean F. Cox |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

## <u>ORDER FOR DEFAULT JUDGMENT</u>

This action having been commenced on April 27, 2010, through the filing of the Complaint by Plaintiffs Coach, Inc., and Coach Services, Inc. (collectively, "Plaintiffs"), and a copy of the Complaint and the appropriate Summons having been personally served on Defendant, through agent Nithal Aoun, on August 23, 2010, and proof of service having been filed on August 26, 2010, and the Defendant having not answered the Complaint, and the time for answering the Complaint having expired, and the Clerk having entered default against the Defendant as of March 10, 2011, and evidence of Plaintiffs' damages having been received by the Court, it is

ORDERED that Plaintiffs' motion for default judgment against the Defendant shall be, and hereby is, GRANTED and JUDGMENT be entered in favor of Plaintiffs and against the Defendant on all counts of the Complaint, and it is further

ORDERED that JUDGMENT be entered for statutory damages in the amount of
$1,200,000.00, attorneys' fees in the amount of $5,927.50, costs in the amount of $492.64, and
investigative fees in the amount of $500.75, totaling **$1,206,920.89**, and it is further

ORDERED that interest pursuant to 28 U.S.C. § 1961 shall accrue from the date the
judgment was entered, which is June 28, 2011.

This judgment is now a Final Judgment for this action, in that it finally disposes of all
remaining claims as to all parties.  The Court expressly determines that there is no just reason for
delay, and thus entry of judgment as described herein is hereby directed by the Court.


Dated:  July 11, 2011                              s/ Sean F. Cox
                                                   Sean F. Cox
                                                   U. S. District Judge



Distribution:

Alejandro Valle      vallea@gshllp.com, eunice_spells@gshllp.com

**5**

 Positive
As of: February 9, 2018 4:57 PM Z

## *Coach, Inc. v. O'Brien*

United States District Court for the Southern District of New York

April 13, 2012, Decided; April 13, 2012, Filed

10 Civ. 6071 (JPO)(JLC)

**Reporter**
2012 U.S. Dist. LEXIS 52565 *; 2012 WL 1255276

COACH, INC. and COACH SERVICES, INC., Plaintiffs,
-against- SHARON O'BRIEN, et al., Defendants.

**Prior History:** *Coach, Inc. v. O'Brien, 2011 U.S. Dist.
LEXIS 135988 (S.D.N.Y., Nov. 28, 2011)*

## Core Terms

infringing, registered trademark, statutory damages,
counterfeit, trademark, Website, willful, default
judgment, products, damages, marks, discovery,
trademark infringement, default, recommend, motion
for default, recommend, noncompliance, services,
profits, actual damage, manufactured, offering, selling,
entry of default, distributing, calculation, sanctions,
parties, courts

## Case Summary

### Overview

Trademark owners were entitled to infringement
damages substantially greater than damages based
solely on the infringer's apparently modest sales since it
was not clear that the infringer's disclosure of sales was
complete, the infringement was willful, the well-known
marks for luxury items were valuable, and deterrence of
the infringer and others warranted a significant award.

### Outcome

Judgment entered.

## LexisNexis® Headnotes

Civil Procedure > Judicial
Officers > Magistrates > Standards of Review

*HN1*[⬇] **Magistrates, Standards of Review**

When reviewing a report and recommendation by a
magistrate judge, a district court may accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate judge. *28
U.S.C.S. § 636(b)(1)*. The court reviews the report
strictly for clear error where no objection has been
made, and will make a de novo determination regarding
those parts of the report to which objections have been
made. However, objections that are merely perfunctory
responses argued in an attempt to engage the district
court in a rehashing of the same arguments set forth in
the original petition will not suffice to invoke de novo
review of the magistrate's recommendations. Further,
the objections must be specific and clearly aimed at
particular findings in the magistrate judge's proposal.
When a party makes only conclusory or general
objections, or simply reiterates the original arguments,
the court will review the report strictly for clear error.

Trademark Law > ... > Damages > Types of
Damages > Statutory Damages

*HN2*[⬇] **Types of Damages, Statutory Damages**

The Lanham Act provides for statutory damages of
between $1,000 and $200,000 per trademark per type
of goods or services sold, offered for sale, or distributed,
as the court considers just. *15 U.S.C.S. § 1117(c)*. For
willful infringements, the court may award statutory
damages up to $2,000,000 per mark per type of goods
or services, also as the court considers just.

Trademark Law > ... > Damages > Types of
Damages > Statutory Damages

*HN3*[⬇] **Types of Damages, Statutory Damages**

2012 U.S. Dist. LEXIS 52565, *52565

The Lanham Act does not provide guidelines for courts to use in determining an appropriate award for trademark infringement, as it is only limited by what the court considers just. In calculating statutory damages, courts consider: (1) the expenses saved and the profits reaped by the defendant infringer; (2) the revenues lost by the plaintiff; (3) the value of the trademark; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether the defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

Trademark Law > ... > Damages > Types of Damages > Statutory Damages

*HN4*[↓] **Types of Damages, Statutory Damages**

Although statutory damages for trademark infringement need not match actual damages, courts generally hold that statutory damages should bear some relation to actual damages suffered.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN5*[↓] **Discovery, Misconduct During Discovery**

*Fed. R. Civ. P. 37(b)(2)(A)* authorizes a court to impose a range of sanctions in the event that a party fails to comply with a court order, including the rendering of a default judgment against the disobedient party. *Rule 37(b)(2)(A)(vi)*. Although *Rule 37* sanctions are a harsh remedy to be used only in extreme situations, they protect other parties to the litigation from prejudice resulting from a party's noncompliance with discovery obligations and serve other functions unrelated to the prejudice suffered by individual litigants, including specific and general deterrence.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN6*[↓] **Discovery, Misconduct During Discovery**

Several factors are useful in evaluating a district court's

exercise of discretion to impose sanctions for discovery misconduct pursuant to *Fed. R. Civ. P. 37*, including (1) the willfulness of the noncompliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the noncompliant party had been warned of the consequences of noncompliance. These factors are not exclusive and none is dispositive, because the text of the rule requires only that the district court's orders be just, and because the district court has wide discretion in imposing sanctions under *Rule 37*.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

Civil Procedure > ... > Eligibility for Sanctions > Parties Subject to Sanction > Self Represented Litigants

*HN7*[↓] **Discovery, Misconduct During Discovery**

All litigants, including pro se litigants, have an obligation to comply with court orders. Failure to comply may result in sanctions, including *Rule 37* sanctions for discovery misconduct.

Civil Procedure > ... > Pretrial Judgments > Default & Default Judgments > Default Judgments

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN8*[↓] **Default & Default Judgments, Default Judgments**

Lesser sanctions for discovery misconduct should be considered before a court proceeds to issue a default judgment against a noncompliant party.

Civil Procedure > ... > Pretrial Judgments > Default & Default Judgments > Default Judgments

*HN9*[↓] **Default & Default Judgments, Default Judgments**

Under the case law interpreting *Fed. R. Civ. P. 55*, a default establishes a defendant's liability as long as the

2012 U.S. Dist. LEXIS 52565, *52565

complaint has stated a valid cause of action. Although a district court should assess whether the alleged facts constitute a valid cause of action, once a default has been established the court accepts as true all the factual allegations in the complaint except as to the amount of damages.

Business & Corporate Compliance > ... > Causes of Action Involving Trademarks > Infringement Actions > Determinations

Trademark Law > Likelihood of Confusion > General Overview

Business & Corporate Compliance > ... > Federal Unfair Competition Law > Lanham Act > Scope

HN10[⤓] Infringement Actions, Determinations

There are two elements necessary to establish trademark infringement under the Lanham Act: (1) a plaintiff's ownership of a valid trademark and (2) the likelihood of confusion from a defendants' use of that trademark without the plaintiff's permission.

Trademark Law > ... > Remedies > Damages > General Overview

HN11[⤓] Remedies, Damages

Having found that a defendant is liable for trademark infringement, a court must conduct an inquiry in order to ascertain the amount of damages with reasonable certainty. This inquiry involves two tasks: determining the proper rule for calculating damages on such a claim, and assessing the plaintiff's evidence supporting the damages to be determined.

Civil Procedure > ... > Pretrial Judgments > Default & Default Judgments > Default Judgments

Civil Procedure > Remedies > Damages > General Overview

HN12[⤓] Default & Default Judgments, Default Judgments

While Fed. R. Civ. P. 55(b)(2) provides that a court, in

considering a default judgment, may conduct hearings or make referrals to determine the amount of damages, Rule 55(b)(2)(B), an inquest into damages may be held on the basis of documentary evidence alone, as long as the court has ensured that there was a basis for the damages specified in the default judgment.

Trademark Law > ... > Damages > Types of Damages > Statutory Damages

HN13[⤓] Types of Damages, Statutory Damages

Pursuant to the Lanham Act, a trademark owner may elect to recover an award of statutory damages instead of actual damages for an amount between $1,000 and $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or, if the court finds the use of the mark to have been willful, up to $2,000,000 per counterfeit mark per type of good. 15 U.S.C.S. § 1117(c). This provision of the Lanham Act does not provide guidelines for courts to use in determining an appropriate award, as it is only limited by what the court considers just. Under the statutory-damages framework courts consider: (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the trademark; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether the defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

Trademark Law > ... > Damages > Types of Damages > Statutory Damages

HN14[⤓] Types of Damages, Statutory Damages

Courts frequently issue awards far below the statutory maximum on a per mark basis even where the defendant willfully infringes on a plaintiff's trademark and fails to stop such behavior after being put on notice by the plaintiff or the court, although there is no concrete information about the defendant's actual sales figures and profits and the estimate of the plaintiff's lost revenue.

Trademark Law > ... > Equitable

2012 U.S. Dist. LEXIS 52565, *52565

Relief > Injunctions > Permanent Injunctions

## HN15[ ] Injunctions, Permanent Injunctions

Where a party seeks injunctive relief in an action alleging trademark infringement, courts apply a four-factor test. Under that standard, injunctive relief should issue where a plaintiff has established a likelihood of success on the merits in seeking a preliminary injunction, or has actually succeeded on the merits in seeking a permanent injunction, and that: (1) the plaintiff is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate plaintiff for that injury; (3) the balance of hardships tips in plaintiff's favor; and (4) the public interest would not be disserved by the issuance of a preliminary injunction.


Trademark Law > ... > Equitable
Relief > Injunctions > Permanent Injunctions

## HN16[ ] Injunctions, Permanent Injunctions

For purposes of injunctive relief, irreparable harm from trademark infringement is automatically satisfied by actual success on the merits, as irreparable harm is established by a showing of likelihood of confusion.


Trademark Law > ... > Equitable
Relief > Injunctions > Permanent Injunctions

## HN17[ ] Injunctions, Permanent Injunctions

For purposes of injunctive relief, no adequate remedy at law for trademark infringement is satisfied where the record contains no assurance against a defendant's continued violation of trademarks. Where default is entered, a court may infer from the defendant's default that it is willing to or may continue its infringement.

**Counsel:** [*1] For Coach, Inc., Coach Services, Inc., Plaintiffs: Brian William Brokate, John Macaluso, Walter-Michael Lee, Gibney, Anthony & Flaherty, LLP, New York, NY.

**Judges:** J. PAUL OETKEN, United States District Judge.

**Opinion by:** J. PAUL OETKEN

## Opinion

ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs Coach, Inc. and Coach Services, Inc. (collectively, "Coach"), bring this action asserting various federal trademark claims against pro se defendant Sharon O'Brien, individually and doing business as www.covermycellphone.com ("O'Brien"), who allegedly offered for sale and sold cellular phone covers bearing counterfeits and infringements of Coach's federally registered trademarks.

O'Brien answered the Complaint after the deadline provided by the Federal Rules of Civil Procedure (the "Federal Rules"). Accordingly, Coach moved to strike O'Brien's Answer and moved for a default judgment. The motion was referred to Magistrate Judge James L. Cott for a Report and Recommendation, and the case was referred to Judge Cott for general pretrial purposes. Although Coach's motion for a default judgment was denied (Dkt. Nos. 29, 30), O'Brien subsequently failed to comply with several Court orders relating to discovery and her defense of this [*2] litigation, and failed to respond to the Court's repeated attempts to contact her. Finally, O'Brien failed to respond to the Court's Order to Show Cause why a default judgment should not be entered against her under Federal Rules 37 and 55. (Dkt. No. 34.)

On November 28, 2011, Judge Cott issued a thorough Report and Recommendation (the "Report") that the Court enter a default judgment against O'Brien, and award Coach, pursuant to Rule 55(b) of the Federal Rules, $12,875.95 in statutory damages for trademark infringement and costs, and enter a permanent injunction against O'Brien, as set forth in the Report, (Dkt. No. 39.)

On December 12, 2011, Coach filed an objection to the Report's calculation of statutory damages. (Dkt. No. 40.) Coach does not object to any other aspect of the Report. O'Brien did not file an objection to the Report.

For the reasons that follow, the Court adopts the Report's findings and conclusions in full, except for the Report's calculation of damages. The Court instead awards Coach $249,456.95 in statutory damages and costs.

2012 U.S. Dist. LEXIS 52565, *2

## I. Standard of Review

HN1[↑] When reviewing a report and recommendation by a magistrate judge, a district court "may accept, reject, or modify, in whole [*3] or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court reviews the Report strictly for clear error where no objection has been made, and will make a de novo determination regarding those parts of the Report to which objections have been made. McDonough v. Astrue, 672 F. Supp. 2d 542, 547 (S.D.N.Y. 2009) (citation omitted).

> However, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition will not suffice to invoke de novo review of the magistrate's recommendations. Further, the objections must be specific and clearly aimed at particular findings in the magistrate judge's proposal.

Id. (internal citations and quotation marks omitted). When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error. Crowell v. Astrue, No. 08 Civ. 8019, 2011 U.S. Dist. LEXIS 118224, 2011 WL 4863537, at *2 (S.D.N.Y. Oct. 12, 2011) (citing Pearson-Fruser v. Bell All., No. 01 Civ. 2343, 2003 U.S. Dist. LEXIS 89, 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003)).

## II. Discussion

The Report, which the Court attaches [*4] to this Order, contains a thorough discussion of the factual and procedural background of the case. The Court will not rehash this discussion here, and instead refers the parties to the Report.

Coach objects only to Judge Cott's calculation of damages and, in fact, requests adoption of the rest of the Report. Because the Court finds no clear error on the face of the record as to the rest of the Report, the Court adopts all of the findings of the Report except the damages calculation.

Coach objects that the Report's calculation of statutory damages is excessively low. HN2[↑] The Lanham Act provides for statutory damages of between $1,000 and $200,000 "per mark per type of goods or services sold, offered for sale, or distributed, as the court considers

just." 15 U.S.C. § 1117(c). For willful infringements, the court may award statutory damages up to $2,000,000 per mark per type of goods or services, also "as the court considers just." Id. Coach argued that O'Brien's infringements were willful and requested $1,000,000 for each of the three infringed marks, for a total of $3,000,000. Judge Cott found that O'Brien's infringements were indeed willful, but awarded damages in the amount of $4,150 [*5] for each infringed mark, for a total of $12,450—well below the maximum award allowed under the statute.

As Judge Cott explained, courts have found that HN3[↑] the Lanham Act "does not provide guidelines for courts to use in determining an appropriate award, as it is only limited by what the court considers just." Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004) (internal citation omitted). Courts typically look to the considerations set forth by decisions applying the statutory damages provision of the Copyright Act, 17 U.S.C. § 504(c). See id. As set forth by the Second Circuit, in calculating statutory damages for copyright infringement, courts consider: (1) "the expenses saved and the profits reaped" by the defendant infringer; (2) "the revenues lost by the plaintiff; (3) "the value of the copyright"; (4) "the deterrent effect on others besides the defendant"; (5) "whether the defendant's conduct was innocent or willful"; (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced"; and (7) "the potential for discouraging the defendant." Gucci, 315 F. Supp. 2d at 520 (quoting [*6] Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., 807 F.2d 1110, 1117 (2d Cir. 1986)).

HN4[↑] Although statutory damages need not match actual damages, courts generally hold that "statutory damages should bear some relation to actual damages suffered." Yurman Studio, Inc. v. Castaneda, Nos. 07 Civ. 1241, 07 Civ. 7862, 2008 U.S. Dist. LEXIS 96994, 2008 WL 4949775, at *2 (S.D.N.Y. Nov. 19, 2008) (quoting RSO Records v. Peri, 596 F. Supp. 849, 862 (S.D.N.Y. 1984)); see also New Line Cinema Corp. v. Russ Berrie & Co., 161 F. Supp. 2d 293, 303 (S.D.N.Y. 2001) ("[S]tatutory damages should be commensurate with the actual damages incurred and, thus, the proper departure point is [defendant's] stipulated gross revenue."); Sara Lee Corp. v. Bags of New York, 36 F. Supp. 2d 161, 167 (S.D.N.Y. 1999) (noting that in calculating statutory damages, "actual damages, such as profits and losses, are a typical starting point for analysis").

2012 U.S. Dist. LEXIS 52565, *6

In applying the *Fitzgerald* factors, Judge Cott found that although there was no evidence of lost revenues to Coach, the marks were valuable, the infringement was willful, and a significant award was necessary to deter the defendant and others from infringing the marks. Thus, a monetary award was appropriate [*7] under the third, fourth, fifth and seventh *Fitzgerald* factors. The Court agrees with this conclusion.

In attempting to evaluate the "expenses saved and profits reaped" by O'Brien, *Fitzgerald, 807 F.2d at 1117*, Judge Cott looked to O'Brien's submissions in opposition to the motion for default judgment. There, O'Brien stated that her total revenues resulting from sales of the alleged infringing items, as reflected in the documents that she had voluntarily produced to Coach, was $5,533.76. (Dkt. No. 16 at 3.) Although there was no evidence regarding what O'Brien's costs were, Judge Cott assumed a 300% markup on each item, which other courts have used in assessing damages from the infringement of luxury goods. *See* Report at 21 (citing *Coach, Inc. v. Melendez, No. 10 Civ. 6178, 2011 U.S. Dist. LEXIS 116842, 2011 WL 4542971, at *7 (S.D.N.Y. Sept. 2, 2011)*; *Malletier v. Apex Creative Int'l Corp., 687 F. Supp. 2d 347, 358 (S.D.N.Y. 2010)*.) This meant that O'Brien's profits from the approximately $5,534 in revenue was $4,150. Applying that total to each of the three infringed marks, Judge Cott arrived at the total statutory award of $12,450.

Coach argues that it is inappropriate to rely on the $5,534 figure because it is [*8] based upon O'Brien's own unsworn, unsubstantiated statements and incomplete discovery productions. Because, as detailed in the Report, O'Brien did not respond to formal discovery requests, Coach was without any means to verify the sales and profits derived from her infringing activities. The Court agrees that relying entirely upon the $5,534 figure is inappropriate—particularly given that one of the *Fitzgerald* factors is "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced." *807 F.2d at 1117*.

At the same time, Coach's request for an arbitrary award of $1,000,000 per mark is no more sensible. Although statutory damages need not equal a hypothetical measure of actual damages, as one treatise put it, statutory damages should at least be "woven out of the same bolt of cloth as actual damages." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright § 14.04[E][1]* (2011). There is nothing in this record to suggest that the actual damages from O'Brien's infringement even remotely approach $3,000,000.

The Defendant has made it impossible accurately assess the profits from the infringement. A willful infringer [*9] should not be able to unilaterally limit a damages award by providing unsubstantiated statements of the fruits of her infringement, and then disappear without providing any opportunity to assess the veracity of those statements. At the same time, a plaintiff should not reap a windfall multi-million dollar award from the actions of a single small-scale infringer.

In light of the willful nature of the infringement, O'Brien's failure to cooperate in "providing records to assess the value of the infringing material produced," and the policy of deterrence of willful infringement that is built into the statutory damages scheme, the Court will presume that O'Brien understated her own revenues from her infringing activity by a factor of 20. In other words, the Court will assume that the revenues she derived from selling infringing products was $110,675.20. (To be sure, this is a far larger amount than is realistic.) Assuming the same 300% markup that Judge Cott used, this amounts to total profits of approximately $83,000. Thus, for the three infringed marks, Coach is entitled to a statutory damages award of $249,000.

Although this award is far below what Coach has requested—and is below the [*10] maximum allowable under the statute—it is commensurate with the damages awards granted in similar cases, and is an award that the Court "considers just." *15 U.S.C. § 1117(c) See All-Star Marketing Group, LLC v. Media Brands Co., Ltd., 775 F. Supp. 2d 613, 624-25 (S.D.N.Y. 2011)* (collecting cases "where the defendant willfully infringes on the plaintiff's mark and fails to stop such behavior after being put on notice by the plaintiff or the court, but where there is no concrete information about the defendant's actual sales figures and profits and the estimate of plaintiff's lost revenue" with damages awards of between $25,000 and $250,000 per infringed mark).

## III. Conclusion

The Court adopts the Report's calculation of $456.95 for costs, but modifies the Report to grant an award of statutory damages and costs to Coach in the amount of $249,000. The total award is thus $249,456.95. The Court adopts the Report in all other respects.

The Court enters a default judgment against O'Brien as

to liability pursuant to *Rules 37(b)(2)(A)(vi)* and *55(a)* of the Federal Rules, and enters the permanent injunction as set forth in the Report and reprinted below:

Defendant Sharon O'Brien and her employees, [*11] agents, servants, successors, and assigns, and all those acting in concert or participating therewith are hereby permanently enjoined from:

(a) using any reproduction, counterfeit, copy, or colorable imitation of the Coach Registered Trademarks to identify any goods or the rendering of any services not authorized by Coach;

(b) engaging in any course of conduct likely to cause confusion, deception or mistake, or injure Coach's business reputation or weaken the distinctive quality of the Coach Registered Trademarks, Coach's name, reputation or goodwill;

(c) using a false description or representation including words or other symbols tending to falsely describe or represent O'Brien's unauthorized goods as being those of Coach or sponsored by or associated with Coach and from offering such goods in commerce;

(d) further infringing or diluting the Coach Registered Trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying or otherwise disposing of any products not authorized by Coach bearing any simulation, reproduction, counterfeit, copy or colorable imitation of the Coach Registered Trademarks;

(e) using any [*12] simulation, reproduction, counterfeit, copy or colorable imitation of the Coach Registered Trademarks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products in such fashion as to relate or connect, or tend to relate or connect, such products in any way to Coach, or to any goods sold, manufactured, sponsored or approved by, or connected with Coach;

(f) making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any services provided, products manufactured, distributed, sold or offered for sale, or rented by O'Brien are in any way associated or connected with Coach, or is provided, sold, manufactured, licensed, sponsored, approved or authorized by Coach;

(g) engaging in any conduct constituting an infringement of any of the Coach Registered Trademarks, of Coach's rights in, or to use or to exploit, said trademark, or constituting any weakening of Coach's name, reputation and goodwill;

(h) using or continuing [*13] to use the Coach Registered Trademarks or trade names in any variation thereof on the Internet (either in the text of a website, as a domain name, or as a keyword, search word, metatag, or any part of the description of the site in any submission for registration of any Internet site with a search engine or index) in connection with any goods or services not directly authorized by Coach;

(i) hosting or acting as Internet Service Provider for, or operating or engaging in the business of selling any web site or other enterprise that offers for sale any products bearing the Coach Registered Trademarks;

(j) acquiring, registering, maintaining or controlling any domain names that include the COACH trademark or any of the other Coach Registered Trademarks or any marks confusingly similar thereto, activating any website under said domain names, or selling, transferring, conveying, or assigning any such domain names to any entity other than Coach;

(k) using any e-mail addresses to offer for sale any nongenuine products bearing counterfeits of the Coach Registered Trademarks;

(l) having any connection whatsoever with any websites that offer for sale any merchandise bearing counterfeits of the Coach [*14] Registered Trademarks;

(m) secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying of all unauthorized products which infringe the Coach Registered Trademarks; and

(n) effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (m).

The Clerk of Court is directed to enter judgment accordingly.

2012 U.S. Dist. LEXIS 52565, *14

SO ORDERED.

Dated: New York, New York

April 13, 2012

/s/ J. Paul Oetken

J. PAUL OETKEN

United States District Judge

Exhibit

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

COACH, INC. and COACH SERVICES, INC., Plaintiffs, -v.- SHARON O'Brien, et al., Defendants.

10 Civ. 6071 (JPO)(JLC)

## REPORT AND RECOMMENDATION

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable J. Paul Oetken, United States District Judge:**

Plaintiffs Coach, Inc. and Coach Services, Inc. (together, "Coach"), a well-known luxury [*15] brand, bring this action asserting various federal trademark claims against pro se defendant Sharon O'Brien, individually and doing business as www.covermycellphone.com ("O'Brien"), who allegedly offered for sale and sold cellular phone covers bearing counterfeits and infringements of Coach's federally registered trademarks. O'Brien has failed to comply with several Court orders relating to both discovery and her defense of this litigation, and has failed to respond to the Court's repeated attempts to contact her. In light of this conduct, which is detailed below, I recommend that the Court find O'Brien in default under Rule 37(b)(2)(A)(vi) of the Federal Rules of Civil Procedure. I further recommend that the Court direct the Clerk of the Court to enter a default judgment pursuant to Rule 55(a), and award Coach, pursuant to Rule 55(b), $12,875.94 in statutory damages for trademark infringement and for costs, and enter a permanent injunction against O'Brien.[1]

---

[1] In conducting the inquiry relevant to this Report and Recommendation, I have relied on Coach's Motion to Strike Defendant's Answer and for a Default Judgment, dated

## I. BACKGROUND

### A. Basis of the Lawsuit

Coach brings this action against O'Brien, an Illinois resident, asserting claims for trademark counterfeiting; trademark infringement; trademark dilution; and unfair competition, false designation of origin, [*17] and false description under 15 U.S.C. §§ 1114, 1125(a), (c), (Complaint, dated Aug. 12, 2010 ("Complaint" or "Compl") (Dkt. No. 1)). Coach alleges that O'Brien willfully infringed its marks by "selling, offering for sale, distributing, promoting and advertising in interstate commerce" on her website, www.covermycellphone.com, cellular phone covers bearing counterfeit and infringing marks similar to certain protected trademarks owned by Coach. (Compl. ¶¶ 10, 25-38). Coach seeks, among other things, injunctive relief and damages for willful infringement under 15 U.S.C. § 1117. (Compl. ¶¶ I-XI).

### B. Procedural History

O'Brien was served with the Summons and Complaint on August 17, 2010 (Affidavit of Service, dated Aug. 23, 2010 (Dkt. No. 4)) such that her answer or other response was due on September 7, 2010. Fed. R. Civ. P. 12(a), (b). On September 10, 2010, Coach obtained entry of default against O'Brien (Clerk's Certificate of Default, dated Sept. 10, 2010 (Dkt. No. 13-2)), who was then proceeding pro se, (Defendant's Reply Memorandum in Opposition to Plaintiff's Motion to Strike

---

January 14, 2011 (Dkt. No. 13) ("Motion for Default Judgment"), [*16] which the Court previously denied. (Dkt. No. 30). Coach renewed its application for a default judgment in a November 15, 2011 letter to the Court ("November 15 Letter"). (Dkt. No. 37). Moreover, although entry of default under Rule 55 necessitates a subsequent inquest to determine the amount of damages, because Coach previously submitted all relevant information in support of its Motion for Default Judgment, and O'Brien submitted her Opposition to the Motion for Default Judgment, there is no need for separate inquest proceedings. See, e.g., Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991) (sufficient basis to evaluate compensatory damages where court was "inundated with affidavits, evidence, and oral presentations by opposing counsel"). Should Coach object to my reliance on the Motion for Default Judgment in considering the renewed application, it should so advise Judge Oetken in any objections to this Report and Recommendation.

2012 U.S. Dist. LEXIS 52565, *16

Defendant's Answer, and Plaintiff's Motion for Default Judgment, dated Jan. 28, 2011 ("Opposition to the Motion [*18] for Default Judgment" or "Def.'s Mem.") (Dkt. No. 16), at 2). On November 10, 2010, after obtaining counsel and engaging unsuccessfully in settlement discussions with Coach, O'Brien filed an Answer to the Complaint. (Notice of Appearance, dated Sept. 14, 2010 (Dkt. No. 5); Defendant's Answer, dated Nov. 10, 2010 (Dkt. No. 7)). On January 14, 2011, Coach moved to strike the answer and enter a default judgment against O'Brien. (Dkt. No. 13). Shortly after O'Brien filed her opposition to the motion on January 28, 2011, the Court granted the motion of O'Brien's counsel to withdraw from the case. (Order, dated Jan. 31, 2011 (Dkt. No. 17)).[2]

On May 17, 2011, the Honorable George B. Daniels, to whom the case was originally assigned,[3] referred Coach's Motion for Default Judgment to me, and for a potential inquest (Dkt. No, 24), and on June 21, 2011, he also referred the case to me for general pretrial purposes, including settlement. (Dkt. No. 26). I conducted telephone conferences with the parties regarding the possibility of settlement on June 30, July 7, and July 14, 2011. When the parties [*19] were unable to reach a settlement and upon Coach's request, I reinstated Coach's Motion for Default Judgment (Endorsed Letter to the Court from Walter-Michael Lee, dated July 18, 2011 (Dkt. No. 28)), which I had deemed withdrawn during the pendency of the settlement discussions. (Order, dated July 7, 2011 (Dkt. No. 27)). In a Report and Recommendation dated July 27, 2011, I recommended that Judge Daniels deny the Motion for Default Judgment. (Dkt. No. 29). Judge Daniels adopted the Report and Recommendation by Memorandum Decision and Order dated September 1, 2011. (Dkt. No. 30).

By Order dated September 9, 2011, I directed the parties to complete discovery by October 4, 2011, and to serve and file all dispositive motions by December 3, 2011. (Dkt. No, 31). Shortly thereafter, Coach advised the Court that O'Brien had failed to respond to Coach's First Set of Interrogatories and Request for the Production of Documents, served July 28, 2011 (the "Discovery Requests"). (Letter to the Court from Walter-Michael Lee, dated Sept. 13, 2011, at 1 (Dkt. No. 35)).

Consequently, by Order dated September 16, 2011, I directed [*20] O'Brien to respond to the Discovery Requests no later than September 28, 2011, (Dkt. No. 32). O'Brien did not respond to the Discovery Requests, nor did she appear for a noticed deposition on September 30, 2011. (November 15 Letter at 1-2).

Having been advised of O'Brien's failure to comply with the September 16 Order (Letter to the Court from Walter-Michael Lee, dated Sept. 30, 2011, at 2 (Dkt. No. 36)), I instructed counsel for Coach to confer with O'Brien as to the parties' availability for a discovery conference. O'Brien did not respond to counsel for Coach; as a result, on October 4 and 5, 2011, my chambers attempted to contact her both by e-mail and phone. O'Brien did not respond to the Court's messages either. Accordingly, on October 6, 2011, I ordered O'Brien to show cause why the Court should not find her in default pursuant to *Rule 37(b)(2)(A)(vi)* and recommend the entry of a default judgment pursuant to *Rule 55*. (Dkt. No. 34). My chambers mailed the October 6 Order to Show Cause—as well as the discovery orders dated September 9 and September 16—to the Alsip, Illinois address O'Brien listed as her contact information on the notice that she would proceed pro se after withdrawal [*21] of her counsel. (Dkt. No. 25). To date, O'Brien has not responded to the October 6 Order to Show Cause although the deadline for a response was October 21, 2011, nor has she sought an extension of her time to do so. Thus, neither counsel for Coach nor the Court has had any contact with O'Brien since the last settlement conference, held on July 14, 2011. (November 15 Letter at 2).

## II. DISCUSSION

### A. Default Judgment as a Sanction Under *Rule 37*

HN5[🔒] *Rule 37(b)(2)(A)* authorizes a court to impose a range of sanctions in the event that a party fails to comply with a court order, including the "rendering [of] a default judgment against the disobedient party[.]" *Fed. R. Civ. P. 37(b)(2)(A)(vi)*. Although *Rule 37* sanctions are "a harsh remedy to be used only in extreme situations," *Agiwal v. Mid Island Mortgage Corp., 555 F.3d 298, 302 (2d Cir. 2009)* (citation omitted), they "protect other parties to the litigation from prejudice resulting from a party's noncompliance with discovery obligations" and "serve other functions unrelated to the prejudice suffered by individual litigants[,]" including specific and general deterrence. *S. New England Tel.*

---

[2] Accordingly, O'Brien is again proceeding pro se. (Notice of Appearance, dated May 10, 2011 (Dkt. No. 25)).

[3] On October 6, 2011, this case was reassigned to Judge Oetken. (Dkt. No. 33).

2012 U.S. Dist. LEXIS 52565, *21

*Co. v. Global NAPs Inc., 624 F.3d 123, 149 (2d Cir. 2010)* [*22] (internal quotation marks and citations omitted).

The Second Circuit has articulated *HN6*[🏠] "[s]everal factors [that] may be useful in evaluating a district court's exercise of discretion" to impose sanctions pursuant to *Rule 37*, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal 555 F.3d at 302-03* (quoting *Nieves v. City of New York, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)*) (internal quotation marks and alteration omitted). These factors are not exclusive and none is dispositive, "[b]ecause the text of the rule requires only that the district court's orders be 'just,'" and "because the district court has 'wide discretion in imposing sanctions under *Rule 37*[.]'" *S. New England Tel. Co., 624 F.3d at 144* (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 135 (2d Cir, 2007)* (internal quotation marks omitted)). Each of these factors favors "rendering a default judgment" against O'Brien. *Fed. R. Civ. P. 37(b)(2)(A)(vi)*.

O'Brien's current status as a *pro se* litigant [*23] does not change this inquiry or my recommendation. *HN7*[🏠] "[A]ll litigants, including pro ses, have an obligation to comply with court orders." *McDonald v. Head Criminal Court Supervisor Officer. 850 F.2d 121, 124 (2d Cir. 1988)*. "[F]ailure to comply may result in sanctions," including *Rule 37* sanctions. *Agiwal, 555 F.3d at 302*; *see also McDonald, 850 F.2d at 124* ("When [pro se litigants] flout that obligation they, like all litigants, must suffer the consequences of their actions.").

**1. Willfulness**

There can be no dispute that O'Brien has failed to comply with her discovery obligations and that her failures were willful under the law. After successfully opposing Coach's Motion for Default Judgment, which afforded her an opportunity to resolve this dispute on the merits, O'Brien then failed to comply with the Court's subsequent discovery order requiring a response to the Discovery Requests by September 28, 2011. She further failed to respond to the attempts of both counsel for Coach and the Court to contact her to schedule a discovery conference in early October. O'Brien's noncompliance continued with her failure to respond to the October 6 Order to Show Cause, despite notification

that such [*24] a failure to comply could result in an entry of default. The Court deems the noncompliance willful given that these orders were mailed directly to O'Brien's address, and yet she repeatedly failed to comply. *See, e.g., Kuruwa v. Meyers, No. 09 Civ. 4412 (GWG), 823 F. Supp. 2d 253, 2011 U.S. Dist. LEXIS 122466, 2011 WL 5059187, at *6 n.2 (S.D.N.Y. Oct. 24, 2011)* (deeming failure to comply with order willful where defendant was aware of order, failed to seek extension to comply, and then did not respond to subsequent order directing him to show cause why he should not be sanctioned for failure to comply); *accord In re Fosamax Prods. Liab. Litig., No. 07 Civ. 3652 (JFK), 2010 U.S. Dist. LEXIS 41145, 2010 WL 1779276, at *2 (S.D.N.Y. Apr. 27, 2010)* ("Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control.") (quoting *Davis v. Artuz, No. 96 Civ. 7699 (GBD), 2001 U.S. Dist. LEXIS 384, 2001 WL 50887, at *3 (S.D.N.Y. Jan. 19, 2001)*).

**2. Efficacy of Lesser Sanctions**

The Court concludes that a less severe sanction would not secure O'Brien's cooperation. While *HN8*[🏠] lesser sanctions should be considered before the Court proceeds to issue a default [*25] judgment against a non-compliant party, *see Agiwal, 555 F.3d at 302*, O'Brien's repeated noncompliance with Court orders and her failure to engage with both counsel for Coach and the Court indicates that any lesser sanction would be "an exercise in futility[.]" *Koch v. Rodenstock, No. 06 Civ. 6586 (BSJ) (DF), 2010 U.S. Dist. LEXIS 49054, 2010 WL 2010892, at *7 (S.D.N.Y. Apr. 23, 2010)* (Report & Recommendation) (citation omitted), *adopted by, 2010 U.S. Dist. LEXIS 49031, 2010 WL 2010900 (S.D.N.Y. May 18, 2010)*.

**3. Duration of Non-Compliance**

O'Brien's failure to engage in discovery and comply with Court orders spans several months, and qualifies as an amount of time sufficient to warrant entry of a default judgment. *See, e.g., Jackson Hewitt. Inc. v. Excellent Prof'l Servs. LLC, No. 08 Civ. 5237 (JG) (RER), 2010 U.S. Dist. LEXIS 141055, 2010 WL 5665033, at *2 (E.D.N.Y. Nov. 8, 2010)* (Report & Recommendation) (two-month period of noncompliance with order to show cause, while "not lengthy[,]" warranted dismissal under *Rule 41(b)* when "considered in connection with

[defendants'] overall failure to participate in this litigation in any meaningful sense"), *adopted by*, *2011 U.S. Dist. LEXIS 8795, 2011 WL 317969 (E.D.N.Y. Jan. 31, 2011)*; *see also Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42-43 (2d Cir. 1982)* [*26] (in analogous posture under *Rule 41(b)*, persistent failure to comply with court orders "may warrant dismissal after merely a matter of months") (citation omitted). Coach served its Discovery Requests on July 28, 2011 (November 15 Letter at 1) such that the Federal Rules compelled O'Brien to serve her answers and any objections by August 30, 2011. *Fed. R. Civ. P. 6(d)*, *33(b)(2)*, *34(b)(2)*. She did not. Nor did she respond to the Court's September 16 Order directing her compliance by September 28, 2011; the telephone and e-mail messages left for her by counsel for Coach and the Court seeking to schedule a conference in early October; or the Court's October 6 Order to Show Cause requiring a response by October 21, 2011. Accordingly, O'Brien's history of repeated failure to engage in discovery and comply with this Court's orders spans several months, warranting an entry of a default judgment. *See Kuruwa, 2011 U.S. Dist. LEXIS 122466, 2011 WL 5059187, at *1* (failure to respond to order to show cause warranted finding of default just weeks after deadline passed).

**4. History of Warnings**

O'Brien was on notice that a failure to engage in the litigation could result in the entry of a default judgment. As early as January, 2011, [*27] when Coach filed its Motion for Default Judgment, O'Brien should have been aware of the possibility that failing to defend against Coach's lawsuit could result in the entry of a default judgment. The October 6 Order to Show Cause further warned O'Brien of this result by specifically directing her to address why the Court should not find her in default pursuant to *Federal Rule of Civil Procedure 37(b)(2)(A)(vi)* as a result of various failures including her failure to respond to Coach's Discovery Requests, to comply with the September 16 Order, and to return the Court's telephone and e-mail messages. Despite these warnings, O'Brien has still failed to respond to the October 6 Order to Show Cause, with the October 21 deadline now weeks past. *See Kuruwa, 2011 U.S. Dist. LEXIS 122466, 2011 WL 5059187, at *6 n.2* (entry of default where "the Order to Show Cause by its terms warned Meyers that he could be sanctioned with a default"); *Robertson v. Doe, No. 05 Civ. 7046 (LAP), 2008 U.S. Dist. LEXIS 47860, 2008 WL 2519894, at *7 (S.D.N.Y. June 19, 2008)* ("In addition, when the Court gave Mr. Dowbenko a 'final' opportunity to show cause

why sanctions should not be imposed, it explicitly mentioned the possibility of default judgment. Accordingly, Mr. Dowbenko [*28] was on notice of the possibility that his refusal to fully comply with the Court's discovery order could result in default judgment.") (internal citation omitted), *aff'd*, *443 Fed. Appx. 659 (2d Cir. 2011)* (Summary Order). Moreover, given Coach's January, 2011 Motion for Default Judgment, O'Brien has been on notice for months of Coach's intention to proceed with this matter to default proceedings should she fail to engage in the litigation. This history of warnings, coupled with the other factors, weighs in favor of rendering a default judgment at this stage.

**B. Liability**

Having determined that O'Brien's noncompliance warrants an entry of default judgment pursuant to *Rule 37*, the Court must "follow the procedure for entry of a default judgment as set forth in *[Rule 55]*." *Kuruwa, 2011 U.S. Dist. LEXIS 122466, 2011 WL 5059187, at *1*. HN9[↑] "Under the case law interpreting that rule, the default establishes [O'Brien's] liability as long as the complaint has stated a valid cause of action[.]" *Id.* (citations omitted). Although a district court should assess whether "the alleged facts constitute a valid cause of action[,]" *Au Bon Pain v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)*, once a default has been established, the [*29] Court accepts as true all the factual allegations in a complaint except as to the amount of damages. *See generally City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011)* ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint.") (citation omitted); *see, e.g., Coach, Inc. v. Melendez, No. 10 Civ. 6178 (BSJ) (HBP), 2011 U.S. Dist. LEXIS 116842, 2011 WL 4542971 (S.D.N.Y. Sept. 2, 2011)* (Report & Recommendation), *adopted by*, *2011 U.S. Dist. LEXIS 112304, 2011 WL 4542717 (S.D.N.Y. Sept. 30, 2011)*. Accordingly, the factual allegations contained in Coach's Complaint, except as to the amount of damages claimed, must be taken as true.

**1. Parties and Jurisdiction**

Plaintiff Coach, Inc. is a corporation duly organized and existing under the laws of the State of Maryland, with its corporate headquarters at 516 West 34th Street, New York, New York 10001. (Compl. ¶ 7). Plaintiff Coach Services, Inc. is a corporation and a wholly owned

subsidiary of Coach, Inc., also existing under the laws of the State of Maryland, with its corporate headquarters at 1 Coach Way, Jacksonville, Florida 32218. (Compl. ¶ 8). O'Brien is a resident of the State of Illinois [*30] residing at 11616 Kildare Avenue, Alsip, Illinois 60803. (Compl. ¶ 9). She is the registrant, owner, operator, and/or controlling force behind the www.covermycellphone.com website (the "Website"). (Compl. ¶ 10).[4]

Coach brings this action [*31] pursuant to the Lanham Act, _15 U.S.C. § 1051 et seq._ Therefore, the Court has subject matter jurisdiction over Coach's claims pursuant to _28 U.S.C. §§ 1331_, _1338(a)_, and _15 U.S.C. § 1121(a)_. The Court also has personal jurisdiction over O'Brien given that O'Brien shipped a cellular phone cover that she sold on the Website to counsel for Coach, located in New York (Affirmation of Benjamin Kwapisz in Support of Plaintiff's Motion to Strike Answer and Motion for a Default Judgment against Defendant, dated Jan. 11, 2011 ("Kwapisz Aff.") (Dkt. No. 13-5), ¶¶ 1, 4-5), and thus conducted business in New York. See _Gucci Am., Inc. v. MyReplicaHandbag.com, No. 07 Civ. 2438 (JGK), 2008 U.S. Dist. LEXIS 14047, 2008 WL 512789, at *2 (S.D.N.Y. Feb. 26, 2008)_ (shipment of goods to New York supported finding of jurisdiction in trademark action) (citing _Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc., 923 F. Supp. 433, 436-37 (S.D.N.Y. 1996)_).

## 2. The Coach Registered Trademarks

Coach is engaged, both in this District and elsewhere, in

---

[4] Coach's Complaint asserts claims against several unidentified defendants in addition to O'Brien, including "Unknown Websites 1-10, 'John Does' 1-10, and Unknown Entities I-10[.]" (Compl. ¶ 11). Coach alleges that, "upon information and belief, they are associated with [O'Brien] and contribute to [O'Brien's] infringing activity [and that] Coach [would] identify these Unknown Websites, Unknown 'John Does' and Unknown Entities upon further knowledge and investigation and [would] amend its pleadings accordingly." Given that Coach has not pursued the action against these unidentified defendants, the Court deems Coach's claims against them abandoned. See, e.g., _MacMillan v. Roddenberry, No. 5:08-cv-351-WTH-GRJ, 2010 U.S. Dist. LEXIS 17246, 2010 WL 668281, at *1 n.1 (M.D. Fla. Feb. 19, 2010)_ (where plaintiff listed three "John Doe" defendants in Complaint but did not identify them or assert any arguments in support of claims against them, court deemed claims abandoned) (citations omitted).

the business of manufacturing and distributing high quality merchandise including handbags, wallets, jewelry, watches, shoes, eye-glasses, and fragrances under federally registered [*32] trademarks associated with the Coach brand, (Compl. ¶ 12), Coach is known throughout the United States and the world, generating global sales in the millions of dollars. (Compl. ¶ 14), Coach Services, Inc. is the owner of all of Coach's United States federal registrations (the "Coach Registered Trademarks"). (Compl. ¶ 15; see Compl. ¶ 16 (describing the forty-six Coach Registered Trademarks)),

The Coach Registered Trademarks have been used in interstate commerce to identify and distinguish Coach's merchandise for an extended period of time, (Compl. ¶ 18). The Coach Registered Trademarks are symbols of Coach's quality, reputation, and goodwill, which Coach has expended substantial time, money, and other resources to develop, advertise, and promote such that the marks are "famous" within the meaning of _15 U.S.C. § 1125(c)_. (Compl. ¶¶ 20-22). As a result of Coach's efforts, members of the consuming public readily identify merchandise bearing any of the Coach Registered Trademarks as being high-quality merchandise sponsored and approved by Coach. (Compl. ¶¶ 23-24). Accordingly, the Coach Registered Trademarks are valid, subsisting, and in full force and effect, and continue to constitute [*33] prima facie evidence of the validity of the marks. (Compl. ¶ 17).

## 3. O'Brien's Operation of the Website

Subsequent to Coach's adoption, use, and registration of the Coach Registered Trademarks, O'Brien began selling, offering for sale, distributing, promoting, and advertising on the Website cellular phone covers bearing counterfeits and infringements of three of the Coach Registered Trademarks as those marks appear on Coach's products, (Compl. ¶ 25; Affirmation of Tiffany Walden In Support of Plaintiffs' Motion to Strike Defendant's Answer and for a Default Judgment, dated Jan. 12, 2011 ("Walden Aff.") (Dkt. No. 13-4), ¶ 26). After Coach discovered the Website in July, 2010, Coach's counsel conducted a "Whois" search to determine the name and contact information for the Website's registrant. (Walden Aff. ¶¶ 15-16 & Ex. 1). The search revealed that the Website was registered by "Covermycellphone, 11616 S. Kildare, Alsip, Illinois 60803, United States," and that the administrative and technical contacts were both listed as "OBRIEN, SHARON," at the same Alsip, Illinois address. (Id. ¶ 16

& Ex. 2).

On July 12, 2010, an employee of Coach's counsel in New York purchased from the Website a cellular [*34] phone cover bearing counterfeits and infringements of the Coach Registered Trademarks, which he received on or about July 15, 2010. (Kwapisz Aff. ¶¶ 4-5 & Ex. 2). The employee paid $19.99 for the cellular phone cover using PayPal, which then generated an e-mail indicating that the payment was sent to "sharon obrien[.]" (Id. at ¶ 4, Ex. 4). The return address listed on the package containing the purchase was "Covermycellphone, 11616 S Kildare Ave, Alsip IL 60803." (Id. ¶ 5, Ex. 2). Coach's counsel examined the cellular phone cover and determined that none of its parts was of genuine Coach origin (Walden Aff. ¶ 21), although the cover displayed the name "Coach" and contained several counterfeits and infringements of the Coach Registered Trademarks. (Id.; see Kwapisz Aff. Ex. 2).

Counsel for Coach contacted O'Brien by letter dated July 19, 2010, which Coach sent both by e-mail to covermycellphone@comcast.net, and by First-Class Mail to the Alsip, Illinois address. (Walden Aff. ¶ 23 & Ex. 3). The letter advised O'Brien of her infringing conduct and demanded that she cease and desist her infringing activities, and supply Coach with certain information and her supply of infringing goods. [*35] (Id.). It also warned her of the consequences of trademark counterfeiting and infringement. (Id.). By letter dated July 26, 2010, counsel for Coach again contacted O'Brien, requesting a response to its July 19, 2010 letter. (Id. ¶ 24 & Ex. 4). Having received no response to these letters, Coach brought this action on August 13, 2010. (Id. ¶ 25).

**4. O'Brien Is Liable for Trademark Infringement**

In its Motion for Default Judgment, Coach requested damages relating to its claims against O'Brien for willful trademark infringement, but not for the remaining causes of action asserted in the Complaint. (Plaintiffs' Memorandum of Law in Support of Its [sic] Motion to Strike Defendant's Answer and for a Default Judgment, dated Jan. 14, 2011 (Dkt. No. 14) ("Pls.' Mem.") at 17 n.1). Therefore, in evaluating whether Coach has established a valid cause of action, the Court considers O'Brien's liability as to the claim of trademark infringement only. See Coach Servs., Inc. v. K Ya Int'l, Inc., No. 09 Civ. 4656 (RMB) (JCF), 2010 U.S. Dist. LEXIS 69631, 2010 WL 2771897, at *2 (S.D.N.Y. June 10, 2010) (Report & Recommendation) ("In connection with this inquest, the plaintiff has requested damages only for trademark infringements in [*36] violation of the Lanham Act, and therefore liability need only be considered with respect to that claim."), adopted by, 2010 U.S. Dist. LEXIS 69655, 2010 WL 2771907 (S.D.N.Y. July 12, 2010).

HN10[⚓] "There are two elements necessary to establish trademark infringement under the Lanham Act: (1) the plaintiff's ownership of a valid trademark and (2) the likelihood of confusion from the defendants' use of that trademark without the plaintiff's permission." Id. (citing Chanel, Inc. v. Louis, No. 06 Civ. 5924 (ARR) (JO), 2009 U.S. Dist. LEXIS 113910, 2009 WL 4639674, at *10 (E.D.N.Y. Dec. 7, 2009)). The allegations contained in the Complaint satisfy both elements, establishing a valid claim of trademark infringement. As to the first element, Coach possesses ownership of the three marks at issue, all of which are valid, subsisting, and in full force and effect. (Compl. ¶¶ 16-17). Notwithstanding Coach's ownership and the validity of these trademarks, O'Brien offered for sale and sold on the Website cellular phone covers bearing counterfeits and infringements of these trademarked designs without authorization from Coach. (Compl. ¶¶ 25, 31; Kwapisz Aff. ¶¶ 4-5, Exs. 1-2). As to the second element, because of the recognition Coach has achieved as a well-known [*37] luxury brand and due to the nature of its trademarked designs, there is likely to be confusion between Coach's authentic merchandise and the products O'Brien offered for sale on the Website that showcased the name "Coach" and other of the Coach Registered Trademarks. (Compl. ¶¶ 18-24, 32). Such use of the trademarks constitutes trademark infringement.

Furthermore, I find O'Brien's trademark infringement to be willful. As an initial matter, O'Brien's infringement and counterfeiting is deemed willful "[b]y virtue of the default[.]" Tiffany (NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003); see, e.g., Chloe v. Zarafshan, No. 06 Civ. 3140 (RJH) (MHD), 2009 U.S. Dist. LEXIS 84255, 2009 WL 2956827, at *7 (S.D.N.Y. Sept. 15, 2009) ("Willfulness may be established by a party's default because an innocent party would presumably have made an effort to defend itself."). Moreover, O'Brien's willfulness is apparent from the similarity between the products she sold and genuine Coach merchandise. See Melendez, 2011 U.S. Dist. LEXIS 116842, 2011 WL 4542971, at *5 ("Because the marks used by defendants on their products are virtually identical to the Coach Registered Trademarks, the

conclusion is inescapable that defendants' infringement and counterfeiting [*38] is intentional.") (citing cases).

## C. Inquest

### 1. Damages

*HN11*[⚓] Having found that O'Brien is liable for trademark infringement, the Court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty," *Credit Lyonnais Secs. (USA) v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)*; see, e.g., *Software Freedom Conservancy, Inc. v. Best Buy Co., No. 09 Civ. 10155 (SAS), 2010 U.S. Dist. LEXIS 75208, 2010 WL 2985320, at *2-3 (S.D.N.Y. July 27, 2010)* (granting application for injunctive relief and awarding damages after entering default pursuant to *Rule 37*). This inquiry "involves two tasks: determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence supporting the damages to be determined under this rule." *Credit Lyonnais, 183 F.3d at 155*. Relevant to this first task is the fact that Coach has elected to recover statutory damages under *15 U.S.C. § 1117(c)*, rather than damages tied to its actual losses or to O'Brien's profits. (Walden Aff. ¶ 26 (citing *15 U.S.C. § 1117(c)*). Accordingly, the Court must assess Coach's entitlement to statutory damages under *15 U.S.C. § 1117(c)*.

As to the second task, *HN12*[⚓] while *Rule 55(b)(2)* provides that the Court, in considering [*39] a default judgment, may "conduct hearings or make referrals" to "determine the amount of damages[,]" *Fed. R. Civ. P. 55(b)(2)(B)*, the Second Circuit has held that an inquest into damages may be held on the basis of documentary evidence alone, "as long as [the court has] ensured that there was a basis for the damages specified in [the] default judgment." *Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989)*; accord *Action S.A., 951 F.2d at 508*, Coach's submissions in support of its Motion for Default Judgment include affidavits and attached documentary evidence, which provide a basis for an award of damages and thus obviate the need for a hearing. See, e.g., *Kuruwa, 2011 U.S. Dist. LEXIS 122466, 2011 WL 5059187, at *2*.

*HN13*[⚓] Pursuant to the Lanham Act, a trademark owner may elect to recover an award of statutory damages instead of actual damages for an amount between $1,000 and $200,000 "per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just;" or, if the court finds the use of the mark to have been willful, up to $2,000,000 per counterfeit mark per type of good. *15 U.S.C. § 1117(c)*; see generally *All-Star Marketing Group, LLC v. Media Brands Co., Ltd., 775 F. Supp. 2d 613, 620-21 (S.D.N.Y. 2011)* [*40] ("The rationale for *§ 1117(c)* is the practical inability to determine profits or sales made by counterfeiters.") (citations omitted). This provision of the Lanham Act "does not provide guidelines for courts to use in determining an appropriate award, as it is only limited by what 'the court considers just.'" *Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004)* (internal citation omitted). Despite this lack of guidelines, "courts have found some guidance in the caselaw of an analogous provision of the Copyright Act, *17 U.S.C. § 504(c)*, which also provides statutory damages for willful infringement." *Id.* (citations omitted). Under the statutory-damages framework articulated by the Second Circuit in *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., 807 F.2d 1110, 1117 (2d Cir. 1986)* ("*Fitzgerald*"), courts consider: (1) "the expenses saved and the profits reaped"; (2) "the revenues lost by the plaintiff; (3) "the value of the copyright" or, by analogy, trademark; (4) "the deterrent effect on others besides the defendant"; (5) "whether the defendant's conduct was innocent or willful"; (6) "whether a defendant has cooperated in providing particular [*41] records from which to assess the value of the infringing material produced"; and (7) "the potential for discouraging the defendant." *Duty Free Apparel, 315 F. Supp. 2d at 520* (citing *Fitzgerald, 807 F.2d at 1117*); see, e.g., *All-Star Marketing Group, 775 F. Supp. 2d at 622-23* (applying test for statutory damages in trademark action subsequent to defendants' default); *Tiffany (NJ), 282 F. Supp. 2d at 125* (same); *Melendez, 2011 U.S. Dist. LEXIS 116842, 2011 WL 4542971, at *6-7* (same).

Here, the evidence provided by Coach—including affidavits and attached documentary evidence, which, as noted, the Court may consider in lieu of an inquest proceeding—demonstrates that Coach is entitled to an award of monetary damages. Coach has established that the Coach Registered Trademarks—recognized as symbols of Coach's quality, reputation, and goodwill—generate Coach millions of dollars in sales per year. (Compl. ¶¶ 14-24). Although nothing in the record demonstrates whether Coach lost any revenue from O'Brien's infringement, the goal of deterring similar conduct generally requires a significant award. See, e.g., *Louis Vuitton Malletier, S.A. v. LY USA, No. 06 Civ. 13463 (AKH), 2008 U.S. Dist. LEXIS 107592, 2008 WL 5637161, at *2 (S.D.N.Y. Oct. 3, 2008)*. In

[*42] addition, this Court has already found that O'Brien's conduct was willful "[b]y virtue of [her] default," *Tiffany (NJ), 282 F. Supp. 2d at 124*, and because of the similarity between genuine Coach merchandise and the cellular phone covers O'Brien offered for sale and sold on the Website. Although the record does not show any evidence of O'Brien's continued sale of cellular phone covers bearing counterfeit Coach Registered Trademarks,[5] the Complaint alleges and the Court accepts as true that, "[d]espite being put on notice by Coach of [O'Brien's] illegal activities, [she] continued to offer for sale and sell merchandise bearing counterfeits of the Coach Registered Trademarks." (Compl. ¶ 27). Thus, the third, fourth, fifth, and seventh factors weigh in favor of an award of statutory damages, with the second factor remaining neutral.

Notwithstanding this analysis, Coach's demand for millions of dollars in statutory damages is excessive. [*43] Coach seeks damages only for the three marks used by O'Brien in her "advertising, distributing, offering for sale and selling of counterfeit Coach products[.]" (Walden Aff. ¶ 26 (citing Compl. Ex. 1; Kwapisz Aff. ¶ 5 & Ex. 2)). In particular, without explanation for its calculation, Coach seeks $3,000,000, or $1,000,000 per trademark infringed (Walden Aff. ¶ 27), an amount that the record does not support given the apparently modest scale of O'Brien's activities. In O'Brien's Opposition to the Motion for Default Judgment, she states that "[t]he total revenues (not profits) resulting from [her] sales of the alleged infringing items was a mere $5,533.76. The profit — *if any* — would be a fraction thereof." (Def.'s Mem. at 3 (emphasis in original)). O'Brien apparently calculated that figure using documents that were contained within a voluntary production to Coach that she made during settlement negotiations last year of all "relevant sales records" for the Website, which she characterized as "documents showing literally every transaction and every dollar and penny received from the sale of the allegedly-infringing goods from the inception of [the Website] to the present." (Def.'s Mem. [*44] at 3). Coach concedes receipt of these materials but characterizes the production as "select sales records, which [O'Brien] purported fully documented her sales of infringing and counterfeit Coach products." (Reply Affirmation of

Walter-Michael Lee in Further Support of Plaintiffs' Motion to Strike Defendant's Answer and for a Default Judgment and in Opposition to Defendant's Reply, dated Feb. 4, 2011 ("Reply" or "PL's Reply Mem.") (Dkt. No. 19), ¶ 7 (citation omitted)). Despite the implication that this disclosure was incomplete and thus did not reflect the entirety of O'Brien's sales, Coach provides no evidence to suggest that O'Brien withheld any information reflecting additional sales, or that the revenues were higher than she proffered. Accordingly, the first and sixth factors weigh in favor of a damages award commensurate with the scale of the Website's sales. See *Duty Free Apparel, 315 F. Supp. 2d at 520* ("[S]tatutory damages 'should be woven out of the same bolt of cloth as actual damages[.]'") (citation omitted); see also *Melendez, 2011 U.S. Dist. LEXIS 116842, 2011 WL 4542971, at *7* ("I believe it is desirable that an award of statutory [damages] be tied to some rough estimate of the actual damages that [*45] would be recoverable[.]").

*HN14*[⬆] Courts frequently issue awards far below the statutory maximum on a per mark basis even where, as here, "the defendant willfully infringes on the plaintiff's mark and fails to stop such behavior after being put on notice by the plaintiff or the court, [although] there is no concrete information about the defendant's actual sales figures and profits and the estimate of plaintiff's lost revenue." *All-Star Marketing Group, 775 F. Supp. 2d at 624* (citing cases); see, e.g., *K Ya Int'l, Inc., 2010 U.S. Dist. LEXIS 69631, 2010 WL 2771897, at *3* (deeming damages award of $20,000—$6,667 per infringement—sought by Coach "appropriate [trademark infringement] award, as it effectively serves both the punitive and deterrent purposes of *15 U.S.C. 1117(c)*"); *Cartier Int'l B.V. v. Ben-Menachem, No. 06 Civ. 3917, 2007 U.S. Dist. LEXIS 95366, 2008 WL 64005, at *15 (S.D.N.Y. Jan. 3, 2008)* ($50,000 statutory damages for each of nineteen counterfeited marks deemed "sufficient to meet the goals of *[15 U.S.C. § 1117(c)]*, including compensating the Plaintiffs and deterring future violations"); *Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc., No. 03 Civ. 2132 (GBD) (KNF), 2005 U.S. Dist. LEXIS 28815, 2006 WL 728407, at *6 (S.D.N.Y. Mar. 21, 2006)* (where plaintiff did [*46] not provide court with any information about corporate defendant's business, "market in which [defendant] sold or is continuing to sell counterfeit products, or any estimate of the volume of products bearing the plaintiff's marks sold by the defendant[,]" court awarded $125,000 per infringed mark because that amount would sufficiently "impress upon [defendant] that there are consequences for its misconduct" and would "serve as a specific

[5] Indeed, the Court notes that the Website (last visited November 28, 2011) appears to be no longer active. See *Muller-Paisner v. TIAA, 289 Fed. Appx. 461, 466 n.5 (2d Cir. 2008)* (taking judicial notice of publication of website) (citation omitted) (Summary Order).

deterrent to [defendant] and as a general deterrent to others who might contemplate engaging in infringing behavior in the future"). This logic, and the application of the Fitzgerald framework, suggest that Coach's requested damage award is inappropriate.

Coach does not argue that the Website sold any infringing products—or even any non-infringing products—other than cellular phone covers. Representative samples of printouts from the Website indicate that these covers cost anywhere from $15.99 to $24.99. (Walden Aff. ¶ 15 Ex, 1). The cover purchased by counsel for Coach cost $19.99. (Kwapisz Aff. ¶ 4 & Ex. 1). These figures indicate that O'Brien would need to sell more than 50,025 cellular phone covers per year— or more than 4,169 per month, or 139 per [*47] day—to earn revenue equal to $1,000,000 a year. She would need to sell three times that amount to equal $3,000,000 in revenue per year, meaning 150,075 per year, 12,507 per month, or 417 per day. Such sales are unsupported by the allegations in the Complaint and seem rather far-fetched in light of the record. As Magistrate Judge Pitman observed in Melendez. another trademark case brought by Coach, "[a]lthough I have no empirical evidence concerning the issue, the notion that defendants—operators of a relatively obscure internet sales site—are selling more than 400 [hand]bags per week seems unlikely." 2011 U.S. Dist. LEXIS 116842, 2011 WL 4542971, at *7 (noting that "the typical starting point for assessing statutory damages is the actual damages calculation, namely plaintiff's losses and/or defendant's profits").

In her Opposition to the Motion for Default Judgment, O'Brien represented that the Website generated only $5,533.76 in revenue (Def's Mem. at 3), and, while the "back up" for that assertion was not presented to the Court, Coach has not offered any evidence to contradict that claim. Accepting the $5,533.76 figure as the entirety of O'Brien's revenue for the sake of this inquiry, without knowledge as to how [*48] much O'Brien marked up the cellular phone covers—for which there is no basis in the record—or what a typical mark-up is for a cellular phone cover, any findings as to her profits would "simply be a guess[.]" M.B.S. Love Unlimited, Inc. v. Park's Sportswear Corp., No. 90 Civ. 0311 (LBS), 1991 U.S. Dist. LEXIS 3770, 1990 WL 276561, at *3 (S.D.N.Y. Mar. 28, 1991) (without evidence indicating "what mark-up is normal in this form of retailing [the T-shirt industry] ... [w]ere this Court to adopt some recognized form of retail pricing (e.g., keystone pricing, i.e., three times wholesale cost), it would simply be a guess as to the applicability of such pricing to T-shirt wholesalers.").

Notwithstanding the apparent dearth of case law or documentary evidence to establish what mark-up is typical for cellular phone covers, in order to award damages that are "just," 15 U.S.C. § 1117(c)(2), I recommend that the Court apply the three-hundred percent mark-up that courts have used in other trademark infringement cases involving luxury goods. See, e.g., Melendez, 2011 U.S. Dist. LEXIS 116842, 2011 WL 4542971, at *7 (trademark action involving Coach handbags); Malletier v. Apex Creative Int'l Corp., 687 F. Supp. 2d 347, 358 (S.D.N.Y. 2010) (trademark action involving [*49] Louis Vuitton handbags). Using this rubric, if O'Brien's revenue from the Website equaled $5,533.76, then O'Brien made approximately $4,150 in profits. Given that Coach seeks damages for infringement of three of the Coach Registered Trademarks, Coach would thus be entitled to recover $12,450 in statutory damages. Considering the willful nature of O'Brien's infringement, this amount is "an appropriate award as it effectively serves both the punitive and deterrent purposes of 15 U.S.C. 1117(c)." K Ya Int'l, Inc., 2010 U.S. Dist. LEXIS 69631, 2010 WL 2771897, at *3 (awarding $6,667 per infringed mark against corporate defendant that sold counterfeit handbags, and maintained offices and retail stores in Manhattan and Brooklyn).[6]

## 2. Costs and Fees

Coach also requests an award of costs in the amount of $456.95, comprised of the $350.00 filing fee, a $50 investigative fee, and the cost of the "Evidential

---

[6] Where trademark infringement is deemed willful, the Lanham Act provides for either treble damages under 15 U.S.C. § 1117(b) (where a plaintiff seeks actual damages under 15 U.S.C. § 1117(a)) or an award of up to $2,000,000 per infringed trademark under 15 U.S.C. § 1117(c)(2) (where a plaintiff seeks statutory damages under 15 U.S.C. § 1117(c)). Because Coach seeks statutory damages under 15 U.S.C. § 1117(c), it does not seek and the Court does not award treble damages as it would if Coach [*50] sought actual damages under 15 U.S.C. § 1117(a). Nor does Coach request the enhanced $2,000,000 award permitted by 15 U.S.C. § 1117(c)(2). (Pls.' Mem. at 17-24). Although Coach has established that O'Brien's trademark infringement was willful, under these circumstances—specifically given the scale of O'Brien's operations and the product she sold, cellular phone covers—the award of $12,450 "will be sufficient to meet the goals of the statute, including compensating the Plaintiffs and deterring future violations." Cartier, 2007 U.S. Dist. LEXIS 95366, 2008 WL 64005, at *15.

2012 U.S. Dist. LEXIS 52565, *50

Purchase Fees," which Coach purports to be $56.95. (Affirmation of Walter-Michael Lee in Support of Plaintiffs' Motion to Strike Defendant's Answer and for a Default Judgment, dated Jan. 14, 2011 ("Lee Aff.") (Dkt. No. 13-3), ¶ 20). However, because the record indicates the cellular phone cover that counsel for Coach purchased cost only $25.94, inclusive of shipping fees (Kwapisz Aff. ¶ 4 & Ex. 1), rather than $56.95, Coach is entitled to reimbursement for fees in the amount [*51] of $425.94. Although Coach may be entitled to reasonable attorney's fees under 15 U.S.C. § 1117(a), see Tiffany (NJ), 282 F. Supp. 2d at 125, Coach has indicated that it "does not seek recovery of its attorneys' fees." (Lee Aff. ¶ 21; Pls.' Mem. at 25 n.3).

**3. Injunctive Relief**

In addition to statutory damages, Coach also seeks a permanent injunction. (PL's Mem. at 26). In the Second Circuit, HN15[⚓] where a party seeks injunctive relief in an action alleging trademark infringement, courts apply the four-factor test enunciated by the Supreme Court in eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 390, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006).[7] Under that standard, injunctive relief should issue where the plaintiff has established a likelihood of success on the merits in seeking a preliminary injunction, or has actually succeeded on the merits in seeking a permanent injunction, and that: (1) plaintiff is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate plaintiff for that injury; (3) the

---

[7] In Salinger v. Colting, 607 F.3d 68, 78 n.7 (2d Cir. 2010), the Second Circuit extended the test articulated by eBay, a patent action involving a permanent injunction, "to preliminary injunctions in the context of copyright cases[.]" Although the Second Circuit did not explicitly extend the eBay test to trademark actions, the Court stated that it saw "no reason that eBay would not apply with equal force to an injunction in any type of case." Id. (emphasis in original) ("eBay strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context."). In light of Salinger, district courts in this Circuit have extended eBay to trademark actions as well. See, e.g., U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 2011 WL 1842980, at *19-20 (S.D.N.Y. 2011) (applying Salinger's extension of eBay in a trademark action) (citing Pretty Girl, Inc. v. Pretty Girl Fashions, Inc., 778 F. Supp. 2d 261, 265 (E.D.N.Y. 2011) (same); NYC Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010) (same)).

balance of hardships tips in plaintiff's favor; and (4) the public interest would not be disserved by the issuance of a preliminary injunction. See Salinger, 607 F.3d at 80 [*52] (citing eBay, 547 U.S. at 391).

The first eBay factor, HN16[⚓] irreparable harm, is "automatically [*53] satisfied by actual success on the merits, as irreparable harm is established by 'a showing of likelihood of confusion.'" Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997) ("[T]he requirement of irreparable harm carries no independent weight, as we have held that a showing of likelihood of confusion (a requirement of both trademark infringement and unfair competition claims) establishes irreparable harm."). O'Brien's default constitutes an admission of liability as to the trademark infringement claim, as noted above, such that Coach has established a likelihood of confusion from which irreparable harm is presumed.

The second eBay factor, HN17[⚓] no adequate remedy at law, "is satisfied where the record contains no assurance against defendant's continued violation" of trademarks. Montblanc-Simplo GmbH v. Colibri Corp., 692 F. Supp. 2d 245, 259 (E.D.N.Y. 2010) (applying eBay test to trade dress claims after entry of default). Where default is entered, "[a] court may infer from a defendant's default that it is willing to, or may continue its infringement." Pearson Educ., Inc. v. Vergara, No. 09 Civ. 6832 (JGK) (KNF), 2010 U.S. Dist. LEXIS 101597, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010) (citations [*54] omitted), adopted by, Order at Dkt. No. 21 (S.D.N.Y. May 11, 2011). O'Brien's default thus weighs against her on this factor.

Finally, the third and fourth eBay factors, those requiring a balance of hardships and a consideration of the public interest, favor Coach. "The balance of hardships weighs in [Coach's] favor since [O'Brien] has not identified any hardships for the Court to consider." Houndog Prods., LLC v. Empire Film Grp., Inc., No. 09 Civ. 9698 (VM) (JLC), 826 F. Supp. 2d 619, 2011 U.S. Dist. LEXIS 104994, 2011 WL 4336694, at *9 (S.D.N.Y. Sept. 16, 2011) (Report & Recommendation), adopted by, 826 F. Supp. 2d 619, 2011 U.S. Dist. LEXIS 130687, 2011 WL 5519829 (S.D.N.Y. Nov. 10, 2011); see also Pearson Educ., Inc., 2010 U.S. Dist. LEXIS 101597, 2010 WL 3744033, at *5 (same). Likewise, "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." NYC Triathlon, LLC, 704 F. Supp. 2d at 344 (granting motion to enjoin defendant from any further violations of trademark).

Here, the public has an interest in being able to rely on the high quality of the products bearing the Coach Registered Trademarks so that the fourth factor, like the others, favors injunctive relief.

Accordingly, I recommend that the Court [*55] enter the permanent injunction Coach seeks, and enjoin O'Brien and her employees, agents, servants, successors, and assigns, and all those acting in concert or participating therewith, from:

(a) using any reproduction, counterfeit, copy, or colorable imitation of the Coach Registered Trademarks to identify any goods or the rendering of any services not authorized by Coach;

(b) engaging in any course of conduct likely to cause confusion, deception or mistake, or injure Coach's business reputation or weaken the distinctive quality of the Coach Registered Trademarks, Coach's name, reputation or goodwill;

(c) using a false description or representation including words or other symbols tending to falsely describe or represent O'Brien's unauthorized goods as being those of Coach or sponsored by or associated with Coach and from offering such goods in commerce;

(d) further infringing or diluting the Coach Registered Trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying or otherwise disposing of any products not authorized by Coach bearing any simulation, reproduction, counterfeit, copy or colorable imitation [*56] of the Coach Registered Trademarks;

(e) using any simulation, reproduction, counterfeit, copy or colorable imitation of the Coach Registered Trademarks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products in such fashion as to relate or connect, or tend to relate or connect, such products in any way to Coach, or to any goods sold, manufactured, sponsored or approved by, or connected with Coach;

(f) making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any services provided, products manufactured, distributed, sold or offered for sale, or rented by O'Brien are in any way associated or connected with Coach, or is provided, sold, manufactured, licensed, sponsored, approved or authorized by Coach;

(g) engaging in any conduct constituting an infringement of any of the Coach Registered Trademarks, of Coach's rights in, or to use or to exploit, said trademark, or constituting any weakening of Coach's name, [*57] reputation and goodwill;

(h) using or continuing to use the Coach Registered Trademarks or trade names in any variation thereof on the Internet (either in the text of a website, as a domain name, or as a keyword, search word, metatag, or any part of the description of the site in any submission for registration of any Internet site with a search engine or index) in connection with any goods or services not directly authorized by Coach;

(i) hosting or acting as Internet Service Provider for, or operating or engaging in the business of selling any web site or other enterprise that offers for sale any products bearing the Coach Registered Trademarks;

(j) acquiring, registering, maintaining or controlling any domain names that include the COACH trademark or any of the other Coach Registered Trademarks or any marks confusingly similar thereto, activating any website under said domain names, or selling, transferring, conveying, or assigning any such domain names to any entity other than Coach;

(k) using any e-mail addresses to offer for sale any nongenuine products bearing counterfeits of the Coach Registered Trademarks;

(l) having any connection whatsoever with any websites that offer for sale [*58] any merchandise bearing counterfeits of the Coach Registered Trademarks;

(m) secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying of all unauthorized products which infringe the Coach Registered Trademarks; and

(n) effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (m),

2012 U.S. Dist. LEXIS 52565, *58

## III. CONCLUSION

For all of the foregoing reasons, I recommend that the Court enter a default judgment against O'Brien as to liability pursuant to *Rule 37(b)(2)(A)(vi)* and *Rule 55(a)*. I further recommend that, pursuant to *Rule 55(b)*, the Court award Coach statutory damages of $12,450.00 and fees in the amount of $425,94, for a total of $12,875.94, and that a permanent injunction be entered as described above.

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b) of the Federal Rules of Civil Procedure,* **[*59]** the parties shall have fourteen (14) days from service of this Report to file written objections. See also *Fed. R. Civ. P. 6*. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable J. Paul Oetken and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Oetken. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** See *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010)* (citing *Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003)* and *Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002))*; *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72*. If O'Brien does not have access to cases cited herein that are reported on LexisNexis or Westlaw, she should request copies from Coach. See *Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009)*.

Dated: New York, New York

November 28, 2011

/s/ James L. Cott **[*60]**

JAMES L. COTT

United States Magistrate Judge

End of Document

**6**

Case 4:17-cv-10964-LVP-APP ECF No. 201-3 PageID.3424 Filed 01/22/19 Page 40 of 135
Fila U.S.A., Inc. v. Run Run Trading Corp., Not Reported in F.Supp. (1996)
1996 WL 271992

1996 WL 271992
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

FILA U.S.A., INC., Fila Sport, S.p.A.,
Reebok International Limited, Reebok
International Ltd., and Nike, Inc., Plaintiffs,
v.
RUN RUN TRADING CORP., Kilsun Lee, On-
Line Hats, Inc., and Thomas Lee, Defendants.

No. 95 CIV. 7144 (PKL).
|
May 21, 1996.

**Attorneys and Law Firms**

Paul Siegert, Jung & Siegert, New York City.

Harley I. Lewin, G. Roxanne Elings, Dana R. Kaplan,
Lewin & Laytin, P.C., New York City.

*MEMORANDUM ORDER*

LEISURE, District Judge:

*1 Before the Court is plaintiffs' motion for summary
judgment against defendants On-Line Hats, Inc., and
Thomas Lee [1] ("defendants"), pursuant to Rule 56
of the Federal Rules of Civil Procedure. Plaintiffs
allege that defendants infringed plaintiffs' trademarks
by selling counterfeit trademarked goods. Plaintiffs seek
the following relief against defendants: (1) an award of
treble damages, jointly and severally, in the amount of
$1,125,373.50; (2) an award of attorney's fees and costs,
jointly and severally, in the amount of $22,818.01; (3) the
release of all bonds posted by plaintiffs in this action; (4)
entry of a permanent injunction restricting and enjoining
defendants' acts; (5) the release of all infringing and
counterfeit Fila, Reebok, and Nike merchandise; (6) a
constructive trust, for the benefit of plaintiffs, on certain
funds currently restrained under this Court's Order at
Korea First Bank of New York, and subsequent release
of those funds in the event this Court awards monetary
damages to plaintiffs; and (7) such other and further relief
as this Court deems equitable and just. *See* Memorandum
of Law in Support of Plaintiffs' Motion for Summary
Judgment at 1-2.

Defendants have consented to the following relief: (1) a
permanent injunction; (2) the release of any infringing
or counterfeit Fila, Reebok, and Nike merchandise, and
(3) the release of any bonds filed by plaintiff. However,
defendants do not concede that an infringement of
trademark laws has occurred, and dispute the amount of
damages claimed by plaintiff. *See* Defendants' Affidavit in
Opposition to Summary Judgment ("Def's Aff.") at 1-2.

Under Rule 56, summary judgment shall be granted if
"the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a
matter of law." Fed. R. Civ. P. 56(c). The Rule further
provides that "[w]hen a motion for summary judgment is
made and supported as provided in this rule, an adverse
party may not rest upon the mere allegations or denials
of the adverse party's pleading, but the adverse party's
response, by affidavits or as otherwise provided in this
rule, must set forth specific facts showing that there is a
genuine issue for trial." Fed. R. Civ. P. 56(e).

Plaintiffs, by offering a motion for summary judgment,
placed a burden upon the defendants to demonstrate
that a genuine issue of material fact exists with respect
to plaintiffs' cause of action. *See Sheldon v. Barre Belt
Granite Employer Union Pension Fund*, 25 F.3d 74, 79 (2d
Cir. 1994). Defendants have not met this burden.

In response to plaintiffs' motion for summary judgment,
defendants submitted only an affidavit by defendant
Thomas Lee. In the affidavit, Lee stated his opposition
to a number of factual allegations made by plaintiff.
Lee alleged that no infringement of trademark law
took place because the reproduction, counterfeit, copy
or colorable imitation seized "could not possibly cause
confusion" because of its lack of similarity to the original
merchandise, and that the defendants did not possess the
requisite level of knowledge necessary for plaintiffs to
make out a prima facie case. *See* Def's Aff. at 2. However,
defendants did not submit any specific factual information
which could be considered in support of their defense
and in response to plaintiffs' allegations. According to
the case law of this Circuit, "[t]he non-movant cannot
escape summary judgment merely by vaguely asserting the
existence of some unspecified disputed material facts." *See*

*Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990).

**\*2** Regardless of whether defendants have provided specific material facts to support their claim, they must prevail under the Lanham Act's trademark infringement provision. To do so, plaintiffs must show that they have a valid mark entitled to protection and that defendants' use of the plaintiffs' marks is likely to cause confusion. *See Cadbury Beverages, Inc. v. Cott Corporation,* 73 F.3d 474, 477 (2d Cir. 1996). Defendants do not dispute the validity of plaintiffs' registered FILA, REEBOK and NIKE trademarks. Therefore, this Court must determine whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *See Gruner + Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1077 (2d Cir. 1993). In order to do this, this Court has relied on the eight-factor test set forth in *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820 (1961). These factors include:

> the strength of the mark; the degree of similarity between the two marks; the proximity of the products; the likelihood that the prior owner will bridge the gap; actual confusion; the defendant's good faith in adopting its own mark; the quality of defendant's product; and the sophistication of the buyers.

*Id.*

The strength of the plaintiffs' mark focuses on the tendency to identify the goods as coming from a particular source. *See Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 581 (2d Cir. 1991). The strength of plaintiffs' trademarks is beyond dispute, and defendants make no attempts to dispute it. The second factor looks to whether the similarity of the marks is likely to provoke confusion among prospective purchasers. *See id.* The defendants' marks are almost identical to plaintiffs' trademarks and it is nearly impossible for the untrained eye to distinguish them from those marks appearing on plaintiffs' merchandise. *See* Declaration of David Simpson, dated

Aug. 28, 1995 ("Simpson Dec."), ¶¶ 19-20; Declaration of Robert Liewald, dated Aug. 28, 1995 ("Liewald Dec."), ¶¶ 15-16. Additionally, defendants sold many of the same products as the plaintiffs, such as hats and shirts. This factor thus makes it even more unlikely that a reasonable observer would be able to distinguish between the two products. These observations inevitably lead the court to infer actual confusion, which is the fifth *Polaroid* factor.

The proximity of the products factor focuses on whether the two products compete with each other. "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *See Lang,* 949 F.2d at 582. Defendants' counterfeit merchandise is sold in direct competition with genuine FILA, REEBOK, and NIKE merchandise. *See* Simpson Dec. ¶ 23; Liewald Dec. ¶ 14; Declaration of Harley I. Lewin, dated Aug. 28, 1995 ("Lewin Dec."), ¶ 14. Moreover, defendants benefit from plaintiffs' advertising without the burden of having to pay for it.

**\*3** The "bridging the gap" factor turns on whether the senior user will enter the market of the junior user. However, when there is already an overlap in the market, as in the situation at issue, "the likelihood of confusion is greater." *See Nikon Inc. v. Icon Corp.,* 987 F.2d 91, 95 (2d Cir. 1993). The fact that there is already an overlap in the market and that consumers are unlikely to exercise great care in purchasing the merchandise at issue, serves to increase the likelihood of confusion as to the source of the product.

The "bad faith" factor concerns "whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang,* 949 F.2d at 583 (quoting *Edison Bros. Stores v. Cosmair, Inc.,* 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987)). With respect to the issue of intent, defendants contend only that they did not possess the knowledge necessary for plaintiffs to make out a prima facie case against them. *See* Def's Aff. at 2. This allegation is not enough to resist summary judgment. *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1980) ("The litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978))). Even if defendants'

Case 4:17-cv-10964-LVP-APP ECF No. 201-3 PageID.3426 Filed 01/22/19 Page 42 of 135
Flik U.S.A., Inc. v. Run Run Trading Corp., Not Reported in F.Supp. (1996)
1996 WL 271992

allegation was more substantial, in cases where a party endeavors to sell products which are identical or nearly identical to those of another party's well-known and widely distributed trademarks, it is reasonable to infer bad faith.

Finally, the quality of the defendant's product factor focuses on whether the plaintiffs' reputation could be "tarnished" by the inferior merchandise of the defendants. *See Cadbury Beverages, Inc.,* 73 F.3d at 483. It appears clear that a reasonable consumer, being unable to distinguish defendants' counterfeit product from that of the plaintiffs' trademarked product, would attribute any inferior quality product to the plaintiffs.

Based on this analysis of the *Polaroid* factors, this Court concludes that there exists an unmistakeable likelihood of confusion between the trademarked products of the plaintiffs and those of the defendants.

Summary judgment is proper on the issue of damages as well as liability. *See* 15 U.S.C. § 1117, *Rolex Watches U.S.A., Inc. v. Dauley,* 230 U.S.P.Q. 617, 619 (N.D. Cal. 1986). As stated previously, defendants must demonstrate that a genuine issue of material fact exists with respect to plaintiffs' cause of action. *See Barre Belt Granite,* 25 F.3d at 79. Defendants claim that there are material issues of fact involved with respect to the issue of damages and allege that plaintiffs, in calculating damages, have combined legitimate sales of merchandise not infringing plaintiffs' trademarks with apparent illegitimate sales. Again, the defendants have made conclusory statements with respect to the issue of damages, but have not provided any specific facts to support their position. Therefore, defendants have failed to sustain their burden of opposing the motion for summary judgment. *See id.*

*\*4* Moreover, the Court finds that the damages, attorney's fees and costs claimed by the plaintiffs are reasonable. Based on documents seized by plaintiffs pursuant to this Court's Order, it appears that defendants have sold counterfeit merchandise as early as August 1992 and continued selling this merchandise up to the date of the seizure -- August 30, 1995. In addition, plaintiffs were able to seize what appear to be complete records for June, July, and August 1995. These records reflect that during this three month period, defendants sold

2,588 pieces of counterfeit merchandise for $10,138.50, and from this figure, the Court calculates that over the thirty-seven month period of infringement, defendants sold 31,894 items of counterfeit merchandise for a total of $375,124.50. Trebling this figure results in damages to plaintiffs in the amount of $1,125,373.50.

Based on the evidence available to the Court, the Court finds this calculation of the damages figure, which is the figure claimed by plaintiffs, to be reasonable. Moreover, in addition to defendants' burden of coming forward with specific facts to oppose a motion for summary judgment, defendants in this trademark infringement case bear the burden of producing evidence to controvert plaintiffs' demonstration of gross sales. *See Louis Vuitton, S.A. v. Spencer Handbag Corp.,* 765 F.2d 966, 973 (2d Cir. 1985). Defendants have failed to satisfy this burden. Accordingly, plaintiffs are awarded treble damages in the amount of $1,125,373.50.

In addition, plaintiffs are entitled to recover the costs of the action and reasonable attorneys' fees because defendants have demonstrated no extenuating circumstances. *See* 15 U.S.C. § 1117(b). Based on a review of plaintiffs' billing records, the Court finds that plaintiffs have reasonably incurred attorneys' and investigators' fees in prosecuting this action, the pro rata share of which for the two defendants opposing this motion amounts to $19,902.26. In addition, the Court finds that the pro rata share of the costs reasonably incurred amounts to $2,915.75, for a total of costs and fees of $22,818.01.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment is granted. Plaintiffs are directed to submit a proposed order, within 30 days of this date, which conforms with the Court's conclusions in this opinion.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 271992

Fila U.S.A., Inc. v. Run Run Trading Corp., Not Reported in F.Supp. (1996)

1996 WL 271992

Footnotes

1       On December 18, 1995, the Court issued a default judgment and permanent injunction against the other two defendants,
        Run Run Trading Corp. and Kilsun Lee.

**End of Document**                                             © 2019 Thomson Reuters. No claim to original U.S. Government Works.

7

2014 WL 2515217
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Thomas GOULAS, Plaintiff,
v.
MAXMO, INC. and Maxmo
Foroozan, an individual, Defendants.

No. 14–10993.
|
Signed June 4, 2014.

**Attorneys and Law Firms**

Steven T. Kiousis, Troy, MI, for Plaintiff.

*ORDER GRANTING PLAINTIFF'S*
*THIRD AMENDED MOTION*
*FOR DEFAULT JUDGMENT [15]*

NANCY G. EDMUNDS, District Judge.

**\*1** Before the Court is Plaintiff Thomas Goulas's motion for default judgment against Defendants Maxmo, Inc., and Maxmo Foroozan for infringement of Plaintiff's "Honey Tree" restaurant trademark. (Dkt.15.)

Plaintiff has filed suit for trademark infringement pursuant to 15 U.S.C. § 1114 for infringing Plaintiff's "Honey Tree" restaurant trademark, for unfair competition pursuant to 15 U.S.C. § 1125(a), unjust enrichment, common law infringement claims, violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, breach of contract, breach of guaranty, and for injunctive relief. (Compl.)

**I. Facts**

Plaintiff states that, since 1975, he has used and/or licensed the trade name and mark "Honey Tree" to over twenty three restaurants located in southeastern Michigan, Toledo, Ohio, and Las Vegas, Nevada. (Comp.¶ 8.) Plaintiff states that he has used the Honey Tree name and mark consistently in connection with his restaurant operations and/or in licensing the Honey Tree name and

mark to authorized licensees or related companies. (Id. ¶ 9.) Plaintiff maintains that the thirty-three year use of the name and mark in connection with Honey Tree's goods and services has resulted in the name and mark becoming widely and favorably known and therefore is a valuable asset to Plaintiff. (Dkt.10.)

Plaintiff is the principal register of the Honey Tree trademark with the United States Patent and Trademark Office and has also registered the name in Michigan. (Exs.1, 2.)

Plaintiff alleges that he has licensed the non-exclusive use of the Honey Tree name and mark to various restaurants in Michigan. (Compl.¶ 9.) Plaintiff states that, as a result of his "extensive and continuous use of the Honey Tree Name and Mark and quality of the of the Honey Tree's good and services over the course of 33 years, the Honey Tree Name and Mark have become widely known and favorably known and valuable assets to Plaintiff[.]" (Id. ¶ 10.)

Plaintiff states that, on August 25, 2013, he and Defendants executed an agreement for Defendants to use the Honey Tree trademark name. (Compl.¶ 16.) Under the licensing agreement, Defendants were to pay a $1,500.00 signing fee and $1,500.00 monthly royalty payments for the first six months. (Compl., Ex. 3.) After the first six months, the royalty rate was to increase to $2,000.00. (Id.)

Shortly after that time, it appears that Defendants defaulted under the agreement by failing to pay amounts owing.

On December 20, 2013, Plaintiff sent Defendants a notice of default under the August 25, 2013 agreement. (Compl.Ex. 4.) Plaintiff informed Defendants that they owed him $7,500.00 under the terms of the agreement. (Id.) The notice stated that Defendants had thirty days to cure the default or Plaintiff would "immediately file suit to cause [Defendants] to remove the Honey Tree name and trade marks from [Defendant's] premises and from [Defendant's] advertising. (Id.)

**\*2** Plaintiff states that Defendants failed to cure the default under the agreement. (Compl.¶ 20.)

On January 29, 2014, Plaintiff sent Defendants a cease and desist letter for Defendants' usage of the Honey Tree name and mark. (Compl., Ex. 5.)

Plaintiff states that he has terminated the agreement and that Defendants therefore do not have any right to use the Honey Tree name or mark. (Compl ¶ 22.)

Plaintiff alleges that, despite terminating the agreement, Defendants are still using the Honey Tree name and mark to provide their services at their business operations (a restaurant) at 160 N. Milford Road, Milford, Michigan. (Compl.¶¶ 23, 24.)

Plaintiff further alleges that "Defendants' adoption and use of the [trademark] for its Milford location ... is an intentional and obvious attempt to trade on the goodwill established by Plaintiff [ ] in the Honey Tree Name and Mark." (Compl.¶ 26.)

Plaintiff alleges that Defendants' unauthorized use of the trademark has "irreparably injured" him "by confusing consumers, diverting sales, and diluting the distinctiveness of the [trademark.]" (Compl.¶ 29.)

Plaintiff claims that Defendants have also failed to pay monies owing under the agreement. (Compl.¶ 29.) Plaintiff states that, if Defendants are permitted to continue, their usage of the trademark will injure Plaintiff, the trademark, and the reputation and goodwill associated with the trademark. (Id.) Plaintiff represents that Honey Tree has a "reputation for exceedingly high-quality food and services[.]" (Id.) Plaintiff states that public interest weighs in favor of the public being free from confusion, mistake, or deception from the improper trademark usage. (Id.) Plaintiff claims that Defendants' usage will likely "falsely suggest a sponsorship, connection, license, endorsement or association with Plaintiff, thereby injuring Plaintiff and the public." (Compl.¶ 30.)

Plaintiff states that Defendants still owe the restaurant licensing fees as well as the royalty rates from September, 2013, through February, 2014. (Compl.Ex. 6.)

Plaintiff requests a litany of relief. (Compl. at 10–11.) Among the noteworthy requests outside of monetary damages, Plaintiff asks that the Court require Defendants "to deliver for impoundment during the pendency of this action, and for destruction upon entry of judgment, all products, menus, fixtures, writings, signage, artwork, and other materials that infringe Plaintiff's rights, falsely designate source or origin, or otherwise facilitate Defendants' unfair competition with Plaintiff[.] Plaintiff requests the Court to order Defendants to show compliance by filing a report in writing and under oath detailing "the manner and form in which Defendants have complied with [the Court's order.]" (Id.) Plaintiff finally requests that the Court enjoin and restrain from: "using the Honey Name and Mark; otherwise infringing the Honey Tree Name and Mark, the Honey Tree Registrations and/or competing unfairly with Plaintiff[ ]." (Id.)

*3  Plaintiff requests legal fees of $10,165.10, which include the "costs to negotiate and draft the license agreement, the efforts to collect the licensing fee and royalties ... and to prosecute th[e] action." [1] (Pl.'s Mot. ¶ 30.)

On April 4, 2014, Plaintiff requested clerk's entries of default against Defendants. (Dkt.6.) That same day, the clerk's office entered those defaults. (Dkt.7, 8.) On May 6, 2014, Plaintiff filed his original motion for default judgment. (Dkt.11.) After a review of Plaintiff's materials, the Court concluded that Plaintiff had not complied with all of the requirements and produced all of the documentation necessary for a default judgment. So the Court ordered production of those materials on May 29, 2014. (Dkt.14.) Plaintiff complied with the Court's order on the same day. (Dkt. 15 .)

Plaintiff states that the agreement provides for attorneys' fees. (Pl.'s Mot. ¶ 29.) In his motion, Plaintiff requests $18,000.00 for license fees and royalties. (Pl.'s Mot. at 11.)

## II. Default judgment standard

Once a plaintiff obtains a Rule 55(a) clerk's entry of default, a plaintiff may then seek a default judgment pursuant to Rule 55(b). [2]  If the plaintiff seeks a judgment for a sum certain, he may requests a clerk's default judgment. Fed.R.Civ.P. 55(b)(1). For all other requests, a plaintiff must apply to a court under Rule 55(b)(2) for relief. To obtain a default judgment pursuant to Rule 55(b)(2), a plaintiff's motion and supporting affidavits must provide:

1. The nature of the claim;

    2. That the return of service was filed with the Court and that service was properly made on the defendant;

    3. A statement that the defendant is not:

    a) an infant or incompetent person; or

    b) in the military service;

    4. The date the Clerk entered a default because the defendant failed to plead or otherwise defend in accordance with Fed.R.Civ.P. 55(a);

    5. The sum certain or the information necessary to allow the computation of a sum certain; and

    6. If an award of interest, costs, or attorney fees is sought, the legal authority and supporting documentation for interest, costs or attorney fees.

*See* Fed.R.Civ.P. 55(b); E.D. Mich. L.R. 55.2. "After a court determines that a default judgment should be entered, it will determine the amount and character of the recovery awarded." *American Auto. Ass'n v. Dickerson*, ——F.Supp.2d ——, 2014 WL 234362, at*2 (E.D.Mich. Jan. 22, 2014) (Borman, J.) (citations omitted).

## III. Analysis

### A. Plaintiff's facts establish that Defendants have infringed upon the Honey Tree mark and name and are also unfairly competing with Plaintiff by using the Honey Tree name and mark

The Court undertakes the same analysis for the trademark infringement, unfair competition, common law trademark infringement, or a violation of the MCPA. *Dickerson*, 2014 WL 234362, at *2 (citations omitted). The Court "must evaluate the likelihood of confusion between the two marks." *Id.* (citations omitted).

**\*4** Accepting the well-pleaded facts as true, the Court finds that Defendants have violated Plaintiff's rights. Here, Defendants are using Plaintiff's Honey Tree name and mark without the authorization to do so. "By using these marks without permission, Defendants are falsely representing that Plaintiff has endorsed or approves of

their business." *Id.* at *3. "The use of [the Honey Tree name and mark] are likely to create confusion and mislead consumers into believing that Plaintiff endorses and recommends Defendants' business." *Id.* The Court further notes that Plaintiff alleges that Defendants' actions are wilful and deliberate given that Plaintiff notified them about their unlawful use of the Honey Tree name and mark.

### B. Monetary damages

Plaintiff is entitled to monetary damages. Plaintiff claims that he is entitled to a $2,000.00 signing fee and the amount necessary to equal the royal rate for all the months that Defendants have failed to make the $1,500.00 monthly payment. The Court first notes that the August 26, 2013 letter requests a signing fee of $1,500.00, so the Court will award that amount for a signing fee. (Compl., Ex. 3.) As for the monthly royalty rate amount, the Court awards the rate from September, 2013, to May, 2014, or eight months: six months at $1,500.00, and three months at $2,000.00, $15,000.00. The total monetary award based on the agreement is therefore $16,500.00. [3]

### C. Injunctive relief

Plaintiff also requests injunctive relief. Plaintiff requests that the Court:

    1. order Defendants, their agents, servants, employees, attorneys, and any and all persons in active concert or participation with them immediately and permanently to cease and desist from all use of Plaintiff's marks or any mark that resembles, suggests, or intimates that Defendants' business is approved or endorsed by Plaintiff;

    2. order Defendants to destroy all literature, menus, web sites, domain names, signs, billboards, labels, prints, packages, wrappers, containers, advertising materials, stationary, and other items in their possession or control that contain Plaintiff's marks or any term, symbol, or logo confusingly similar to Plaintiff's mark; and to destroy any and all means in their possession or control of making any of those infringing items;

    3. order Defendants to have deleted or removed from publication, sign, menu, and/or any advertisements paid for or used by them containing any of Plaintiff's

Goulas v. Maxmo, Inc., Not Reported in F.Supp.3d (2014)

marks and any other name, mark, or logo confusingly
similar to them;

4. order Defendants to permanently delete, destroy,
and remove all electronic content, including all
websites, domain names, and other electronic materials
displaying Plaintiff's marks and any other name, mark,
or logo confusingly similar to them; and

5. order Defendants to file a report under oath within
30 days after the entry of an injunction setting forth in
detail the manner in which Defendants have complied
with the Court's injunction and orders.

**\*5** The Lanham Act provides for permanent injunctions
to prevent future violations of the Act. 15 U.S.C. §
1116. "A plaintiff who seeks a permanent injunction must
demonstrate: (1) it has suffered irreparable injury; (2)
there is no adequate remedy at law; (3) that considering
the hardships between the plaintiff and defendant; a
remedy in equity is warranted; and (4) that it is in the
public's interest to issue such an injunction." *Dickerson*,
2014 WL 234362, at \*4 (citation omitted). But, the Sixth
Circuit has held "that no particular finding of likelihood
of ... irreparable harm is necessary for injunctive relief in
trademark infringement or unfair competition cases." *Id.*
(citation omitted). Such a finding is not necessary because
"irreparable injury ordinarily follows when a likelihood
of confusion or possible risk to reputation appears from
infringement or unfair competition." *Id.* (citation and
quotation marks omitted).

Here, the Court finds that a permanent injunction is
warranted. Plaintiff has suffered an irreparable injury
in that Defendants are infringing Plaintiff's Honey Tree
mark and operating with that mark. There is also no
adequate remedy at law, since there is a potential for
future harm from continuing infringement. *Dickerson*,
2014 WL 234362, at \*4 (citation omitted). Plaintiff would
also suffer hardship in that he faces the possibility of
the loss of goodwill. *Id.* And finally, as the *Dickerson*
court noted that preventing consumer confusion is in the
public's interest. *Id.*

Plaintiff is entitled to the injunctive relief he requests.

### D. Attorneys' fees
Plaintiff asserts that the agreement entitled him to
attorneys' fees. He is correct.

The agreements includes an attorneys' fees provision.
(Agreement, ¶ 16.05.) The provision states that
Defendants are to pay a reasonable attorneys' fee, costs
and expenses that Plaintiff incurs in successfully enforcing,
or obtaining, any remedy arising from the breach of the
agreement. (*Id.*)

Plaintiff says that he has incurred legal fees of $10,165.10,
an amount that includes the costs to negotiate and draft
the license agreement, the efforts to collect the licensing
fee and royalties, and to prosecute this action. (Pl.'s Mot.,
Ex. B, Pl.'s Aff. ¶ 24 .)

The Court finds that some of fees Plaintiff requests are
improper, given the fact that the agreement provides for
an attorneys' fees award for enforcing the agreement and
prosecuting any wrongs stemming from the agreement,
but not entering into the agreement. Plaintiff has not
provided any authority for those fees that happened
outside of enforcing the agreement. The Court therefore
removes 13.5 hours from the fee detail. The total hours
expended with that 13.5 hours removed is 16.6 hours.
The Court will base its award on the 16.6 hours, finding
those hours a little high, but within the range of being
reasonable. Plaintiff's counsel requests an hourly rate of
$325.00. Plaintiff's counsel has not supported that hourly
request with any authority that that rate is reasonable.
The Court finds that it is not a reasonable rate. Looking
to the 2010 Economics of Law Practice Attorney Income
and Billing Rate Summary Report, the Court finds that
an hourly rate of $325 would put Plaintiff's counsel at
nearly the ninety-fifth percentile. [4] Given that Plaintiff's
counsel has not provided the Court with any information
regarding his background or experience, the Court will
award the mean hourly billing rate for intellectual
property/trade secrets attorneys, $268.00 per hour. The
attorneys' fees award would therefore be $ 4,448.80. The
Court awards the remaining costs and fees of $ 382.60. The
total fee award is therefore $4,831.40.

### IV. Conclusion
**\*6** For the above-stated reasons, the Court GRANTS
Plaintiff's motion for default judgment. The Court
therefore immediately ORDERS:

1. Defendants, their agents, servants, employees,
attorneys, and any and all persons in active concert or
participation with them immediately and permanently

Goulas v. Maxmo, Inc., Not Reported in F.Supp.3d (2014)

to cease and desist from all use of Plaintiff's marks or any mark that resembles, suggests, or intimates that Defendants' business is approved or endorsed by Plaintiff;

2. Defendants to destroy all literature, menus, web sites, domain names, signs, billboards, labels, prints, packages, wrappers, containers, advertising materials, stationary, and other items in their possession or control that contain Plaintiff's marks or any term, symbol, or logo confusingly similar to Plaintiff's mark; and to destroy any and all means in their possession or control of making any of those infringing items;

3. Defendants to have deleted or removed from publication, sign, menu, and/or any advertisements paid for or used by them containing any of Plaintiff's marks and any other name, mark, or logo confusingly similar to them;

4. Defendants to permanently delete, destroy, and remove all electronic content, including all websites, domain names, and other electronic materials displaying Plaintiff's marks and any other name, mark, or logo confusingly similar to them;

5. Defendants to file a report under oath within 30 days after the entry of an injunction setting forth in detail the manner in which Defendants have complied with the Court's injunction and orders;

6. Defendants to pay $16,500.00 in monetary damages; and

7. Defendants to pay $4,831.40 in attorneys' fees and costs.

So ordered.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2515217

**Footnotes**

1    In his first motion for default judgment, Plaintiff's counsel represented that he was requesting $9,500.00 in legal fees, which included costs to negotiate and draft the license agreement, the efforts to collect the licensing fee and royalties, and to prosecute the action. (Dkt.11.)

2    Once a default is entered, all the complaint's well-pleaded allegations are to be established as true. *See Rohn v. Commercial Recovery Systems, Inc.,* 13–10780, 2013 WL 6195578, at *3 (E.D.Mich. Nov.26, 2013) **(Murphy, J.)** (quoting, "[w]hile a default constitutes an admission of all the facts 'well pleaded' in the complaint, it does not admit any conclusions of law alleged therein, nor establish the legal sufficiency of any cause of action ... it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.") (citations omitted).

3    Plaintiff claims he is entitled to $18,000.00 in monetary damages. He does not, though, describe how he calculated that number.

4    *Available at,* http: //www.michbar.org/pmrc/articles/0000146.pdf (last visited June 2, 2014).

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**8**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------ x
NORTH ATLANTIC OPERATING COMPANY, :
INC., AND NATIONAL TOBACCO            :
COMPANY, L.P.,                        :
                                      :
                    Plaintiffs,       :
                                      :
         -against-                    :
                                      :
EVERGREEN DISTRIBUTORS, LLC;          :
MANHATTAN WHOLESALERS NY CORP.,       :
d/b/a MANHATTAN WHOLESALERS, INC;     :
GOURMET FOOD MARKET; NEW STAR         :
TOBACCO, INC., d/b/a NEW STAR         :
TOBACCO; and JOHN DOES ONE through    :
TEN, inclusive,                       :
                                      :
                    Defendants.       :
------------------------------------------------------ x

**REPORT AND
RECOMMENDATION**

13 Civ. 4974 (ERK) (VMS)

**Scanlon, Vera M., United States Magistrate Judge:**

Before the Court on referral from District Judge Edward R. Korman are the motions of

Plaintiffs North Atlantic Operating Company, Inc. ("NAOC") and National Tobacco Company,

L.P. ("NTC") (collectively, "North Atlantic" or "Plaintiffs'), and Defendant Douglas Ezring

("Mr. Ezring" or "Defendant") seeking default judgment against Defendants Evergreen

Distributors, LLC ("Evergreen"), Gourmet Food Market and New Star Tobacco, Inc. ("New

Star") (collectively, "Defendants").[1]  For the reasons stated below, this Court respectfully

---

[1] Defendant Manhattan Wholesalers NY Corp. ("Manhattan Wholesalers") has appeared in this action.  See Letter, ECF No. 117 (Plaintiffs and Manhattan Wholesalers are in settlement negotiations).  All other Defendants have been dismissed from this action.  See Orders, ECF Nos. 85-87, 116 (dismissing Defendants Douglas Ezring ("Mr. Ezring"); Majid Haroon ("Mr. Haroon"); K & W Wholesale Phone Accessories, Inc. ("K & W"); Hussein Hachem ("Mr. Hachem"); and Hookah Plus, Inc. ("Hookah Plus")); Notices of Voluntary Dismissal, ECF Nos. 46-47 (Plaintiffs voluntarily dismissed Defendants New Line Food Distribution, Inc. and 23rd Street General Market & Deli Corp.); Stip. of Dismissal, ECF No. 66 (Plaintiffs and Defendant Majid Rashidzada ("Mr. Rashidzada") filed a stipulation of dismissal; Plaintiffs subsequently did not include Mr. Rashidzada as a party in the Amended Complaint).

recommends granting in part and denying in part Plaintiffs' motions for default judgment by

awarding Plaintiffs statutory damages of $240,000.00 against Evergreen; $7,500.00 against

Gourmet Food Market; and $7,500.00 against New Star; attorneys' fees of $9,508.35 against

each Defendant; and prejudgment interest in an amount to be calculated by the Clerk of Court,

equal to 4% annual interest from the date of service of the Amended Complaint to the date of

entry of judgment. In addition, this Court respectfully recommends entering a permanent

injunction as described below and dismissing Plaintiffs' claims for deceptive business practices.

## I.    BACKGROUND

The Court will briefly relate the facts relevant to the defaulting Defendants.[2]  Unless

otherwise noted, the following facts are drawn from the Amended Complaint and are accepted as

true only for purposes of the liability portion of this motion. Am. Compl., ECF No. 71. Where

noted, additional facts are drawn from documents Plaintiffs submitted in support of their

motions, including the declaration of Plaintiffs' attorney, Robert L. Meyerhoff ("Mr.

Meyerhoff"), with exhibits ("Meyerhoff Decl. I"), ECF No. 95;[3] Mr. Meyerhoff's supplemental

declaration ("Meyerhoff Supp. Decl."), ECF No. 113; and the amended declaration of Plaintiffs'

---

[2] A description of the facts relevant to this case, not limited to the defaulting Defendants, is available in the Court's prior Reports and Recommendations. See N. Atl. Operating Co., Inc. v. Evergreen Distribs., LLC ("N. Atl. Operating Co. I"), No. 13 Civ. 4974 (ERK) (VMS), 2013 WL 5603602, at *5 (E.D.N.Y. Sept. 27, 2013), report & recommendation adopted as modified, No. 13 Civ. 4974 (ERK) (VMS), 2013 WL 5603596 (E.D.N.Y. Oct. 11, 2013); N. Atl. Operating Co., Inc. v. Evergreen Distribs., LLC ("N. Atl. Operating Co. II"), No. 13 Civ. 4974 (ERK) (VMS), 2013 WL 5603810, at *2 (E.D.N.Y. Sept. 30, 2013), report & recommendation adopted as modified, No. 13 Civ. 4974 (ERK) (VMS), 2013 WL 5603596 (E.D.N.Y. Oct. 11, 2013).

[3] Mr. Meyerhoff submitted separate declarations concerning each Defendant. See Meyerhoff Decl. I, ECF No. 95 (concerning Evergreen); Meyerhoff Decl. II, ECF No. 98 (concerning Gourmet Food Market); Meyerhoff Decl. III, ECF No. 101 (concerning New Star). These declarations are substantively similar and, unless otherwise noted, the Court will cite to Mr. Meyerhoff's declaration concerning Defendant Evergreen.

attorney, Marcella Ballard ("Ms. Ballard"), with exhibits ("Ballard Decl."), ECF No. 113-1; see ECF No. 110.[4]

### A.      Plaintiffs North Atlantic

North Atlantic is a seller and distributor of cigarette paper products in the United States, including roll-your-own cigarette paper and related products ("Cigarette Paper Products"). Am. Compl. ¶ 2. The product at issue in this action is ZIG-ZAG® Cigarette Paper Products, specifically ZIG-ZAG® 1¼ Size French orange cigarette papers (hereinafter, "ZIG-ZAG® Orange"). Id. ¶ 7. Cigarette papers are small sheets of paper that can be rolled around loose tobacco to create a cigarette.

North Atlantic is the exclusive licensee in the United States of ZIG-ZAG® brand Cigarette Paper Products. Am. Compl. ¶ 2. North Atlantic is party to an exclusive distribution agreement concerning the ZIG-ZAG® brand trademarks and design mark depicting the bearded man design (the "Smoking Man Design") (collectively, the "ZIG-ZAG® Trademarks"). Id. ¶ 3. North Atlantic is also the owner of the federal trademark registrations for North Atlantic Operating Company, Inc. and the design displayed on ZIG-ZAG® brand Cigarette Paper Products (the "NAOC® Trademarks"). Id. ¶ 4. Specifically, North Atlantic owns the following United States federal trademark registrations, which are valid and appear on the principal register in the United States Patent and Trademark Office ("USPTO"): Registration No. 610,530 for ZIG-ZAG® (stylized); Registration No. 1,127,946 for ZIG-ZAG®; Registration Nos. 2,169,540 and 2,169,549 for the Smoking Man Design (collectively, these four trademarks are the ZIG-ZAG® Trademarks); Registration Nos. 2,664,694 and 2,664,695 for North Atlantic Operating Company and design; and Registration Nos. 2,610,473

---

[4] Ms. Ballard filed her amended and redacted declaration at ECF No. 113 to comply with the Court's order that it would "not rely on any comparator information about attorneys' fees that is not publicly filed." Order, Oct. 6, 2014. The exhibits referenced therein were not re-filed, but are publicly available at ECF Nos. 110-1 through 110-6.

and 2,635,446 for North Atlantic Operating Company (collectively, these four trademarks are the NAOC® Trademarks). Id. ¶ 44, Ex. A (USPTO records for the federal trademark registrations). In addition, North Atlantic is the owner of the copyright registration in the United States for the NAOC and design graphic entitled "North Atlantic Operating Company, Inc." (the "NAOC© Copyright"). Id. ¶ 5; see id. Ex B. (United States Copyright Office records concerning the NAOC© Copyright). North Atlantic has continuously used the ZIG-ZAG® Trademarks since 1997; continuously used the NAOC® Trademarks for over a decade; and been the proprietor of all rights, titles and interest in the NAOC© Copyright for over a decade. Id. ¶¶ 3, 6.

**B.      Defendant Evergreen**

Defendant Evergreen is a Louisiana entity that sells and distributes consumer products, including ZIG-ZAG® Orange, to other wholesalers. Am. Compl. ¶ 17.

In or around August 2013, a Texas wholesaler (the "Texas Wholesaler") agreed to make a controlled buy of suspected counterfeit ZIG-ZAG® Orange from Defendant Evergreen, on Plaintiffs' behalf and at Plaintiffs' direction. Am. Compl. ¶¶ 98-99. When the Texas Wholesaler contacted Evergreen, Evergreen contacted its agent (the "Agent"), an individual located in New York State. Id. ¶ 100. Evergreen and the Agent offered the Texas Wholesaler ZIG-ZAG® Orange at a significant discount, and the Texas Wholesaler purchased 800 cartons of purportedly authentic ZIG-ZAG® Orange from Evergreen for $23.00 per carton, when the price usually offered to wholesalers is $26.24 per carton. Id. ¶¶ 100-101. On August 21, 2013, the 800 cartons were sent by the Agent from Bethpage, New York, to the Texas Wholesaler. Id. ¶ 102. The return address for the shipment included both the Agent and Evergreen's name, and the shipment included an invoice from Evergreen with a Louisiana address. Id. ¶¶ 103-104. In or around September 2013, Evergreen contacted the Texas Wholesaler about buying additional cartons of ZIG-ZAG® Orange, which the Texas Wholesaler declined to do. Id. ¶ 108.

4

The Texas Wholesaler mailed two sample cartons from the Evergreen shipment to North Atlantic. Am. Compl. ¶¶ 105-06. North Atlantic's Research and Development Department analyzed the sample cartons and determined that they were counterfeit, as opposed to genuine, in nature. Id. ¶ 107. The counterfeit ZIG-ZAG® Orange contained exact copies of both the ZIG-ZAG® and NAOC® Trademarks, as well as unauthorized, unlicensed reproductions of the NAOC© Copyright. Id. ¶ 111.

After Plaintiffs filed the original Complaint in this action, the Agent cooperated with Plaintiffs' investigation. Am. Compl. ¶ 109. The Agent told North Atlantic that the sale to the Texas Wholesaler was completed at the direction of Defendant Evergreen. Id. ¶ 110.

### C.     Defendants Gourmet Food Market And New Star

Defendant Gourmet Food Market is a New York entity with a retail location in Brooklyn, New York. Am. Compl. ¶ 25. Gourmet Food Market purchases and sells a variety of consumer products, including ZIG-ZAG® Orange. Id.

Defendant New Star is also a New York entity with a retail location in Brooklyn, New York. Am. Compl. ¶ 26. Like Gourmet Food Market, New Star purchases and sell a variety of consumer products, including ZIG-ZAG® Orange. Id. The Court will refer to Gourmet Food Market and New Star, collectively, as the "Retailer Defendants."

On May 29, 2012, North Atlantic's sales agents purchased ZIG-ZAG® Orange from Defendant Gourmet Food Market at its retail store. Am. Compl. ¶ 62. After the purchase, North Atlantic learned through inspection and analysis that the ZIG-ZAG® Orange purchased from Gourmet Food Market was counterfeit in nature, in that the papers and their packaging were not genuine products offered for sale by North Atlantic in the United States and contained numerous differences in quality and composition from North Atlantic's authentic ZIG-ZAG® Orange. Id. ¶ 63. North Atlantic's representatives returned to Gourmet Food Market's retail location to hand deliver a

5

cease and desist letter. Id. ¶ 64. Thereafter, Gourmet Food Market identified to North Atlantic the wholesaler that allegedly was the source of the counterfeit ZIG-ZAG® Orange, but Gourmet Food Market did not otherwise cooperate in North Atlantic's investigation. Id. ¶ 65.

On May 29, 2012, North Atlantic's sales agents also purchased ZIG-ZAG® Orange from Defendant New Star at its retail store. Am. Compl. ¶ 66. As with Defendant Gourmet Food Market, after the purchase, North Atlantic learned through inspection and analysis that the ZIG-ZAG® Orange purchased from New Star was counterfeit in nature. Id. ¶ 67. North Atlantic's representatives returned to New Star's retail location to hand deliver a cease and desist letter. Id. ¶ 68. According to North Atlantic, New Star "has taken no steps to cooperate" in North Atlantic's investigation. Id. ¶ 69.

The counterfeit ZIG-ZAG® Orange offered for sale by the Retailer Defendants contained exact copies of the ZIG-ZAG® and NAOC® Trademarks, as well as unauthorized, unlicensed reproductions of the NAOC© Copyright, used without permission from North Atlantic. Am. Compl. ¶ 57.

**D.      The Harm To North Atlantic From Defendants' Actions**

According to North Atlantic, Defendants' conduct deprives North Atlantic of the right to control the quality of the ZIG-ZAG® and NAOC® Trademarks and deprives North Atlantic of its rights pertaining to the NAOC© Copyright, which jeopardizes the goodwill and value associated therewith. Am. Compl. ¶¶ 115-16. The counterfeit products sold by Defendants are of inferior quality to those sold and distributed by North Atlantic. Id. ¶ 117. For example, the paper in Defendants' products' packaging is of inferior quality to authentic ZIG-ZAG® Orange, and Defendants' products use booklets of cheaper, glossier construction. Id. Defendants' conduct deprives North Atlantic of sales and profits it otherwise would receive. Am. Compl. ¶ 119. United States consumers may be less likely to think favorably of North Atlantic's products if they

encounter the counterfeit ZIG-ZAG® Orange, and this may also decrease North Atlantic's sales.  Id.

¶ 118.  Defendants' conduct harms the public, due to customer confusion as to the source and

quality of Plaintiffs' products, and because customers have been duped into purchasing inferior

products.  Id. ¶ 120.

    **E.**  **Procedural History And The Motions For Default Judgment**

   Plaintiffs brought this action alleging trademark infringement under the Lanham Act, 15

U.S.C. §§ 1114 & 1125(a); copyright infringement under the Copyright Act of 1976, 17 U.S.C.

§§ 101 et seq.; and related New York statutory and common law violations.  Compl. ¶ 1, ECF

No. 1.  At the start of this litigation, Plaintiffs requested that a preliminary injunction issue

against Defendants, enjoining them from, inter alia, selling or distributing counterfeit ZIG-

ZAG® brand Cigarette Paper Products.  The District Court adopted this Court's recommendation

that the preliminary injunction issue as to Evergreen, but not as to the Retailer Defendants.  N.

Atl. Operating Co. I, 2013 WL 5603602, at *11 (report and recommendation concerning, inter

alia, the Retailer Defendants); N. Atl. Operating Co. II, 2013 WL 5603810, at *6 (report and

recommendation concerning Evergreen); N. Atl. Operating Co. v. Evergreen Distribs., LLC ("N.

Atl. Operating Co. III"), No. 13 Civ. 4974 (ERK) (VMS), 2013 WL 5603596, at *1 (E.D.N.Y.

Oct. 11, 2013) (applying the preliminary injunction to third parties, and holding that the reports

and recommendations were "otherwise adopted in their entireties").[5]  The preliminary injunction

remains in effect "during the pendency of this Action."  N. Atl. Operating Co. I, 2013 WL

5603602, at *18.

   As the case progressed, Plaintiffs provided Defendants with ample notice of this

litigation.  On September 9, 2013, Plaintiff served the summons and complaint on Gourmet Food

---

[5] The Honorable Sandra L. Townes issued the Memorandum and Order adopting this Court's
two Reports and Recommendations concerning the preliminary injunction motion.

Market and on New Star.  Summonses Returned Executed, ECF Nos. 11, 16.[6]  On September 12,

2013, Plaintiffs personally served Evergreen, through its alleged owner and agent James Blaine

Salter, Jr. ("Mr. Salter"), with the summons, complaint, Order to Show Case and all other

documents filed in the case at that time.  Summons Returned Executed, ECF No. 19; see Cert. of

Service, ECF No. 28 (attaching State of Louisiana Secretary of State records listing Mr. Salter as

an officer of Evergreen).  On September 23, 2013, Plaintiffs served Defendants with copies of

the September 10, 2013 preliminary injunction hearing transcript and the Court's September 20,

2013 Order.  Affs. of Service, ECF Nos. 22-23.  On September 27, 2013, Plaintiffs served

Defendants with a copy of the Court's September 27, 2013 Report and Recommendation.  Cert.

of Service, ECF No. 28.  On October 1, 2013, Plaintiffs served Evergreen with a copy of the

Court's September 30, 2013 Report and Recommendation.  Cert. of Service, ECF No. 30.[7]  On

October 4, 2013, Plaintiffs served Defendants with a copy of the Court's Order granting, in part,

Plaintiffs' request for expedited discovery.  Cert. of Service, ECF No. 35.  On October 10, 2013,

Plaintiffs served Defendants with copies of the Court's October 10, 2013 Scheduling Order and

the full docket.  Cert. of Service, ECF No. 40.

Notwithstanding these communications, Defendants failed to appear.  On January 31,

2014, Plaintiffs requested that the Clerk of Court issue Certificates of Default against

Defendants.  Request for Cert. of Default, ECF No. 54.  Plaintiffs subsequently filed an

---

[6] For Gourmet Food Market, service was made on Omar Farooq.  For New Star, service was made on Mohammed Esa.  The process server's affidavits of service did not state the basis for his knowledge that these individuals were authorized to accept service on the Defendants' behalf, but such information was provided when Plaintiffs served the Amended Complaint, as described below.

[7] This Report and Recommendation concerned only Defendant Evergreen.  The Court required Plaintiffs to serve this Report and Recommendation on Evergreen, but not the other Defendants. R&R at 15, ECF No. 29.

8

Amended Complaint, dated April 29, 2014.  Am. Compl., ECF No. 71.[8]  On June 23, 2014, the

Amended Complaint was served on Abdul Isa, Manager and Managing Agent of New Star.  Aff.

of Serv., ECF No. 88.  Also on June 23, 2014, the Amended Complaint was served on Naiwar

Rizwan, a manager authorized to accept service for Gourmet Food Market.  Aff. of Serv., ECF

No. 89.  On June 27, 2014, the Amended Complaint was served on Melvin Robinson, Sr., a

registered agent for Evergreen.  Aff. of Serv., ECF No. 90.  Thereafter, the Clerk of Court

entered the defaults of Evergreen and the Retailer Defendants.  Entries of Default, ECF Nos. 91-

93.

Plaintiffs moved for default judgment against each defaulting Defendant.  Mot. for

Default J. I, ECF No. 94 (motion as to Evergreen); Mot. for Default J. II, ECF No. 97 (motion as

to Gourmet Food Market); Mot. for Default J. III, ECF No. 100 (motion as to New Star).  In

addition to the declarations described above, see, e.g., Meyerhoff Decl. I, ECF No. 95, Plaintiffs

submitted memoranda of law in support of each motion.  See Pls. Mem. I, ECF No. 96

(concerning Evergreen); Pls. Mem. II, ECF No. 99 (concerning Gourmet Food Market); Pls.

Mem. III, ECF No. 102 (concerning New Star).  Plaintiffs served Defendants with copies of

these default judgment motion papers.  Aff. of Serv., ECF No. 105.

The Court allowed Plaintiffs to submit supplemental briefing as to their requests for

statutory damages, attorneys' fees and litigation costs.  Plaintiffs served Defendants with a copy

of the Court's Order permitting this supplemental briefing.  Aff. of Serv., ECF No. 105.

Plaintiffs then filed a supplemental memorandum, Pls. Damages Mem., ECF No. 108, as well as

the declarations described above, see Meyerhoff Supp. Decl., ECF No. 113; Ballard Decl., ECF

---

[8] Further providing Defendants with notice of this action, Chambers mailed a copy of a June 5, 2014 Scheduling Order to Defendants.  The mailing to Gourmet Food Market was returned as "undeliverable."  Mail Returned, ECF No. 81.

No. 113-1. Plaintiffs served Defendants with these supplemental motion papers, as well as a copy of the full docket. Affs. of Serv., ECF Nos. 111, 114.

The Court now considers Plaintiffs submissions. For each Defendant, Plaintiffs seek statutory damages of $16,000,000.00, which reflects the maximum statutory damages of $2,000,000.00 for each of eight allegedly infringed trademarks. See Pls. Mem. I at 10; Pls. Mem. II at 8; Pls. Mem. III at 8. Plaintiffs also request prejudgment interest and a permanent injunction against each allegedly defaulting Defendant, enjoining that Defendant from, inter alia, improperly using Plaintiffs' ZIG-ZAG® and NAOC® Trademarks or false representations thereof; selling and distributing counterfeit ZIG-ZAG® goods; unfairly competing with North Atlantic; and destroying records pertaining to North Atlantic's products. Proposed Final Judgments, ECF Nos. 94-1, 97-1, 100-1. In addition, Plaintiffs request a total attorneys' fees award of $31,030.84. Meyerhoff Supp. Decl. ¶ 16.[9] Plaintiffs have not requested that they be reimbursed for any litigation costs.

## II.    ANALYSIS

### A.    Default Judgment Liability

Plaintiffs move for default judgment against Defendants pursuant to Federal Rule of Civil Procedure ("Rule") 55(b)(2). A two-step process exists for obtaining a default judgment. See James v. Arango, No. 05 Civ. 2593 (TCP) (AKT), 2011 WL 1594832, at *7 (E.D.N.Y. Mar. 28, 2011), report & recommendation adopted, No. 05 Civ. 2593 (TCP), 2011 WL 1627099 (E.D.N.Y. Apr. 27, 2011). First, when a party has failed to plead or otherwise defend, at a

---

[9] Plaintiffs have not requested joint and several liability as to the attorneys' fees, and thus the Court understands Plaintiffs to be requesting that each Defendant be liable for one-third of the $31,030.84 amount. Indeed, as discussed infra, Plaintiffs divided the total attorneys' fees incurred in bringing this action to determine the defaulting Defendants' pro rata share. Since $31,030.84 does not divide evenly by three, the Court will treat Plaintiffs' request as for $10,343.61 in attorneys' fees as against each Defendant.

plaintiff's request, the Clerk of Court enters a certificate of default pursuant to Rule 55(a).

Second, the moving party may make an application for entry of a default judgment pursuant to

Rule 55(b). In this case, as discussed above, the Clerk of Court entered Defendants' defaults,

and Plaintiffs moved for entry of default judgment.

"A default judgment is ordinarily justified where a defendant fails to respond to the

complaint." SEC v. Anticevic, No. 05 Civ. 6991 (KMW), 2009 WL 4250508, at *2 (S.D.N.Y.

Nov. 30, 2009) (citing Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1984)). Therefore, the court

should consider whether the plaintiff has shown that the defendant had notice of the action and

an opportunity to defend against it.

We look to the service here to see if Defendants had notice of the suit. Plaintiff effected

service of the summons and complaint pursuant to Rule 4(h)(1)(B) by serving Defendants'

officers or agents. As described above, Plaintiffs also served Defendants with, inter alia, copies

of the docket, several Orders, the Amended Complaint and the default judgment motion papers.

Defendants were therefore provided with adequate notice of the lawsuit.

"The decision to grant a motion for a default judgment lies in the sound discretion of the

trial court." O'Callaghan v. Sifre, 242 F.R.D. 69, 73 (S.D.N.Y. 2007) (citing Shah v. N.Y.S.

Dep't of Civil Serv., 168 F.3d 610, 615 (2d Cir. 1999)). Courts must be cautious in awarding

default judgment because it is an extreme remedy that should only be granted as a last resort.

See Akhalia v. Guardia, No. 11 Civ. 531 (ARR) (CLP), 2013 WL 2395974, at *3 (E.D.N.Y. May

31, 2013) (citing Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981)). When considering

whether to grant a default judgment, a court must be "guided by the same factors [that] apply to a

motion to set aside entry of a default." First Mercury Ins. Co. v. Schnabel Roofing of Long

Island, Inc., No. 10 Civ. 4398 (JS) (AKT), 2011 WL 883757, at *1 (E.D.N.Y. Mar. 11, 2011);

see Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993). These factors include: (1) whether the default was willful; (2) whether ignoring the default would prejudice the opposing party; and (3) whether the defaulting party has presented a meritorious defense. See Swarna v. Al-awadi, 622 F.3d 123, 142 (2d Cir. 2010); Enron, 10 F.3d at 96.

As for the first factor, a defendant's failure to respond to the complaint is sufficient to demonstrate willfulness. See Bds. of Trs. of Ins., Annuity, & Apprenticeship Training Funds of Sheetmetal Workers' Int'l Ass'n, Local Union No. 137 v. Frank Torrone & Sons, Inc., No. 12 Civ. 3363 (KAM) (VMS) (E.D.N.Y. Feb. 3, 2014) (ECF No. 17 at 5) (the defendant's non-appearance and failure to respond equated to willful conduct), report & recommendation adopted, No. 12 Civ. 3363 (KAM) (VMS), 2014 WL 674098 (E.D.N.Y. Feb. 3, 2014); Traffic Sports USA v. Modelos Restaurante, Inc., No. 11 Civ. 1454 (ADS) (AKT), 2012 WL 3637585, at *2 (E.D.N.Y Aug. 1, 2012) (same), report & recommendation adopted, No. 11 Civ. 1454 (ADS) (AKT), 2012 WL 3626824 (E.D.N.Y. Aug. 22, 2012). Here, Plaintiffs properly served Defendants with notice, but Defendants neither answered nor responded in any other way, nor did they request an extension of time in which to respond. Defendants' failure to respond to the pleadings therefore establishes willfulness.

Concerning the second factor, Defendants' failure to respond and Plaintiffs' efforts to prosecute their case are sufficient to demonstrate that ignoring the default would prejudice Plaintiffs, "as there are no additional steps available to secure relief in this Court." Bridge Oil Ltd. v. Emerald Reefer Lines, LLC, No. 06 Civ. 14226 (RLC) (RLE), 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008) (citing Mason Tenders Dist. Council v. Duce Constr. Corp., No. 02 Civ. 9044 (LTS) (GWG), 2003 WL 1960584, at *3 (S.D.N.Y. Apr. 25, 2003)). Third, Defendants cannot establish a meritorious defense, because where Defendants have not "filed an

12

answer, there is no evidence of any defense." Id. (citing Mason Tenders Dist. Council, 2003 WL 1960584, at *3). As all three factors are satisfied, a default judgment would be proper in the present circumstances.

**B.      Defendants' Liability**

A default is a concession of all well-pleaded factual allegations of liability in the complaint. See Cement & Concrete Workers Dist. Council Welfare Fund v. Metrofoundation Contractors, Inc., 699 F.3d 230, 234 (2d Cir. 2012); First Mercury Ins. Co, 2011 WL 883757, at *1. Upon default, the court accepts the factual allegations in the complaint pertaining to liability as true. See Cement & Concrete Workers, 699 F.3d at 234; Friedman v. Sharinn & Lipshie, No. 12 Civ. 3452 (FB) (CLP), 2013 WL 1873302, at *3 (E.D.N.Y. Mar. 28, 2013) (in deciding whether to grant liability on a motion for default judgment, a court must consider whether "the claims were pleaded in the complaint, thereby placing the defendant on notice" (citing Rule 54(c))), report & recommendation adopted, No. 12 Civ. 3452 (FB) (CLP), 2013 WL 1869924 (E.D.N.Y. May 3, 2013); Unitrans Consol., Inc. v. Classic Closeouts, No. 09 Civ. 2098 (SLT) (SGM), 2010 WL 1265206, at *2 (E.D.N.Y. Mar. 31, 2010) ("[T]he well-pleaded factual allegations in the complaint are deemed admitted upon a defendant's default . . . ."); 10 Moore's Federal Practice § 55.32 (Matthew Bender 3d ed. 2014).

The question is thus whether the plaintiff's allegations in the complaint, if accepted as true, establish liability for the plaintiff's claims. See James, 2011 WL 1594832, at *3 (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)); see also Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014) (under both a motion to dismiss and a motion for default, the plaintiff must proffer well-pleaded allegations); City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("[P]rior to entering default

13

judgment, a district court is 'required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law.'" (quoting Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009))); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981) ("[A] district court has discretion under Rule 55(b)(2) once a default is determined to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action . . . ."); Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 69 (2d Cir.1971), rev'd on other grounds, 409 U.S. 363 (1973) (citing with approval the district judge's reasoning that a complaint is not well-pleaded if the allegations are "'made indefinite or erroneous by other allegations in the same complaint'" or 'are contrary to facts of which the court will take judicial notice, or which are not susceptible of proof by legitimate evidence, or which are contrary to uncontroverted material in the file of the case'" (quoting Trans World Airlines, Inc. v. Hughes, 308 F. Supp. 679, 683 (S.D.N.Y. 1969) supplemented, 312 F. Supp. 478 (S.D.N.Y. 1970) and aff'd as modified, 449 F.2d 51, rev'd on other grounds, 409 U.S. 363)).[10] On a motion for default judgment, the burden is on the plaintiff to establish the defendant's liability, and a failure to plead sufficient facts may require the denial of the motion. See Danser v. Bagir Int'l, 571 F. App'x 54, 55 (2d Cir. 2014); Taizhou Zhongneng Imp. & Exp. Co., Ltd v. Koutsobinas, 509 F. App'x 54, 58 (2d Cir. 2013); Lanzafame v. Dana Restoration, Inc., No. 09 Civ. 0873 (ENV),

---

[10] What standard applies in cases involving default as a sanction for failure to comply with court orders is a question the Court need not address in this case, which involves non-appearing defendants. See Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995) (affirming default judgment as a sanction for failing to comply with court orders; citing to Trans World Airlines, 449 F.2d at 69 for the proposition that "[a] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability"); Flaks v. Koegel, 504 F.2d 702, 706 (2d Cir. 1974) (vacating a default judgment as a sanction for not complying with court orders, in part because the judgment allowed for an award of punitive damages under a statute that did not allow for punitive damages).

2011 WL 1100111, at *2 (E.D.N.Y. Mar. 22, 2011) (discussing the "threshold requirement" that a complaint be well-pleaded).

Here, Plaintiffs allege that Defendants' actions constituted trademark infringement in violation of the Lanham Act;[11] copyright infringement in violation of the Copyright Act; deceptive acts and practices in violation of New York General Business Law ("NYGBL") § 349; and unfair competition under New York common law.

### 1.   The Trademark Infringement Claims

To establish a claim for trademark infringement under the Lanham Act, the plaintiff must show that (1) its mark is entitled to protection, and (2) the use of its mark by the defendant is likely to confuse consumers as to the sponsorship or origin of the goods.  See Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003); Chanel, Inc. v. Xiao Feng Ye, No. 06 Civ. 3372 (CPS) (SMG), 2007 WL 2693850, at *2 (E.D.N.Y. Sept. 12, 2007).  Concerning the first factor, a court should consider prior use of the mark and ownership of rights in the mark.  Virgin Enters. Ltd., 335 F.3d at 146.  Although the second factor is typically analyzed by reference to eight non-exclusive factors, known as the Polaroid factors, see id. (citing Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492 (2d Cir. 1961)), an analysis of the Polaroid factors is unnecessary in a counterfeiting case.  See, e.g., Coach, Inc. v. Horizon Trading USA Inc., 908 F. Supp. 2d 426, 433 (S.D.N.Y. 2012) (defendants' admission that their product was confusing to customers was not needed to prove confusion where defendants' marks were "demonstrably counterfeit").[12] This is because "counterfeits, by their very nature, cause confusion."  Gucci Am., Inc. v. Duty

---

[11] The Amended Complaint states a separate claim for unfair competition and false designation of origin under the Lanham Act.  Am. Compl. ¶¶ 133-142. As Plaintiffs have not provided any argument as to default on the federal unfair competition and false designation of origin claim, the Court will not address that cause of action.

[12] A "counterfeit" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C.A. § 1127.

Free Apparel, Ltd., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003); see Fendi Adele S.R.L. v.

Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 596-97 (S.D.N.Y. 2010)

("[W]here counterfeit marks are involved, the court need not engage in a Polaroid analysis

because 'counterfeit marks are inherently confusing.'" (quoting Chloe v. DesignersImports.com

USA Inc., No. 07 Civ. 1791 (CS), 2009 WL 1227927, at *6 (S.D.N.Y. Apr. 30, 2009)); Danone

Asia Pte. v. Happy Dragon Wholesale, Inc., No. 05 Civ. 1611 (CPS), 2006 WL 845573, at *5

(E.D.N.Y. Mar. 29, 2006) (same).

Here, Plaintiffs' well-pleaded allegations establish that Defendants engaged in trademark

infringement.  First, Plaintiffs adequately alleged that the ZIG-ZAG® and NAOC® trademarks

are entitled to protection; indeed, Plaintiffs attached to their Amended Complaint the USPTO

records of their federal trademark registrations.  Am. Compl. Ex. A.  Second, Plaintiffs

adequately alleged Defendants' involvement in selling counterfeit ZIG-ZAG® Orange.

Specifically, Plaintiffs described Evergreen's involvement in selling and shipping 800 cartons of

ZIG-ZAG® Orange, which Plaintiffs determined to be counterfeit.  Am. Compl. ¶¶ 98-113; see

Meyers Decl. I, Ex. D at ¶¶ 7-10 (the Declaration of Steven T. Gnadinger, Manager of Product

Integrity, attesting to the counterfeit nature of the product obtained from Evergreen).  Plaintiffs

also described making controlled buys of ZIG-ZAG® Orange (which was likewise determined to

be counterfeit) from the Retailer Defendants.  Id. ¶¶ 56-69.[13]  Defendants' "default alone suffices

to establish the allegation that [the] wares were counterfeit."  Chanel, Inc. v. Schwartz, No. 06

---

[13] Although Plaintiffs' pleadings are sufficient, the Court notes that at a hearing concerning
Plaintiffs' request for a preliminary injunction, the Court heard the testimony of John M. Hood,
III ("Mr. Hood"), the Director of Operations at L.S.S. Consulting, Inc., a Michigan-based private
investigation firm hired by Plaintiffs.  N. Atl. Operating Co. I, 2013 WL 5603602, at *3.  Mr.
Hood described the steps he and Plaintiffs took to determine that the ZIG-ZAG® Orange
obtained from the defaulting Defendants and other Defendants was counterfeit.  Id. at *5-7.

Civ. 3371 (BMC) (JO), 2007 WL 4180615, at *5, n.2 (E.D.N.Y. Nov. 19, 2007).   Thus,

Plaintiffs' pleadings establish Defendants' liability as to trademark infringement.

### 2.   The Copyright Infringement Claims

To establish a claim for copyright infringement under the Copyright Act, the plaintiff

must show that (1) the plaintiff had a valid copyright, and (2) the defendant violated the

exclusive rights provided to copyright holders by 17 U.S.C. § 106.   See Kwan v. Schlein, 634

F.3d 224, 229 (2d Cir. 2011); Island Software & Computer Serv., Inc. v. Microsoft Corp., 413

F.3d 257, 260 (2d Cir. 2005); Sleppin v. Thinkscan.com, LLC, No. 14 Civ. 1387 (ADS) (ARL),

2014 WL 5431352, at *5 (E.D.N.Y. Oct. 23, 2014).   The Copyright Act gives the copyright

holder the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale,"

17 U.S.C. § 106(3), and any person who violates this right "is an infringer of the copyright," id. §

501(a).   Thus, "[a]lthough the word 'counterfeit' never appears in the [Copyright] Act, Section

501(a) of the Copyright Act proscribes the unauthorized reproduction and copying of works of

an owner holding an exclusive copyright in an original work of authorship."   Millennium TGA,

Inc. v. Leon, No. 12 Civ. 1360 (MKB), 2013 WL 5719079, at *5 (E.D.N.Y. Oct. 18, 2013).   A

defendant "can be held liable as the distributor of an unauthorized copy," without having

"actually copied" the copyrighted work.   Island Software & Computer Serv., 413 F.3d at 261

(affirming a grant of summary judgment on a copyright infringement claim where the defendant

sold counterfeit computer software that an "antecedent entity in the supply chain" had copied);

see L.A. Printex Indus., Inc. v. Pretty Girl of California, Inc., No. 09 Civ. 4206 (KBF), 2012 WL

695453, at *2 (S.D.N.Y. Mar. 5, 2012) (the "defendant's sale of the skirt with plaintiff's

[copyrighted] floral design constitutes an act of infringement"); Microsoft Corp. v. AGA

Solutions, Inc., No. 05 Civ. 5796 (DRH) (MLO), 2007 WL 777756, at *4 (E.D.N.Y. Mar. 12,

2007) (denying a motion to dismiss because "even assuming [there were] insufficient allegations that [the defendant] actually copied [the plaintiff's] products, sufficient facts have been alleged to hold [the defendant] liable as the distributor of unauthorized copies").

Here, Plaintiffs adequately alleged their ownership of a valid copyright; Plaintiffs also attached to the Amended Complaint the certificate of registration for that copyright. Am. Compl. ¶ 50; Am. Compl. Ex. B. As to the second element, Plaintiffs' pleadings sufficiently established that Defendants infringed on Plaintiff's copyright by distributing counterfeit ZIG-ZAG® Orange that displayed the NAOC© Copyright. Am. Comp. ¶¶ 56-69, 98-113. Although there are no allegations that Defendants created the counterfeit ZIG-ZAG® Orange, the allegations as to their distribution of the counterfeit goods is sufficient to establish Defendants' liability for copyright infringement.

### 3.     The New York General Business Law Claims

Under NYGBL § 349(a), "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). To state a claim under NYGBL § 349, "a plaintiff must show that: (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Johnson & Johnson v. Azam Int'l Trading, No. 07 Civ. 4302 (SLT) (SMG), 2013 WL 4048295, at *11 (E.D.N.Y. Aug. 9, 2013) (quoting U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F. Supp. 2d 158, 176 (S.D.N.Y. 2001)). "The purpose of NYGBL § 349 is to 'empower customers, especially the disadvantaged' and to 'even the playing field of their disputes with better funded and superiorly situated fraudulent businesses.'" Van Praagh v. Gratton, 993 F. Supp. 2d 293, 305 (E.D.N.Y. 2014)

(quoting Watts v. Jackson Hewitt Tax Service Inc., 579 F. Supp. 2d 334, 346 (E.D.N.Y. 2008);

internal quotations omitted).

"[T]he prevailing view in the Second Circuit is that 'trademark infringement claims are

not cognizable under § 349 unless there is specific and substantial injury to the public interest

over and above the ordinary trademark infringement.'" Romeo & Juliette Laser Hair Removal,

Inc. v. Assara I LLC, No. 08 Civ. 442 (TPG) (FM), 2014 WL 4723299, at *4 (S.D.N.Y. Sept. 23,

2014) (quoting Perfect Pearl Co. v. Majestic Pearl & Stone, Inc., 887 F. Supp. 2d 519, 543

(S.D.N.Y. 2012)); see LBF Travel, Inc. v. Fareportal, Inc., No. 13 Civ. 9143 (LAK) (GWG),

2014 WL 5671853, at *11 (S.D.N.Y. Nov. 5, 2014) ("[C]ourts in New York have routinely

dismissed trademark claims brought under Sections 349 . . . as being outside the scope of the

statutes, because ordinary trademark disputes do not pose a significant risk of harm to the public

health or interest and are therefore not the type of deceptive conduct that the statutes were

designed to address.'" (quoting Kaplan, Inc. v. Yun, No. 13 Civ. 1147 (JGK), 2014 WL

1689040, at *9 (S.D.N.Y. Apr. 30, 2014); internal quotation omitted)); L'Oreal USA, Inc. v.

Trend Beauty Corp., No. 11 Civ. 4187 (RA), 2013 WL 4400532, at *22 (S.D.N.Y. Aug. 15,

2013) (same).

While allegations of danger to public health or safety may be sufficient to state a claim

under NYGBL § 349, "[i]t is well-established that trademark infringement actions alleging only

general consumer confusion do not threaten the direct harm to consumers for purposes of stating

a claim under [NYGBL §] 349[.]" Van Praagh, 993 F. Supp. 2d at 306 (quoting Perkins Sch. for

the Blind v. Maxi-Aids, Inc., 274 F. Supp. 2d 319, 327 (E.D.N.Y. 2003)); see Johnson &

Johnson, 2013 WL 4048295, at *11 (on a motion for default judgment, finding the elements of

NYGBL § 349 to be met where "the counterfeit test strips sold by [the defendant] were the

19

subject of at least three different nationwide alerts issued by the FDA that warned of danger associated with their use by diabetics"); <u>Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.,</u> No. 08 Civ. 0068 (KAM) (JO), 2010 WL 2133937, at *7 (E.D.N.Y. Mar. 11, 2010) (on a motion for default judgment in a counterfeiting case, recommending the dismissal of a NYGBL § 349 claim that was based on consumers' confusion and disappointment, and the plaintiff's loss of goodwill), <u>report & recommendation adopted,</u> No. 08 Civ. 0068 (KAM) (JO), 2010 WL 2160058 (E.D.N.Y. May 27, 2010).[14]

    In this case, it is beyond dispute that Defendants' actions in selling counterfeit goods were directed at consumers and misleading in a material way. Nonetheless, Plaintiffs' allegations are not sufficient to establish Defendants' liability under NYGBL § 349 because Plaintiffs allege only the type of harm ordinarily attributed to trademark infringement, such as consumer confusion and loss of goodwill. Am. Compl. ¶¶ 115-20. Plaintiffs have not made any allegations of a greater injury, such as a threat to public health or safety. Therefore, Plaintiffs have not established Defendants' liability under NYGBL § 349, and this Court respectfully recommends that the NYGBL claims be dismissed. <u>See U.S. Sun Star Trading,</u> 2010 WL 2133937, at *7; <u>see generally Danser,</u> 571 F. App'x at 55 (where the allegations fail to state a claim on which relief can be granted, default judgment is inappropriate); <u>Taizhou Zhongneng Imp. & Exp. Co.,</u> 509 F. App'x at 58 (same); <u>Mickalis Pawn Shop,</u> 645 F.3d at 137 (same).[15]

---

[14] Plaintiffs cite to <u>United Air Lines, Inc. v. United Airways, Ltd.,</u> No. 09 Civ. 4743 (KAM) (JMA), 2013 WL 1290930, at *7 (E.D.N.Y. Mar. 4, 2013) (recommending that default judgment be entered against an air transportation service for a violation of NYGBL § 349, due to the defendant's unauthorized use of another airline's trademarks), <u>report & recommendation adopted,</u> No. 09 Civ. 4743 (KAM) (JMA), 2013 WL 1290916 (E.D.N.Y. Mar. 28, 2013), which does not discuss the separate standard for NYGBL § 349 claims. Pl. Mem. I at 8.

[15] Dismissal of the NYGBL claims would not affect the damages calculation made below because Plaintiffs have not requested damages specific to the NYGBL claims. Plaintiffs have instead requested statutory damages under the Lanham Act.

### 4.    The New York Unfair Competition Claims

To establish a claim for unfair competition under New York common law, the plaintiff must establish 1) that the plaintiff possesses a valid, protectable mark, and 2) that the defendant's use of that mark resulted in a likelihood of confusion. See LBF Travel, 2014 WL 5671853, at *8; ESPN, Inc. v. Quiksilver, Inc., 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008). The plaintiff must also show that the defendant acted in bad faith. See LBF Travel, 2014 WL 5671853, at *8; see also ESPN, 586 F. Supp. 2d at 230 (the requirement of bad faith was "easily satisifie[d]" where the infringing mark was similar "at first glance" to the valid trademark). "Use of a counterfeit mark creates a presumption of bad faith under New York law." Coach, 908 F. Supp. 2d at 436 (quoting Burberry Ltd. & Burberry USA v. Designers Imps., Inc., No. 07 Civ. 3997 (PAC), 2010 WL 199906, at *8 (S.D.N.Y. Jan. 19, 2010)); see L'Oreal USA, 2013 WL 4400532, at *22 (this presumption is not rebutted where the defendant is the seller, not the manufacturer, of the counterfeit goods); Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) (finding a presumption of bad faith despite the defendants' denial that they were aware that they were selling counterfeit goods).

As previously stated, Plaintiffs established that they possess valid trademarks. In addition, they sufficiently alleged that the counterfeit marks were likely to cause consumer confusion. Am. Compl. ¶ 120; see Gucci Am., 286 F. Supp. 2d at 287 ("[C]ounterfeits, by their very nature, cause confusion."). Furthermore, a presumption of bad faith attached to Defendants' sale of counterfeit goods. Thus, Plaintiffs' allegations are sufficient to establish Defendants' liability as to unfair competition under New York common law.

21

### C.  Plaintiffs' Requested Relief

Plaintiffs request a damages award, as against each Defendant, of $16,000,000.00 for statutory damages and $10,343.61 for attorneys' fees, as well as prejudgment interest and entry of a permanent injunction.

On a motion for default judgment, the plaintiff bears the burden to present proof of damages.  See Profi-Parkiet Sp. Zoo v. Seneca Hardwoods LLC, No. 13 Civ. 4358 (PKC) (LB), 2014 WL 2169769, at *6 (E.D.N.Y. May 23, 2014), report & recommendation adopted, No. 13 Civ. 4358 (PKC) (LB), 2014 WL 2765793 (E.D.N.Y. June 18, 2014).  A court may evaluate the fairness of a proposed damages award by relying on affidavits and documentary evidence.  See Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993).  Rule 55(b)(2) permits, but does not require, a court to conduct a hearing in order to determine the amount of damages to award after a liability judgment by default.  Fed. R. Civ. P. 55(b)(2); see Nwagboli v. Teamwork Transp. Corp., No. 08 Civ. 4562 (JGK) (KNF), 2009 WL 4797777, at *2 (S.D.N.Y. Dec. 7, 2009) (citing Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989)).  The amount of damages awarded, if any, must be ascertained "with reasonable certainty."  Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999).

#### 1.  Statutory Damages

Pursuant to the Lanham Act,

> In a case involving the use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of —

    (1)     not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

    (2)     if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c).

The Second Circuit has explained that "courts have 'considerably broad discretion' to balance the 'punitive, deterrent function' of an award against the direction that it 'not constitute a windfall for prevailing plaintiffs.'" Louis Vuitton Malletier S.A. v. LY USA, Inc., 472 F. App'x 19, 22 (2d Cir. 2012) (quoting Rolls–Royce PLC v. Rolls–Royce USA, Inc., 688 F. Supp. 2d 150, 157 (E.D.N.Y. 2010)). In determining an award for statutory damages, courts consider, "the amount of [the] defendants' likely profits from their infringement, the possibility of deterrence, and the need for redress of wrongful conduct." Nike, Inc. v. Top Brand Co., No. 00 Civ. 8179 (KMW) (RLE), 2006 WL 2946472, at *2 (S.D.N.Y. Feb. 27, 2006), report & recommendation adopted, No. 00 Civ. 8179 (KMW) (RLE), 2006 WL 2884437 (S.D.N.Y. Oct. 6, 2006).

As described in Unilever Supply Chain, Inc. v. I & I Wholesale Food Inc., No. 10 Civ. 1077 (RJD) (RER), 2011 WL 1113491 (E.D.N.Y. Feb. 17, 2011), report & recommendation adopted, No. 10 Civ. 1077 (RJD) (RER), 2011 WL 1099841 (E.D.N.Y. Mar. 24, 2011), a case relied on by Plaintiffs, Pls. Supp. Mem. 4, "courts have found a range of statutory awards to be appropriate." Id. at *4. Cases where courts award the maximum statutory damages "tend to feature widespread and extremely expensive infringements," while courts award "far less in statutory damages" when the infringing acts are smaller in scale. Id.; see Tiffany (NJ) LLC v. Dong, No. 11 Civ. 2183 (GBD) (FM), 2013 WL 4046380, at *6 (S.D.N.Y. Aug. 9, 2013) (collecting cases in which courts "awarded $50,000 or less per infringing mark or group of

23

marks" in circumstances "involving small-scale counterfeiting operations" and "as much as $1 million for each trademark willfully infringed" where there was evidence that "the defendant's sales were substantial," such as when the defendant produced "'millions of infringing goods'"; quoting Nike, 2006 WL 2946472, at *2).

In line with such reasoning, in the cases relied on by Plaintiffs in which a court awarded the maximum statutory damages, see Pls. Supp. Mem. 3-6, the defendants were involved in large scale counterfeiting activities involving hundreds of thousands to millions of counterfeited products. See Nike, 2006 WL 2946472, at *2 (recommending the maximum statutory damages based on "the size of the defendants' infringing operations, which led to the production of millions of infringing goods produced, the willfulness of their conduct, and their behavior in this litigation"); Phillip Morris USA Inc. v. Marlboro Express, No. 03 Civ. 1161 (CPS), 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005) (awarding the maximum statutory damages where the defendant "pled guilty to knowingly and intentionally conspiring to traffic counterfeit cigarettes"; his "counterfeiting operation was large, involving at least 200,000 cartons and millions of cigarettes"; and the government estimated the value of his "five infringing shipments to be $4,773,790"). In cases involving large scale operations, some courts have awarded significant statutory damages without awarding the maximum. See Louis Vuitton Malletier S.A., 472 F. App'x at 22 (affirming an award of less than half the maximum statutory damages where "U.S. Customs had seized some 100,000 counterfeit items from just one of the defendants in a single year and that the incomplete sales records produced by the defendants invited an inference of a 'massive counterfeiting enterprise'"); Dong, 2013 WL 4046380, at *2, 5-7 (although the maximum statutory damages were $144 million, awarding statutory damages of $9 million where Defendants "offered more than 10,000 counterfeit Tiffany items for sale" through seven

24

websites); <u>Sara Lee Corp. v. Bags of New York, Inc.</u>, 36 F. Supp. 2d 161, 168-70 (S.D.N.Y.

1999) (awarding statutory damages of $750,000.00 against defendants who "concealed evidence

and lied under oath to mislead the plaintiffs and the court"; persisted "in the face of extensive

governmental efforts to end their counterfeiting business"; and operated a large-scale factory and

sales operation that touted the counterfeit nature of their products).

   In other cases relied on by Plaintiffs, <u>see</u> Pls. Supp. Mem. 4-6, courts awarded substantial

statutory damages despite a counterfeiting operation of a relatively smaller scope; these cases

often involved aggravating circumstances, such as repeat offenders and threats to public safety,

that were not at issue in the present case. <u>See Unilever Supply Chain</u>, 2011 WL 1113491, at *3-

4 (where the defendants used "counterfeit labels to push expired mayonnaise onto an

unsuspecting public," an award "greater than the $200,000 maximum for non-willful

infringement" was warranted; awarding $500,000.00 in statutory damages rather than the $2

million requested by the plaintiff); <u>Rolls-Royce PLC v. Rolls-Royce USA, Inc.</u>, 688 F. Supp. 2d

150, 157 (E.D.N.Y. 2010) (where "[t]he brazenness of the defendant's infringement [was] almost

impressive had it not been so patently illegal," awarding $25,000.00 for each infringing act, for a

total of $1 million); <u>Burberry Ltd. v. Euro Moda, Inc.</u>, No. 08 Civ. 5781 (CMA) (JP), 2009 WL

4432678, at *1-2, 6 (S.D.N.Y. Dec. 4, 2009) (although the maximum statutory damages were

$24 million, awarding 1/6 of the possible statutory damages, for an award of $4 million for the

sale of counterfeit goods by defendants who had a prior history of selling counterfeit versions of

the plaintiff's products); <u>Tiffany (NJ) Inc. v. Luban</u>, 282 F. Supp. 2d 123, 125 (S.D.N.Y. 2003)

(recognizing that the maximum statutory damages would exceed $100 million for multiple

infringing items sold online, but finding an award of $550,000 to be a sufficient deterrent); <u>see</u>

<u>also Tu v. TAD Sys. Tech. Inc.</u>, No. 08 Civ. 3822 (SLT) (RM), 2009 WL 2905780, at *6

(E.D.N.Y. Sept. 10, 2009) (awarding the plaintiffs the statutory maximum of $150,000.00

available under the Copyright Act and denying the plaintiff's request for $6 million in statutory

damages under the Lanham Act).

Plaintiffs assert that an award of $16,000,000.00 against each Defendant—the maximum

possible statutory damages under the Lanham Act for the infringement of the eight trademarks—

is warranted due to the deterrent effect of such an award; the harm suffered by Plaintiffs; the

difficulty of determining actual damages; and because Plaintiffs are not seeking statutory

damages under the Copyright Act.[16] Pls. Supp. Mem. 3-6.

Plaintiffs' allegations in this case weigh against an award of the highest statutory

damages.  Concerning the scope of Defendants' counterfeiting activities and likely profits, there

is no evidence that Defendants are operating on a massive scale.  As described above, Evergreen

---

[16] Under the Copyright Act,

> (1) Except as provided by clause (2) of this subsection, the
> copyright owner may elect, at any time before final judgment is
> rendered, to recover, instead of actual damages and profits, an
> award of statutory damages for all infringements involved in the
> action, with respect to any one work, for which any one infringer is
> liable individually, or for which any two or more infringers are
> liable jointly and severally, in a sum of not less than $750 or more
> than $30,000 as the court considers just. For the purposes of this
> subsection, all the parts of a compilation or derivative work
> constitute one work.
>
> (2) In a case where the copyright owner sustains the burden of
> proving, and the court finds, that infringement was committed
> willfully, the court in its discretion may increase the award of
> statutory damages to a sum of not more than $150,000. In a case
> where the infringer sustains the burden of proving, and the court
> finds, that such infringer was not aware and had no reason to
> believe that his or her acts constituted an infringement of
> copyright, the court in its discretion may reduce the award of
> statutory damages to a sum of not less than $200. [ . . . ]

17 U.S.C § 504(c).

sold 800 cartons of counterfeit ZIG-ZAG® Orange to the Texas Wholesaler, then attempted to sell

additional cartons to that wholesaler. Am. Compl. ¶¶ 102-104, 108.  Evergreen sold the 800 cartons

for $23.00 per carton (for a total of $18,400.00), although the price typically offered to wholesalers is

$26.24 per carton.  Id. ¶ 101.  Evergreen's agent also turned over more than 2,300 unsold cartons of

counterfeit ZIG-ZAG® Orange to Plaintiffs.  Id. ¶ 109.  Had Evergreen sold all 3,100 cartons,

Evergreen might have recouped $71,300.00.  Although the 3,100 cartons of counterfeit ZIG-ZAG®

Orange obtained by Evergreen is a significant amount, the quantity of product and potential earnings

fall far below the amounts warranting the maximum statutory damages in cases such as Nike and

Marlboro Express.

As to the Retailer Defendants, Plaintiffs' agents purchased an undisclosed amount of

counterfeit ZIG-ZAG® Orange during a single controlled buy from each Retailer Defendant on May

29, 2012. Am. Compl. ¶¶ 62, 66.  Plaintiffs' allegations do not provide the Court with enough

information to estimate the value of those sales, but the nature of the businesses involved suggest the

two sales were modest transactions.  There are no allegations that the Retailer Defendants continued

to sell counterfeit ZIG-ZAG® Orange at any time after May 29, 2012; that they were observed to

possess large amounts of counterfeit ZIG-ZAG® Orange; or that they were otherwise involved in

distributing large amounts of counterfeit ZIG-ZAG® Orange.

Moreover, although Plaintiffs count eight separate trademark violations, each North Atlantic

product contains all eight trademarks.  Thus, the actual counterfeit product is one product— ZIG-

ZAG® Orange—and packaging with eight trademarks.  See U.S. Sun Star Trading, 2010 WL

2133937, at *13 (the harm to the plaintiff "does not necessarily double simply because the

product bears two counterfeit marks of the same producer"); see, e.g., Dong, 2013 WL 4046380,

at *5-7 (collecting cases where courts had awarded statutory damages by single trademark

infringements or by groups of infringed trademarks; where each of nine counterfeit products had

27

eight infringed trademarks, declining the plaintiff's request to determine statutory damages by each infringed trademark and instead basing the award on each counterfeit product).  Although the Court does not condone the counterfeiting, it is worth noting that Plaintiffs' product is not being undermined by multiple counterfeit products, which would likely lead to greater market confusion.

In such circumstances, Plaintiffs' requested statutory damages of $16,000,000.00 per Defendant—assuming these amounts could ever be collected from Defendants—would constitute an impermissible windfall for Plaintiffs, an unjust award of damages far exceeding the amount of actual damages that might reasonably be inferred from the allegations and the amount necessary for a deterrent effect.  Furthermore, the allegations do not suggest that either Defendants' wrongful conduct or the damages sustained by Plaintiffs and the public were of an exceptional nature warranting an award at the higher end of the spectrum.  Rather, Plaintiffs have made general allegations of deceptive and uncooperative behavior, customer confusion, loss of goodwill and lost sales and profits.  Although the deceptive nature of Defendants' unlawful activities hampers Plaintiffs' ability to quantify Plaintiffs' damages—a problem that the statutory damages provision of 15 U.S.C. § 1179(c) was intended to address[17]—the burden remains on Plaintiffs to establish their entitlement to the amount of damages they seek.  See generally Credit Lyonnais Secs. (USA), 183 F.3d at 155; Profi-Parkiet Sp. Zoo, 2014 WL 2169769, at *6.

Finally, the fact that Defendants also violated the Copyright Act is not a persuasive reason for awarding the maximum statutory damages under the Lanham Act.  Pls. Supp. Mem. 5-6.  Plaintiffs do not suggest they are entitled to recover under both statutes for the same unlawful acts, and to the extent Plaintiffs cite to Tu, the court in Tu awarded damages only under the

---

[17] See S. Rep. No. 104-177 at 10 (1995) ("[C]ounterfeiters' records are frequently nonexistent, inadequate or deceptively kept in order to willfully deflate the level of counterfeiting activity actually engaged in, making proving actual damages in these cases extremely difficult if not impossible.  Enabling trademark owners to elect statutory damages is both necessary and appropriate in light of the deception routinely practiced by counterfeiters.").

Copyright Act, which provides a maximum of $150,000.00 in statutory damages, rather than the $2,000,000.00 allowed by the Lanham Act. Tu, 2009 WL 2905780, at *4 ("Plaintiffs are not entitled to duplicative recoveries for the same intellectual property theft under multiple theories of liability"; awarding the plaintiffs statutory damages under the Copyright Act and denying a duplicative recovery under the Lanham Act); see Telebrands Corp. v. HM Imp. USA Corp., No. 09 Civ. 3492 (ENV) (RLM), 2012 WL 3930405, at *6 (E.D.N.Y. July 26, 2012) ("[T]he clear weight of authority in this Circuit does not support plaintiff's demand for dual statutory damages for the same infringed product."), report & recommendation adopted, No. 09 Civ. 3492 (ENV) (RLM), 2012 WL 3957188 (E.D.N.Y. Sept. 10, 2012). Thus, Tu does not suggest that a defendant's violation of the Copyright Act provides support for an award of the maximum statutory damages under the Lanham Act.

First, the Court recommends a statutory damages award of $240,000.00 against Evergreen. Under the circumstances, which include that only 800 of the 3,100 cartons were sold and that Evergreen's Agent voluntarily surrendered the remaining 2,300 cartons to Plaintiffs, the Court finds that an award of $10,000.00 per mark, or $80,000.00 would adequately compensate Plaintiffs for their damages, such as loss of goodwill and loss of sales.[18] The Court recommends trebling this amount to account for Evergreen's willful violation, so that the total statutory damages award against Evergreen would be $240,000.00. See Deckers Outdoor Corp. v. TKM

---

[18] To the extent that "statutory damages 'should be woven out of the same bolt of cloth as actual damages,'" Telebrands Corp., 2012 WL 3930405, at *8 (E.D.N.Y. July 26, 2012) (quoting Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004)), for cases involving willful counterfeiting, 15 U.S.C. § 1117(b) allows for treble the amount of the actual "profits or damages." 15 U.S.C. § 1117(b). As to actual profits, while Evergreen might have received $71,300.00 had it sold all 3,100 cartons of counterfeit ZIG-ZAG® Orange, the Court has no information as to what portion of this amount was profit, such that the Court could utilize the $71,300.00 amount in determining statutory damages. As to damages, the Court finds that $10,000.00 per mark would adequately compensate Plaintiffs in the circumstances of this case.

Forest Hills, LLC, No. 12 Civ. 5986 (ENV) (CLP), 2014 WL 4536715, at *10 (E.D.N.Y. Sept. 11, 2014) (awarding $83,790.00 in statutory damages, which "reflect[ed] a trebling of the approximate loss in revenue plaintiff suffered," for the potential sale of 152 pairs of counterfeit boots, without taking into account additional counterfeit items seized by the district attorney); Richemont Int'l S.A. v. Montesol OU, No. 11 Civ. 9322 (JGK) (HBP), 2014 WL 3732887, at *9 (S.D.N.Y. May 13, 2014) (where the defendants sold hundreds of various counterfeit items per week, awarding statutory damages of "$300,000 per counterfeit mark per type of good sold" and then trebling that amount "because defendants acted willfully," for a total award of $900,000.00), report & recommendation adopted, No. 11 Civ. 9322 (JGK) (HBP), 2014 WL 3732919 (S.D.N.Y. July 29, 2014); see generally Gucci Am., 315 F. Supp. 2d at 522 ("[I]t is an 'unadventurous corollary' to also treble any determinable damages when awarding statutory damages because '[s]tatutory damages give even greater weight to the need to deter and punish.'" (quoting Sara Lee Corp. v. Bags of N.Y., Inc., 36 F. Supp. 2d 161, 170 (S.D.N.Y. 1999))).

The total recommended award of $240,000.00 is within the range awarded by courts in comparable circumstances, notwithstanding that courts have used a variety of methods in determining a statutory damages award. See Philip Morris USA Inc. v. Tammy's Smoke Shop, Inc., 726 F. Supp. 2d 223, 224-25 (E.D.N.Y. 2010) (where the defendants conceded their liability for selling two hundred cartons of counterfeit cigarettes, awarding $100,000.00 in statutory damages without discussing treble damages; stating that the defendants' willfulness warranted a "substantial" award, even though the "plaintiff [did] not urge the Court to make a finding of willfulness"); Philip Morris USA Inc. v. C.H. Rhodes, Inc., No. 08 Civ. 0069 (ARR) (CLP), 2010 WL 1196124, at *6 (E.D.N.Y. Mar. 26, 2010) (recommending an award of $1 million as "a

substantial deterrent" where 12,500 cartons of counterfeit cigarettes were seized from an importer; finding willful behavior without discussing treble damages), <u>report & recommendation adopted,</u> No. 08 Civ. 0069 (ARR) (CLP), 2010 WL 1633455 (E.D.N.Y. Apr. 21, 2010); <u>U.S. Sun Star Trading</u>, 2010 WL 2133937, at *13 (recommending an award of $90,000 in statutory damages where 3,950 cartons of counterfeit cigarettes were seized, which included the plaintiff's potential lost revenues plus $500.00, the minimum statutory damages award available under the then-current version of 15 U.S.C. § 1117(c)(1)); <u>Philip Morris USA Inc. v. Felizardo</u>, No. 03 Civ. 5891 (HB), 2004 WL 1375277, at *7 (S.D.N.Y. June 18, 2004) (awarding statutory damages of $62,500.00 for the distribution of or attempts to distribute 230 cartons of counterfeit cigarettes, which equated to the defendant's potential net profits, "doubled, to account for his infringement of two separate marks"). Here, a statutory award of $240,000.00 would serve as an adequate deterrent against future unlawful acts, without providing Plaintiffs with a windfall. <u>See</u> <u>Louis Vuitton Malletier S.A.</u>, 472 F. App'x at 22.

As to the Retailer Defendants, a lesser award is warranted in light of the allegations of a single purchase of an undisclosed, but presumably modest, amount of counterfeit goods. Considering that there are no allegations of any further unlawful activity or harm to Plaintiffs, the Court recommends a statutory damages award of $2,500.00 against each Retailer Defendant. The Court further recommends that this amount be trebled to account for the Retailer Defendants' willfulness, which would result in a statutory damages award of $7,500.00 against each Retailer Defendant. <u>See</u> <u>Philip Morris USA Inc. v. 5 Bros. Grocery Corp.</u>, No. 13 Civ. 2451 (DLI) (SMG), 2014 WL 3887515, at *6 (E.D.N.Y. Aug. 5, 2014) (awarding the plaintiff's requested amount of $4,000.00 in statutory damages against each of several retailer defendants for the sale of counterfeit cigarettes); <u>Lorillard Tobacco Co. v. N. Fast Food, Inc.</u>, No. 11 Civ.

1489 (GLS), 2012 WL 5897621, at *1 (N.D.N.Y. Nov. 21, 2012) (awarding statutory damages of $8,000.00 for a "one-time, unintentional purchase of five cartons of counterfeit cigarettes"); Philip Morris USA Inc. v. A & V Minimarket, Inc., 592 F. Supp. 2d 669, 674 (S.D.N.Y. 2009) (awarding statutory damages of $2,000.00, an amount requested by the plaintiff, against each of forty-nine grocery stores and other retailers who sold counterfeit cigarettes); Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 458 (S.D.N.Y. 2005) (awarding $12,500.00 in statutory damages against a grocery store for the sale of counterfeit cigarettes, as this amount would serve as a deterrent "without being unnecessarily punitive in light of defendants' apparently limited financial means"). Based on the circumstances relevant to the Retailer Defendants, which include no allegations of continuing wrongdoing, a statutory damages award of $7,500.00 would likewise provide an adequate deterrent without creating a windfall for Plaintiffs.

Thus, this Court respectfully recommends awarding statutory damages of $240,000.00 against Evergreen; $7,500.00 against Gourmet Food Market; and $7,500.00 against New Star.

## 2. Attorneys' Fees

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a)(3). Although the statutory damages provision, 15 U.S.C. § 1117(c), is silent as to attorneys' fees, the Second Circuit reasoned that it was "unlikely that Congress intended to prevent a plaintiff who opts to recover statutory damages from also receiving attorney's fees" and, thus, "an award of attorney's fees is available under section 1117(a) in 'exceptional' cases even for those plaintiffs who opt to receive statutory damages under section 1117(c)." Louis Vuitton Malletier S.A., 676 F.3d at 111. The Second Circuit has also "noted that '[t]he finding of willfulness determines the right to attorneys' fees,'

32

and that '[e]xceptional' circumstances include willful infringement.'" Merck Eprova AG v.
Gnosis S.p.A., 760 F.3d 247, 266 (2d Cir. 2014) (quoting Bambu Sales, Inc. v. Ozak Trading,
Inc., 58 F.3d 849, 854 (2d Cir. 1995)); see Louis Vuitton Malletier S.A., 676 F.3d at 111 (same).
For the reasons discussed above, the Defendants violated the Lanham Act willfully, which for
purposes of 15 U.S.C. § 1117(c) establishes exceptional behavior warranting a fee award.

The predominant method for determining a fee award is to calculate the lodestar figure by
multiplying a reasonable hourly rate by the reasonable number of hours expended.  See Perdue v.
Kenny A., 559 U.S. 542, 546, 551 (2010).  "The reasonable hourly rate should be 'what a
reasonable, paying client would be willing to pay, given that such a party wishes to spend the
minimum necessary to litigate the case effectively.'"  Bergerson v. N.Y.S. Office of Mental
Health, Cent. N.Y. Psychiatric Ctr., 652 F.3d 277, 289 (2d Cir. 2011) (quoting Simmons v.
N.Y.C. Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009); internal quotations omitted).  The
calculation of a reasonable fee is within the district court's discretion.  See Millea v. Metro-N. R.
Co., 658 F.3d 154, 166 (2d Cir. 2011).  The burden is on the party seeking the fee award to prove
that the requested fees and hours are reasonable.  See Hugee v. Kimso Apartments, LLC, 852 F.
Supp. 2d 281, 298 (E.D.N.Y. 2012) (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).
Considerations relevant to determining the reasonable fee include: "(1) the difficulty of the
matter; (2) the nature and extent of the services rendered; (3) the time reasonably expended on
those services; (4) the quality of performance by counsel; (5) the qualifications of counsel; (6)
the amount at issue; and (7) the results obtained (to the extent known)."  Aurora Commercial
Corp. v. Approved Funding Corp., No. 13 Civ. 230 (RPP), 2014 WL 3866090, at *3 (S.D.N.Y.
Aug. 6, 2014); see In re One Infant Child, No. 12 Civ. 7797 (PKC), 2014 WL 704037, at *2

33

(S.D.N.Y. Feb. 20, 2014) (same; citing <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v.</u>

<u>Cnty. of Albany & Albany Cnty. Bd. of Elections</u>, 522 F.3d 182, 184 (2d Cir. 2008)).

As discussed above, Plaintiffs seek an attorneys' fee award of $10,343.61 against each

Defendant. This litigation has involved twelve Defendants named at various times during this

litigation, and it is related to a series of lawsuits and a larger investigation concerning the

distribution of counterfeit ZIG-ZAG® Orange in and around New York, New York; Albany, New

York; Worcester, Massachusetts; Detroit, Michigan; Southern California; Philadelphia,

Pennsylvania; and other metropolitan areas in the United States. Pls. Mem. I at 2. In other

words, the work conducted by Plaintiffs' counsel in this matter has not solely related to the

defaulting Defendants. In calculating their requested fees on this motion, Plaintiffs considered

that there were originally eleven Defendants (including the three defaulting Defendants), and, on

these motions, Plaintiffs have requested three-elevenths of their time related to the Complaint

and initial motion papers seeking emergency relief;[19] half of the billings by Mr. Meyerhoff dated

January 29, 2014, and by Plaintiffs' counsel Michael C. Hartmere ("Mr. Hartmere") dated

January 27, 2014, January 31, 2014 and July 17, 2014, "because those entries include work that

is equally related and unrelated to the Defaulting Defendants";[20] and the entirety of their

remaining billings from January 31, 2014 to July 28, 2014, as this time related to the motions for

default judgment. Ballard Decl. ¶¶ 13-14; Meyerhoff Supp. Decl. Ex. B. Plaintiffs' fee award

(as against all three Defendants) includes 178.5 attorney hours and 12.4 paralegal hours.

---

[19] These billings are dated from August 16, 2013 to September 13, 2013. <u>See</u> Meyerhoff Supp. Decl. Ex. B.

[20] Ms. Ballard's declaration does not mention reducing Mr. Hartmere's January 27, 2014 billing by half, <u>see</u> Ballard Decl. ¶ 13, but is apparent from the time records that this entry was also halved. <u>See</u> Meyerhoff Supp. Decl. Ex. B at 2.

Meyerhoff Supp. Decl. ¶¶ 6-7. The Court will next consider the reasonableness of the Plaintiffs' requested fees.

### a.      The Reasonable Hourly Rates For Plaintiffs' Counsel

A reasonable hourly rate is determined based on current market rates "for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984); see Reiter v. MTA N.Y.C. Transit Auth., 457 F.3d 224, 232 (2d Cir. 2006) (stating that the court must use current, prevailing rates for that court's district); Brady v. Wal-Mart Stores, Inc., 455 F. Supp. 2d 157, 214 (E.D.N.Y. 2006) (recognizing that "the law of this circuit" is to "use[] current rates in the lodestar"), aff'd, 531 F.3d 127 (2d Cir. 2008).

Reasonable hourly rates in the Eastern District of New York "are approximately $300-$450 per hour for partners, $200-$300 per hour for senior associates, and $100-$200 per hour for junior associates." Hugee, 852 F. Supp. 2d at 298-99 (quoting Pilitz v. Inc. Village of Freeport, No. 07 Civ. 4078 (ETB), 2011 WL 5825138, at *4 (E.D.N.Y. Nov. 17, 2011), and listing cases); see U.S. Bank, N.A. v. Byrd, 854 F. Supp. 2d 278, 286 (E.D.N.Y. 2012) ("In the Eastern District of New York, hourly rates range from approximately $300 to 400 per hour for partners, $200 to $300 per hour for senior associates, and $100 to $200 per hour for junior associates.").

In intellectual property cases, courts in this District have awarded fees at the higher end of the range or even above the typical range. For example, in Microsoft Corp. v. Computer Care Center, Inc., No. 06 Civ. 1429 (SLT) (RLM), 2008 WL 4179653, at *14-15 (E.D.N.Y. Sept. 10, 2008), a case relied on by Plaintiffs, see Pls. Supp. Mem. 9, the court awarded a partner in an intellectual property matter an hourly rate of $500.00 and an associate an hourly rate of $385.00. In another, more recent intellectual property case cited by Plaintiffs, see Pls. Supp. Mem. 12, a court in this District awarded attorneys' fees at an hourly rate of $400.00 for partners, $265.00

35

for associates and $100.00 for paralegals. Telebrands, 2012 WL 3930405, at *12; see Broad. Music, Inc. v. Bayside Boys, Inc., No. 12 Civ. 03717 (CBA) (VMS), 2013 WL 5352599, at *8-9 (E.D.N.Y. Sept. 23, 2013) (in a copyright infringement case, reducing the hourly rate of a partner with fifteen years' experience to $440.00; citing cases in which partners in copyright cases were awarded between $400.00 to $440.00 per hour; and reducing the hourly rate of paralegals to $100.00); Ortho Sleep Products, LLC v. Dreamy Mattress Corp., No. 11 Civ. 6049 (CBA) (CLP), 2012 WL 6621288, at *12 (E.D.N.Y. Aug. 29, 2012) (in a trademark case, recommending that a Manhattan-based partner with twenty-five years' experience be awarded an hourly rate of $375.00, and that an experienced associate receive a $275.00 hourly rate), report & recommendation adopted, No. 11 Civ. 6049 (CBA) (CLP), 2012 WL 6589208 (E.D.N.Y. Dec. 17, 2012); Pall Corp. v. 3M Purification Inc., No. 03 Civ. 0092 (RRM) (ETB), 2012 WL 1979297, at *5 (E.D.N.Y. June 1, 2012) (recognizing that "[i]ntellectual property expertise does merit special consideration when determining attorneys' fees" and that such expertise has warranted higher rates in this District, but finding that no upward departure was warranted in a patent action involving "relatively simple discovery motions," and awarding rates of $450.00 per hour for a partner with nineteen years' experience; $400.00 per hour for a partner with eleven years' experience; and $325.00 per hour for a senior associate with six years' experience).

　　In comparison to the Eastern District, intellectual property lawyers litigating in the Southern District have received notably higher hourly rates, commanding up to $785.00 per hour for a senior partner with over thirty-five years' experience. See Sub-Zero, Inc. v. Sub Zero NY Refrigeration & Appliances Servs., Inc., No. 13 Civ. 2548 (KMW) (JLC), 2014 WL 1303434, at *9 (S.D.N.Y. Apr. 1, 2014) (in a trademark infringement action, finding an hourly rate of $785.00 to be reasonable for a senior partner who had been practicing since 1976; this rate was

"higher than any hourly rate previously awarded in this district for a trademark case," but warranted due to the attorney's expertise; see also Sprint Commc'ns Co. L.P. v. Chong, No. 13 Civ. 3846 (RA), 2014 WL 6611484, at *6 (S.D.N.Y. Nov. 21, 2014) (in an action involving, inter alia, trademark infringement, awarding hourly rates of $480.00 and $475.00 to partners with over twenty years' experience, and $335.00 to an associate with three years' experience); A.V.E.L.A., Inc. v. Estate of Monroe, No. 12 Civ. 4828 (KPF) (JCF), 2014 WL 3610902, at *2-3 (S.D.N.Y. July 18, 2014) (in an intellectual property case, reducing the hourly rates of partners who graduated in 1999 and 2002 to $600.00; of associates to $300.00 to $400.00; and of a paralegal to $200.00); Broad. Music, Inc. v. Pamdh Enterprises, Inc., No. 13 Civ. 2255 (KMW), 2014 WL 2781846, at *6 (S.D.N.Y. June 19, 2014) (in a copyright infringement case, finding the hourly rate of $570.00 for a partner with fifteen years' experience and $200.00 for a Managing Clerk to be reasonable); Merck Eprova AG v. Gnosis S.P.A., No. 07 Civ. 5898 (RJS) (JCF) (E.D.N.Y. Jan. 31, 2013) (ECF No. 255 at 8-9) (in an action brought under the Lanham Act, awarding attorneys' fees at hourly rates of $467.00 to $640.00 for partners; $590.00 for counsel; $269.00 to $457.00 for associates; and $150.00 to $225.00 for paralegals).

Following the forum rule, courts generally apply the reasonable hourly rate for an attorney practicing in the district in which the court sits, such that the higher Southern District rates would not apply in this case. See Simmons, 575 F.3d at 174. "[A] district court may use an out-of-district hourly rate—or some rate in between the out-of-district rate sought and the rates charged by local attorneys—in calculating the presumptively reasonable fee if it is clear that a reasonable, paying client would have paid those higher rates." Arbor Hill, 522 F.3d at 191. Although courts presume that reasonable clients will hire counsel at local hourly rates, that "presumption may be rebutted—albeit only in the unusual case—if the party wishing the district

court to use a higher rate demonstrates that his or her retention of an out-of-district attorney was reasonable under the circumstances as they would be reckoned by a client paying the attorney's bill." Id. To rebut the presumption, the plaintiff must not only show that the selection "was predicated on experience-based, objective factors, but also . . . the likelihood that use of in-district counsel would produce a substantially inferior result." Simmons, 575 F.3d at 176.

Here, Plaintiffs request hourly rates above those typically awarded in this District. Plaintiffs request $665.00 per hour for the work of Ms. Ballard, an equity partner at the law firm Venable, LLP ("Venable") in Manhattan, New York. Meyerhoff Supp. Decl. Ex. B. Ms. Ballard's current hourly rate is $670.00. Ballard Decl. ¶ 16.[21] Ms. Ballard graduated[22] from law school in 1988; practiced as an Assistant District Attorney in Bronx County, New York, and at the firms of Proskauer Rose LLP and Baker & McKenzie LLP, prior to joining Venable; is an experienced intellectual property litigator; and regularly publishes articles and speaks at conferences on intellectual property issues. Id. ¶ 6, Ex. B. Ms. Ballard is lead counsel in this case and has represented Plaintiffs for over a decade. Id. ¶ 3.

Plaintiffs request $540.00 to $555.00 per hour for the work of Mr. Hartmere, counsel at Venable. Meyerhoff Supp. Decl. Ex. B. Mr. Hartmere's current hourly rate is $555.00. Ballard

[21] Plaintiffs' calculations are based on the attorneys' and paralegals hourly rates at the time of their work, not their current hourly rates. Compare Ballard Decl. Ex. B. with Meyerhoff Supp. Decl. Ex. B. Although litigants may request fee awards based on current hourly rates, see Gierlinger v. Gleason, 160 F.3d 858 (2d Cir. 1998), Plaintiffs did not do so in this case, and the Court will consider the hourly rates Plaintiffs proposed.

[22] The Court notes that an attorney's graduation date is not equivalent to the date he or she began practicing law, as a new graduate must typically take the bar exam and be admitted to the bar before beginning to practice as an attorney, a process that takes at least several months to complete. Although not particularly significant for the partners involved in this case, any difference between the attorney's graduation date and year of admission to the bar may be more significant for determining the reasonable rates for the junior associates staffed on this case. Nevertheless, the Court refers to Plaintiffs' attorneys' graduation dates because this was the information provided by Plaintiffs.

Decl. ¶ 16.  Mr. Hartmere graduated law school in 2001, after which he clerked on the Southern District of New York and practiced civil litigation at Simpson Thacher & Bartlett LLP, prior to working at Venable.  Id. ¶ 7, Ex. C.  Intellectual property litigation is one of his practice areas. Id. Ex. C.

Plaintiffs request $390.00 per hour for the work of Victoria R. Danta ("Ms. Danta"), an associate at Venable.  Meyerhoff Supp. Decl. Ex. B.  Ms. Danta's current hourly rate is $430.00. Ballard Decl. ¶ 16.  Ms. Danta graduated from law school in 2001.  Id. ¶ 8, Ex. D.  Ms. Danta's practice focuses on intellectual property litigation.  Id. Ex. D.

Plaintiffs request $295.00 to $360.00 per hour for the work of Mr. Meyerhoff, an associate at Venable who graduated from law school in 2012 and whose practice focuses on complex commercial litigation, including intellectual property matters.  Meyerhoff Supp. Decl. Ex. B; Ballard Decl. ¶ 9, Ex. E.  His current hourly rate is $360.00.  Ballard Decl. ¶ 16.

Ms. Ballard has "worked extensively with Mr. Hartmere, Ms. Danta and Mr. Meyerhoff on prior matters involving North Atlantic and the protection of its registered marks and copyrights."  Ballard Decl. ¶ 4.

Plaintiffs also request $250.00 per hour for the work of Orlando Salcedo ("Mr. Salcedo"), a Managing Clerk and paralegal at Venable, and $235.00 to $240.00 per hour for the work of Daniel Smith ("Mr. Smith"), a paralegal at Venable.  Meyerhoff Supp. Decl. ¶¶ 14-15, Ex. B. Mr. Salcedo's current hourly rate is $250.00.  Ballard Decl. ¶ 16.  Mr. Smith's current hourly rate is $240.00.  Id.  Plaintiffs have not provided any information as to Mr. Salcedo's and Mr. Smith's qualifications.

Although Plaintiffs do not specifically request a departure from the forum rule—instead, Plaintiffs argue that the requested rates are reasonable based on, inter alia, the complexity of the

39

case and the skill of their counsel, see Pls. Supp. Mem. 10-12—the Court nevertheless finds that

a departure is warranted in this case. First, Ms. Ballard attests that the requested rates are what

her firm customarily bills clients for the work of these attorneys. Ballard Decl. ¶ 16; Pls. Supp.

Mem. 11; see E.F. ex rel. N.R. v. N.Y.C. Dep't of Educ., No. 11 Civ. 5243 (GBD) (FM), 2012

WL 5462602, at *3 (S.D.N.Y. Nov. 8, 2012) ("One of the most important factors in determining

the prevailing market rate, and thus the reasonable hourly rate, is the amount that counsel

actually charge their clients."), report & recommendation adopted, No. 11 Civ. 5243 (GBD)

(FM), 2014 WL 1092847 (S.D.N.Y. Mar. 17, 2014); see also Chawla v. Metro. Oral Surgery

Associates, P.C., No. 11 Civ. 6248 (RRM) (VMS), 2014 WL 4678023, at *11 (E.D.N.Y. Sept.

19, 2014) (departing from the forum rule to award an attorney $525.00 per hour, where the client

was billed $525.00 per hour, "thus recognizing that in this case that is the value of [the

attorney's] work").

    Second, it was reasonable for Plaintiffs to retain counsel outside of this District when the

present litigation is but one part of Plaintiffs' nationwide investigation into and response to

recent counterfeiting concerns. From a cost savings standpoint, even if cheaper local counsel

were retained for this litigation, the attorneys involved in the nationwide investigation would be

consulted on and involved with this litigation, possibly creating a duplication of efforts or worse,

inconsistent positions or records.

    Third, it was also reasonable for Plaintiffs to retain Ms. Ballard and her colleagues

specifically, because Plaintiffs have worked with Ms. Ballard for over a decade and also have a

working relationship with her colleagues. Plaintiffs' counsel's familiarity with Plaintiffs'

business likely resulted in greater efficiency. See Wells Fargo Bank, NA v. Konover, No. 05

Civ. 1924 (AWT), 2014 WL 3908596, at *8 (D. Conn. Aug. 8, 2014) (an attorney's involvement

in prior litigation with the same client provided an "intimate, and irreplaceable, familiarity with that case that made him uniquely qualified" for retention in the present action); Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, LTD., No. 07 Civ. 3208, 2010 WL 3925195 (E.D.N.Y. Sept. 9, 2010) (finding it reasonable "to retain the same counsel in this action as [the prevailing party had] retained in [an] earlier litigation, in light of the significant overlap of the two cases"), report & recommendation adopted as modified, 2010 WL 3924674 (E.D.N.Y. Sept. 30, 2010), aff'd, 682 F.3d 170 (2d Cir. 2012).[23]  For these reasons, a departure from the forum rule is appropriate, and Southern District of New York rates should apply.

The hourly rates of $665.00 requested for Ms. Ballard and $540.00 to $555.00 requested for Mr. Hartmere are within the range found reasonable in the Southern District of New York for partners with their many years' experience. See, e.g., A.V.E.L.A., 2014 WL 3610902, at *2-3 (awarding partners who graduated in 1999 and 2002 at $600.00 per hour); Sub-Zero, 2014 WL 1303434, at *9 (awarding a partner practicing since 1976 at $785.00 per hour); Merck Eprova AG, No. 07 Civ. 5898 (RJS) (JCF) (S.D.N.Y. Jan. 13, 2013) (finding of range of hourly rates from $467.00 to $640.00 to be appropriate for partners).  To the extent the requested rates are on the high end of the range, they are nonetheless justified by the work required in this case. Although the legal issues as to the defaulting Defendants were not overly complex, the litigation

---

[23] In Star Mark Management, 2010 WL 3925195, the court found that a departure from the forum rule was warranted in a suit involving trademark infringement where the prevailing party submitted an affidavit that it was unaware of any litigation firms specializing in intellectual property law with offices in this District. Id. at *3; see Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc., No. 04 Civ. 2293 (SMG), 2009 WL 5185808, at *5 (E.D.N.Y. Dec. 23, 2009) (stating, in dicta, that a departure from the forum rule would be warranted because, although the parties did not address the issue, the court was "aware of few if any litigation firms specializing in intellectual property matters with offices based in the Eastern District of New York"), aff'd, 409 F. App'x 389 (2d Cir. 2010). Here, Plaintiffs have not submitted any affidavits as to their efforts to obtain counsel in the Eastern District, so the Court cannot determine whether the availability of suitable local counsel weighs for or against the forum rule.

41

as a whole, and its relation to a nationwide investigation, required skill and expertise that was readily apparent in counsel's thoroughly and well-researched oral and written presentations to the Court. Therefore, the Court respectfully recommends finding that the requested rates for Ms. Ballard and Mr. Hartmere are reasonable.

On the other hand, the hourly rates of $390.00 for Ms. Danta and up to $360.00 for Mr. Meyerhoff appear high even for the Southern District of New York, considering these attorneys' relatively recent graduations in 2010 and 2012, respectively. See, e.g., Sprint Commc'ns, 2014 WL 6611484, at *6 (awarding an associate with three years' experience at $335.00 per hour); A.V.E.L.A., 2014 WL 3610902, at *2-3 (finding a range of $300.00 to $400.00 per hour appropriate for associates); Merck Eprova AG, No. 07 Civ. 5898 (RJS) (JCF) (S.D.N.Y. Jan. 31, 2013) (finding a range of $269.00 to $457.00 appropriate for associates). Although their apparent contributions to this litigation have been excellent, a reduction is warranted to bring their rates into line with those found reasonable for junior associates in the Southern District of New York. The Court respectfully recommends awarding Ms. Danta at an hourly rate of $350.00 and Mr. Meyerhoff at an hourly rate of up to $300.00. To the extent Plaintiffs' were charged $295.00 per hour for Mr. Meyerhoff at the beginning of the litigation, that rate was reasonable.

Similarly, although the paralegals assigned to this case made significant contributions by drafting declarations and proposed judgments, see Meyerhoff Supp. Decl. Ex. B, the proposed rates of $250.00 per hour for Mr. Salcedo and $240.00 per hour for Mr. Smith are somewhat high by Southern District of New York standards. See A.V.E.L.A., 2014 WL 3610902, at *2-3 (awarding an hourly rate of $200.00 to a paralegal); Broad. Music, 2014 WL 2781846, at *6 (awarding an hourly rate of $200.00 to a Managing Clerk); Merck Eprova AG, No. 07 Civ. 5898

42

(RJS) (JCF) (E.D.N.Y. Jan. 31, 2013) (awarding hourly rates in a range of $150.00 to $225.00 to paralegals). Plaintiffs have not submitted information as to the paralegals' backgrounds and levels of experience, which also supports a reduction of the requested rates. See Chawla, 2014 WL 4678023, at *11. This Court respectfully recommends reducing Mr. Salcedo's hourly rate to $200.00 and Mr. Smith's hourly rate to $190.00.

In summary, this Court respectfully recommends an hourly rate of $665.00 for Ms. Ballard; $540.00 to $555.00 for Mr. Hartmere; $350.00 for Ms. Danta; $295.00 to $300.00 for Mr. Meyerhoff; $200.00 for Mr. Salcedo; and $190.00 for Mr. Smith.

### b.    The Reasonable Hours Expended By Plaintiffs' Counsel

"[I]n reviewing a fee application, a district court should 'examine[ ] the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case,' and if it 'concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation.'" Green v. City of New York, 403 F. App'x 626, 630 (2d Cir. 2010) (quoting Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir. 1997)). As previously discussed, a party seeking attorneys' fees must substantiate its requested number of hours expended through contemporaneous time records. See Hensley, 461 U.S. at 437; U.S. Bank, N.A., 854 F. Supp. 2d at 287 (listing cases). "[E]xcessive, redundant, or otherwise unnecessary" hours will not be compensated. Bliven v. Hunt, 579 F.3d 204, 213 (2d Cir. 2009) (quoting Hensley, 461 U.S. at 434). The Second Circuit has "recognized the authority of district courts 'to make across-the-board percentage cuts in hours as a practical means of trimming fat from a fee application.'" Green, 403 F. App'x at 630 (quoting In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir.1987)).

Plaintiffs request attorneys' fees for 32.5 hours of Ms. Ballard's time; 66.8 hours of Mr. Hartmere's time; 38.0 hours of Ms. Danta's time; 41.2 hours of Mr. Meyerhoff's time; 1.8 hours of Mr. Salcedo's time; and 10.6 hours of Mr. Smith's time. Meyerhoff Supp. Decl. ¶¶ 10-15, Ex. B. As described above, Plaintiffs seek a recovery of three-elevenths of counsel's time spent prior to the default judgment motions (which included drafting the Complaint, the ex parte motions and the related motion hearing); half of counsel's time for a few specific entries; and the entirety of counsel's time spent on the default judgment motions.

Having carefully reviewed the attorneys' contemporaneous time records, Meyerhoff Supp. Decl. Ex. B, this Court finds that the billed hours were, for the most part, reasonable. The division of labor reflects an effort to minimize costs by having Mr. Hartmere review the associates' drafting of litigation documents, and by having paralegals draft the most routine litigation documents. Although "fees stemming from conferences between attorneys are not per se excessive," Hargroves v. City of New York, No. 03 Civ. 1668 (RRM) (VMS), 2014 WL 1271039, at *6 (E.D.N.Y. Mar. 26, 2014), the lack of duplicative billing in this case is notable; conferences between Plaintiffs' attorneys were frequently billed by only one attorney. Moreover, Plaintiffs' consolidation of its claims against eleven original Defendants into one action no doubt greatly reduced the total hours spent on drafting the complaint and moving for a preliminary injunction, as compared to the hours if Plaintiffs had filed a separate action against each Defendant. Concerning the default judgment motions, the 22.2 attorney hours and 7.8 paralegal hours were not excessive, especially considering that Plaintiffs moved against three Defendants.

Nonetheless, there are several entries which indicate that time was spent on matters related to litigation or investigation in other districts. Examples include the August 30, 2013

44

entry for "multiple conferences and emails regarding status and strategy in SDNY and EDNY actions"; the September 3, 2013 entry for drafting an email "to local counsel regarding default judgment motions against Sunny Hill, Majid Haroon in D. Mass. Litigation"; the September 3, 2013 entry that included "revise[d] SDNY papers"; the September 12, 2013 entry of "conference with foreign counsel regarding investigation in China"; and the September 13, 2013 entry of "review[ed] information regarding Arizona investigation." Meyerhoff Supp. Decl. Ex. B (capitalization removed). Plaintiffs do not explain why the defaulting Defendants should be liable for such seemingly unrelated work. As the Court cannot tease out exactly how much time was devoted to unrelated matters, a modest across-the-board reduction of 10% is warranted on all entries prior to Plaintiffs' work on the default judgment motions (in other words, the entries for which Plaintiffs request 3/11th or 1/2 of their time). See Green, 403 F. App'x at 630. The work on the default judgment motions concerned only the defaulting Defendants and does not require an across-the-board reduction.

Finally, although Plaintiffs' early efforts for a preliminary injunction against the Retailer Defendants were not successful, the motion was in no sense frivolous, and does not warrant reducing Plaintiffs' requested hours. "[A]n attorney who loses no battles is not trying hard enough." Brady v. Wal-Mart Stores, Inc., 455 F. Supp. 2d 157, 216 (E.D.N.Y. 2006), aff'd, 531 F.3d 127 (2d Cir. 2008).

The Court calculated the recommended award by the reasonable hours multiplied by the reasonable hourly rates, and respectfully recommends an award of attorneys' fees as follows:

| Attorney/ Paralegal | Recomm. Hourly Rate | Recorded Hours | | | Requested Hours | | Total Fees With Reduction |
|---|---|---|---|---|---|---|---|
| | | For 3/11th Time | For 1/2 Time | For Full Time | Total[24] | 10% Reduc. | |
| Ms. Ballard | $665.00 | 32.50 | | | 8.86 | 7.97 | $5,300.05 |
| Mr. Hartmere | $540.00 | 56.90 | 3.10 | | 17.07 | 15.36 | $8,294.44 |
| | $555.00 | | | 6.80 | 6.80 | | $3,774.00 |
| Ms. Danta | $350.00 | 38.00 | | | 10.36 | 9.32 | $3,262.00 |
| Mr. Meyerhoff | $295.00 | 22.00 | 3.80 | | 7.90 | 7.11 | $2,097.45 |
| | $300.00 | | | 15.40 | 15.40 | | $4,620.00 |
| Mr. Salcedo | $200.00 | 1.50 | | | 0.41 | 0.37 | $74.00 |
| | $200.00 | | | 0.30 | 0.30 | | $60.00 |
| Mr. Smith | $190.00 | | | 6.10 | 6.10 | 5.49 | $1,043.10 |
| | | | | | | TOTAL: | $28,525.04 |
| | | | | | TOTAL DIVIDED INTO THIRDS: | | $9,508.35 |

Thus, the Court respectfully recommends an attorneys' fees award of $9,508.35 against each defaulting Defendant.

### 3.    Prejudgment Interest

In their proposed judgments, Plaintiffs request prejudgment interest "at a rate of 9% from the date of the commencement of this Action to the date this Judgment is entered." Proposed Final Judgments, ECF Nos. 94-1, 97-1, 100-1. Plaintiffs do not provide any argument as to this request in their motion papers. Although there is no provision for prejudgment in 15 U.S.C. § 1117(c), the statutory damages provision, under 15 U.S.C. § 1117(b), the actual damages provision in cases of intentional counterfeiting, "the court may award prejudgment interest on

---

[24] The Court's totals differ slightly from Plaintiffs' totals, see Meyerhoff Supp. Decl. ¶¶ 10-16, possibly because the Court rounded to two decimal places, while it appears that Plaintiffs used more decimal places. For example, prior to applying the 10% reduction, the Court calculated 3/11th of 32.5 hours at $665.00 per hour to be $5,891.19, while Plaintiffs' total was $5,894.32. See Meyerhoff Supp. Decl. ¶ 10. The difference presumably occurs because the Court found 3/11th of 32.5 hours to be 8.86 hours, while Plaintiffs found it to be 8.863636, or some other, longer amount of decimal places. The Court finds no fault in using more decimal places, but it is not practical for purposes of recording the Court's calculations in this Report and Recommendation.

such amount at an annual interest rate established under section 6621(a)(2) of Title 26, beginning

on the date of the service of the claimant's pleadings setting forth the claim for such entry of

judgment and ending on the date such entry is made, or for such shorter time as the court

considers appropriate." 15 U.S.C. § 1117(b).  Courts in this District have awarded prejudgment

interest on statutory damages.  See Dong, 2013 WL 4046380, at *7; see generally U.S. Sun Star

Trading, Inc., 2010 WL 2133937, at *14 (E.D.N.Y. Mar. 11, 2010); Johnson & Johnson

Consumer Companies, Inc. v. Aini, 540 F. Supp. 2d 374, 396 (E.D.N.Y. 2008); cf. EMI Apr.

Music Inc. v. 4MM Games, LLC, No. 12 Civ. 2080 (DLC) (JLC), 2014 WL 325933, at *9

(S.D.N.Y. Jan. 13, 2014) ("While the Copyright Act does not expressly provide for prejudgment

interest, several judges in this District have concluded that such an award is appropriate";

collecting cases), report & recommendation adopted, No. 12 Civ. 2080 (DLC) (JLC), 2014 WL

1383468 (S.D.N.Y. Apr. 7, 2014).  Moreover, an award of prejudgment interest despite 15

U.S.C. 1117(c)'s silence on that point would comport with the Second Circuit's reasoning in

Louis Vuitton Malletier S.A., which allowed an award of attorneys' fees under 15 U.S.C.

1117(c), despite there being no mention of attorneys' fees in that provision, to comport with the

purposes of the statute.  Louis Vuitton Malletier S.A., 676 F.3d at 110 ("If Congress's purpose in

enacting section 1117(c) was to address the problem facing a plaintiff unable to prove actual

damages, denying an attorney's fee award to those plaintiffs making use of the new statutory-

damages election would be inconsistent with that remedial purpose.").  Thus, in circumstances

involving intentional counterfeiting, plaintiffs should not be required to choose between

obtaining a statutory damages award and obtaining prejudgment interest.  Therefore, this Court

respectfully recommends awarding prejudgment interest.

Under 26 U.S.C.A. § 6621(a)(2), the appropriate interest rate is,

47

    (A)    the Federal short-term rate determined under subsection (b), plus

    (B)    3 percentage points.

26 U.S.C.A. § 6621(a)(2).

As the calculation of prejudgment interest commences with "the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment, or for such shorter time as the court considers appropriate," 15 U.S.C. § 1117(b), and default was entered on the Amended Complaint, the Court in its discretion recommends starting the clock with the date of service of the Amended Complaint: June 23, 2014 for the Retailer Defendants and June 27, 2014 for Evergreen.[25]  Plaintiffs did not seek entry of default until several months after Defendants failed to answer, and the process was further delayed by the filing of the Amended Complaint. Calculating a prejudgment interest award from service of the original Complaint would, in these circumstances, reward delay.

The federal short-term rate as of June 2014 was 0.32%.  See Index of Applicable Federal Rates (AFR) Rulings, http://apps.irs.gov/app/picklist/list/federalRates.html (last visited Dec. 6, 2014).  Rounding to the nearest percentage point, see 26 U.S.C. § 6621(b)(3), and adding 3%, see 26 U.S.C. § 6621(a)(2)(B), results in 4%.

Therefore, the Court respectfully recommends that Plaintiffs be awarded prejudgment interest, in an amount to be calculated by the Clerk of Court, equal to 4% annual interest from the aforementioned date of service to the date of entry of judgment.

---

[25] As discussed above, Plaintiffs' affidavits of service as to the original Complaint on the Retailer Defendants did not explain the processer server's knowledge that the person accepting service for Defendants were authorized to do so.  This further supports using service of the Amended Complaint to calculate prejudgment interest.

48

#### 4.    Permanent Injunction

Finally, Plaintiffs request that a permanent injunction issue against each defaulting

Defendant.  The requested permanent injunction is substantively identical to those approved by

the District Court as to dismissed Defendants Mr. Hachem, Mr. Haroon, Hookah Plus and K &

W, Orders, ECF No. 80, 112; and that recommended for approval by this Court and then

approved by the District Court as to Defendant Ezring, see Proposed Order, ECF No. 65-1;

R&R, ECF No. 70; Order, May 27, 2014.

Federal law grants courts the authority to issue permanent injunctions to prevent

trademark violations, see 15 U.S.C. § 1116(a), and copyright violations, see 17 U.S.C. § 502(a).

The relevant standard for issuing a permanent injunction in a trademark or copyright

infringement action is the four-factor test articulated in eBay Inc. v. MercExchange, LLC, 547

U.S. 388, 391 (2006).[26]  Under the eBay test, a plaintiff seeking a permanent injunction must

demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law,

such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction." eBay, 547 U.S. at

391.  To warrant a permanent injunction, the plaintiff must "actually succeeded on the merits," a

---

[26] See Salinger v. Colting, 607 F.3d 68, 78 n.7 (2d Cir. 2010) (applying the eBay test in the context of a preliminary injunction in a copyright case, although eBay involved a permanent injunction in a patent case; further stating that "we see no reason that eBay would not apply with equal force to an injunction in any type of case"); Laboratorios Rivas, SRL v. Ugly & Beauty, Inc., No. 11 Civ. 5980 (RA) (JLC), 2013 WL 5977440, at *11 (S.D.N.Y. Nov. 12, 2013) (applying the eBay test in the context of a permanent injunction in a trademark infringement action), report & recommendation adopted, No. 11 Civ. 5980 (RA) (JLC), 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014); Coach, Inc. v. O'Brien, No. 10 Civ. 6071 (JPO) (JLC), 2012 WL 1255276, at *17 (S.D.N.Y. Apr. 13, 2012) (same); Car-Freshener Corp. v. Excellent Deals, Inc., No. 10 Civ. 1391 (ENV) (SMG), 2011 WL 3846520, at *4 (E.D.N.Y. Aug. 1, 2011) (same), report & recommendation adopted, No. 10 Civ. 1391 (ENV) (SMG), 2011 WL 3849440 (E.D.N.Y. Aug. 30, 2011).

requirement met by a defendant's default, which is an admission of liability.  Laboratorios Rivas,

SRL, 2013 WL 5977440, at *11; see Krevat v. Burgers to Go, Inc., No. 13 Civ. 6258 (JS)

(AKT), 2014 WL 4638844, at *11-14 (E.D.N.Y. Sept. 16, 2014) ("Plaintiff has demonstrated

success on the merits by establishing his entitlement to a default judgment."); Fed. Exp. Corp. v.

JetEx Mgmt. Servs., Inc., No. 13 Civ. 4431 (CBA) (RER), 2014 WL 4628910, at *4-5 (E.D.N.Y.

May 8, 2014) (as "the well-pleaded allegations in the complaint establish [the defendants']

liability under the Lanham Act, [the plaintiff] has achieved success on the merits"), report &

recommendation adopted, No. 13 Civ. 4431 (CBA) (RER), 2014 WL 4628983 (E.D.N.Y. Sept.

15, 2014).  It is within the court's equitable discretion to grant or deny a permanent injunction.

See eBay, 547 U.S. at 391.

    Both this Court and the District Court previously considered the eBay test in the context

of Plaintiffs' request for a preliminary injunction against the Defendants; that request for a

preliminary injunction was granted as to Evergreen and denied as to the Retailer Defendants.  N.

Atl. Operating Co. I, 2013 WL 5603602, at *11; N. Atl. Operating Co. II, 2013 WL 5603810, at

*6; N. Atl. Operating Co. III, 2013 WL 5603596, at *1.  As to the Retailer Defendants, the Court

recommended denying the motion for a preliminary injunction because "there [was] insufficient

evidence of Plaintiffs' likelihood of success on the merits," due to the limited evidence of sales

of counterfeit products by the Retailer Defendants.  N. Atl. Operating Co. I, 2013 WL 5603602,

at *10-11.  Additionally, Plaintiffs had not initially included the Retailer Defendants in their

application, meaning that "the Retailer Defendants ha[d] not had any opportunity to be heard

because of Plaintiffs' drafting decisions."  Id. at *11.  Having defaulted, the Retailer Defendants

have admitted their liability as to the sale of counterfeit ZIG-ZAG® Orange, and as detailed

above, the Retailer Defendants have received ample notice of this action and of the present

motion with its request for a permanent injunction. Thus, the concerns which warranted denying the request for a preliminary injunction are not present as to a permanent injunction.

As to each of the Defendants, in the context of the request for a preliminary injunction, this Court found that Plaintiffs made a sufficient showing that the sale or distribution of counterfeit ZIG-ZAG® brand cigarette paper products would cause irreparable injury, based on evidence of likely reputational damage, loss of goodwill, negative effects on profitability and damage to Plaintiffs's relationships with its direct clients and customers; moreover, the remedies available at law could not adequately compensate Plaintiffs for such injuries. See N. Atl. Operating Co. I, 2013 WL 5603602, at *11-13; N. Atl. Operating Co. II, 2013 WL 5603810, at *5; see also CJ Prods. LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 145 (E.D.N.Y. 2011) ("Injecting the market with counterfeit products will not only result in lost sales, but will impair plaintiffs' reputation achieved through considerable time and effort. This type of harm cannot be redressed by monetary damages available at law."). The balance of the hardships also favored Plaintiffs, see N. Atl. Operating Co. I, 2013 WL 5603602, at *13-14; N. Atl. Operating Co. II, 2013 WL 5603810, at *5, as "any harm appear[ed] to stem from [the] defendants' own wrongful conduct in passing off a competitor's product as [the plaintiffs'] product and continuing to capitalize on [the] plaintiffs' . . . good will." Golden Krust Patties, Inc. v. Bullock, 957 F. Supp. 2d 186, 199-200 (E.D.N.Y. 2013). Finally, it was in the public's interest to halt the sale and distribution of counterfeit goods. See N. Atl. Operating Co. I, 2013 WL 5603602, at *14; N. Atl. Operating Co. II, 2013 WL 5603810, at *5. It is well recognized that "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010); see Coach, 2011 WL 6122265, at *12 (finding that

"the public has an interest in being able to rely on the high quality of the products bearing the [plaintiffs' mark]"); see generally Pita v. Tulcingo Car Serv., Inc., No. 10 Civ. 0481 (DLI) (JO), 2011 WL 1790833, at *5-7 (E.D.N.Y. Apr. 7, 2011) (noting that "[a]n injunction will not prevent the defendants from continuing to engage in a car service business; it would only prohibit them from doing so using the name that infringes on [the plaintiff's] mark"), report & recommendation adopted, No. 10 Civ. 0481 (DLI) (JO), 2011 WL 1827125 (E.D.N.Y. May 10, 2011).

These factors support the entry of a permanent injunction. See Felizardo, 2004 WL 1375277, at *7 ("As [the plaintiff] has established that [the defendant] violated the Lanham Act through his counterfeiting activities, the Court finds that a permanent injunction is warranted."). This Court respectfully recommends that a permanent injunction be entered against Defendants, as described below.[27]

### III.  CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the District Court grant in part and deny in part Plaintiffs' motions for default judgment by awarding Plaintiffs statutory damages of $240,000.00 against Evergreen; $7,500.00 against Gourmet Food Market; and $7,500.00 against New Star; attorneys' fees of $9,508.35 against each Defendant; and prejudgment interest in an amount to be calculated by the Clerk of Court, equal to 4% annual interest from June 23, 2014 for the Retailer Defendants and June 27, 2014 for Evergreen to the date of entry of judgment. In addition, this Court respectfully recommends entering a permanent injunction stating that the defaulting Defendants, their agents, servants, employees, officers and

---

[27] The Court includes the language of the recommended permanent injunction below because Plaintiffs' proposed orders include requests, such as for $16,000,000.00 in statutory damages, that the Court does not recommend.

all other persons in active concert or participation with them who receive actual notice of the

final judgment by personal service or otherwise, are permanently restrained and enjoined from,

directly or indirectly:

1.  Improperly using any of the ZIG-ZAG® trademarks and design mark depicting
    the bearded man (the "Smoking Man Design") (collectively, the "ZIG-ZAG®
    Trademarks"), NORTH ATLANTIC OPERATING COMPANY, INC. and the
    gear design displayed on ZIG-ZAG® Cigarette Paper Products (the "NAOC®
    Trademark"), and the NAOC and design graphic entitled "North Atlantic
    Operating Company, Inc." (the "NAOC© Copyright") or any name, or any marks
    similar thereto, in connection with the manufacture, sale, offer for sale,
    distribution, advertisement, or any other use, of cigarette paper products or related
    goods;

2.  Using any logo, trade name, trademark or trade dress similar to any of the
    ZIGZAG® Trademarks, NAOC® Trademark and/or NAOC© Copyright, which
    may be calculated to falsely represent or which has the effect of falsely
    representing that the sale of any counterfeit or infringing ZIG-ZAG® Orange
    Cigarette Paper Products (collectively, "ZIG-ZAG® Orange"), or any counterfeit
    or infringing packaging for same, is sold under the control or supervision of North
    Atlantic;

3.  Selling, passing off, inducing or enabling others to sell or pass off any products,
    including without limitation ZIG-ZAG® Orange, as North Atlantic goods or as
    produced by or for North Atlantic, which are not North Atlantic's goods, or are
    not sold under the control or supervision of North Atlantic;

4. Committing any acts calculated to cause purchasers to believe that counterfeit or infringing ZIG-ZAG® products are sold under the control or supervision of North Atlantic, when they are not;

5. Directly or indirectly importing, manufacturing, distributing, advertising, promoting, making, purchasing, offering for sale or selling any counterfeit or infringing ZIGZAG® products, or any counterfeit or infringing packaging for same;

6. Infringing any of the ZIG-ZAG® Trademarks, NAOC® Trademark and/or NAOC© Copyright;

7. Otherwise unfairly competing with North Atlantic in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of cigarette paper products;

8. Using any reproduction, counterfeit, copy or colorable imitation of any of the ZIG-ZAG® Trademarks, NAOC® Trademark and/or NAOC© Copyright in connection with the publicity, promotion, sale or advertising of cigarette paper products;

9. Affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being North Atlantic goods and from offering such goods in commerce;

10. Diluting any of the ZIG-ZAG® Trademarks, NAOC® Trademark and/or NAOC© Copyright;

54

11.     Destroying any records documenting the manufacture, advertising, receipt, importation, shipment, purchase, sale, offer for sale or distribution of any products either purporting to be North Atlantic products or products using any of the ZIG-ZAG® Trademarks, NAOC® Trademark and/or NAOC© Copyright or any word or symbol similar thereto;

12.     Assisting, inducing, enabling, aiding or abetting any other person or business entity engaging in or performing any of the activities referred in subparagraphs 1-11 above.

Finally, the Court respectfully recommends dismissing Plaintiffs' claims for deceptive business practices. On or before January 9, 2015, Plaintiffs must file an affidavit of service of this Report and Recommendation on Defendants.

**IV.    OBJECTIONS**

This Report and Recommendation will be filed electronically. Written objections to this report and recommendation must be filed with the Clerk of Court in accordance with the Individual Rules of the District Judge within fourteen days of service of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b). Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this report and recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b); see Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

Dated: January 5, 2015
      Brooklyn, New York

                                    *Vera M. Scanlon*
                                    VERA M. SCANLON
                             United States Magistrate Judge

55

**9**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NORTH ATLANTIC OPERATING       :
COMPANY, INC.,                 :
                               :
        Plaintiff,             :
                               :       CIVIL ACTION NO.:
v.                             :       1:12-CV-12063-FDS
                               :
ABC MINI MARKET, a/k/a, A B C MINI :
MARKET; THE STORE; SUNNY HILL  :
MINIMART, a/k/a, SUNNY HILL MINI :
MART; SAS ENTERPRISES INC.;    :
MAJID HAROON; and              :
JOHN DOES ONE through TEN, inclusive, :
                               :
        Defendants.            :

## DEFAULT JUDGMENT
## AGAINST DEFENDANT MAJID HAROON

Saylor, D.J.

Defendant Majid Haroon ("Defendant"), having failed to plead or otherwise defend in this action and his default having been entered,

Now, upon motion of Plaintiff North Atlantic Operating Company, Inc. ("Plaintiff") for default judgment, it is hereby ORDERED, ADJUDGED, AND DECREED that:

1.      Default judgment be entered against Defendant in favor of Plaintiff, and that Plaintiff recover from Defendant an award of statutory damages in the amount of [at least] $1,750,000, as well as its attorneys' fees and costs in an amount to be determined; and

2.      Defendant, an individual, and all those acting in concert or participation with him, shall be, and hereby are PERMANENTLY ENJOINED and restrained from:

        a.      Directly or indirectly importing, manufacturing, distributing, advertising, promoting, making, purchasing, offering for sale, or selling any counterfeit or infringing

ZIG-ZAG® cigarette paper products, including but not limited to ZIG-ZAG® Orange Cigarette Paper Products, or any ZIG-ZAG® brand products not sold under the authority of North Atlantic, or any packaging for same, containing infringing ZIG-ZAG® or NAOC® Trademarks or any colorable imitation thereof or the ZIG-ZAG© Copyright;

   b.     Selling or passing off, or inducing or enabling others to sell or pass off, any of North Atlantic's products, or products not authorized by North Atlantic, not produced, imported, and distributed under the control and supervision of North Atlantic, and/or approved for sale in the United States by North Atlantic under the ZIG-ZAG® and NAOC® Trademarks or using the NAOC© Copyright;

   c.     Committing any acts calculated to cause purchasers to believe that counterfeit or infringing ZIG-ZAG® cigarette paper products, including but not limited to ZIG-ZAG® Orange Cigarette Paper Products, are sold under the control or supervision of North Atlantic, when they are not;

   d.     In any way infringing or damaging the ZIG-ZAG® or NAOC® Trademarks or the NAOC© Copyright;

   e.     Importing, shipping, delivering, distributing, returning, or otherwise disposing of, in any manner, products or inventory not authorized by North Atlantic to be sold or offered for sale in the United States, and which bear infringing ZIG-ZAG® or NAOC® Trademarks or the NAOC© Copyright;

   f.     Otherwise unfairly competing with North Atlantic in any manner;

   g.     Attempting, causing, or assisting any of the above-described acts, including but not limited to enabling others to conduct the scheme described in North Atlantic's Complaint filed in this Action, or by passing along information to others to

allow them to import, manufacture, distribute, advertise, promote, make, purchase, offer for sale, or sell counterfeit or infringing ZIG-ZAG® brand products; and

       h.      Destroying or disposing of any documents, records, or electronic files relating to the import, manufacture, distribution, advertisement, promotion, making, purchase, offer to sell or sale of any product that has been or is intended to be sold in packaging containing the ZIG-ZAG® or NAOC® Trademarks or the NAOC© Copyright.

SO ORDERED.

                                          By the Court,

Dated:  22 OCT 2013

                                          /s/ Pietro Cicolini
                                          Courtroom Deputy Clerk

NOTE: The post judgment interest rate effective this date is: 0.14%.

# 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| NORTH ATLANTIC OPERATING COMPANY, INC., NATIONAL TOBACCO COMPANY, L.P., | 4:16-CV-12076-TGB |
| Plaintiffs, | DEFAULT JUDGMENT |
| vs. | |
| WALTER C SCOTT, et al., | |
| Defendants. | |

In accordance with the Opinion and Order (Dkt. 118) entered on September 28, 2018:

A.   North Atlantic Operating Company's Motion for Default Judgment and Related Relief is **GRANTED**;

B.   Default Judgment, pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55.2, is hereby entered against the following groups of "Non-Responding Defendants" for each and all of the Counts alleged in North Atlantic's Complaint in the amount of **$200,000**, jointly and severally per group of Non-Responding Defendants ((a) – (i), below), for a total statutory damages award of **$1,800,000** under the

Lanham Act (15 U.S.C. § 1117(c)) against the following "Non-Responding Defendants":

    a) Defendants Walter C. Scott and eBay Seller respect843;

    b) Defendants Mohammad Akbar, eBay Seller zigzag_wholesale, eBay Seller atlantic_market, and eBay Seller smwholesale360;

    c) Defendants Harold L. Thompson, HFOco Network Services, and eBay Seller publisherpete;

    d) Defendants James Cleary, and eBay Seller iluvmoney1232012;

    e) Defendants Burtin/Burton Parker, River City Depot, and eBay Seller cheepstuff65;

    f) Defendants Nicless Cigarette Filters, and eBay Seller usbigdiscountwarehouse;

    g) Defendants Amazon Seller kennyskorner;

    h) Defendants Jose Adrian, Amazon Seller Express Deals Corp., and Fast World Closeout; and,

    i) Defendant Rakuten Seller Granpawenterprise;

C. In addition to the above, North Atlantic Operating Company is also awarded its reasonable attorneys' fees, costs, and investigative fees in the above-listed amounts, pursuant to the Lanham Act (15 U.S.C. § 1117) and Copyright Act (17 U.S.C. § 505):

D. The Non-Responding Defendants, and their officers, agents, servants, employees, and attorneys, and all those in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, are forever enjoined and restrained from, directly or indirectly, anywhere in the world:

    a) Importing, shipping, manufacturing, delivering, advertising, promoting, making, purchasing, offering for

sale, selling, distributing, or otherwise disposing of, in any manner, any counterfeit or infringing ZIG-ZAG® brand cigarette paper products, including but not limited to ZIG-ZAG® 1 ¼ Size French Orange cigarette paper products ("ZIG-ZAG® Orange"), or any cigarette paper products bearing:

    i. Infringing or counterfeit versions of the ZIG-ZAG® Trademarks,[1] the NAOC® Trademarks,[2] the NAOC© Copyright,[3] and/or the ZIG-ZAG® Orange Trade Dress,[4] which appear alone or in combination on all cases, cartons, and booklets of ZIG-ZAG® Orange cigarette paper products distributed by North Atlantic in the United States; or

---

[1] Defined as the marks of U.S. Registration Nos. 610,530 (ZIG-ZAG (stylized)); 1,127,946 (ZIG-ZAG (Word Mark)); 2,169,540 (Smoking Man Design (Circle Border)); 2,169,549 (Smoking Man Design (No Border)).

[2] Defined as the marks of U.S. Registration Nos. 2,664,694 and 2,664,695 (NORTH ATLANTIC OPERATING COMPANY INC. and Gear Design); and 2,610,473 and 2,635,446 (NORTH ATLANTIC OPERATING COMPANY (Word Mark)).

[3] Defined as the work of the federal copyright registration for the visual material/computer graphic titled "North Atlantic Operating Company, Inc." (VAu 464-855).

[4] Defined as the distinctive design elements comprising the overall look and feel of ZIG-ZAG® Orange packaging (booklets and cartons), including at least the following: (1) ZIG-ZAG® and NAOC® Trademarks, (2) NAOC© Copyright, (3) gold-fill lettering and design elements, (4) French phrases such as "Qualite Superieure" and "Braunstein Freres France," and (5) the express statements that the products are "Made in France" or "Imported French", or "Distributed by North Atlantic Operating Company, Inc."

        ii. The false statement that such products are "Distributed by North Atlantic Operating Company, Inc.", or otherwise under North Atlantic's supervision or control, when they are not;

b. Importing, shipping, manufacturing, distributing, delivering, advertising, promoting, making, purchasing, offering for sale, selling, passing off, distributing, or otherwise disposing of, in any manner, any purported North Atlantic products that are not actually produced, imported, or distributed under North Atlantic's supervision or control, or approved for sale by North Atlantic in the United States in connection with the ZIG-ZAG® or NAOC® Trademarks, the NAOC© Copyright, or the ZIG-ZAG® Orange Trade Dress, or inducing or enabling others to commit any of the aforesaid acts;

c. Committing any acts calculated to cause purchasers to believe that counterfeit or infringing ZIG-ZAG® cigarette paper products, including ZIG-ZAG® Orange, originate with North Atlantic when they do not;

d. In any way infringing or damaging the ZIG-ZAG® or NAOC® Trademarks, the NAOC© Copyright, or the ZIG-ZAG® Orange Trade Dress;

e. Forming or causing to be formed any corporation or other entity that engages in any of the above-described acts ((a) – (e)); and

f. Attempting, causing, or assisting in any of the above-described acts ((a) – (f)), including but not limited to enabling others in the above-described acts or passing on information to allow them to do so.

DATED this 28th day of September, 2018.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

DAVID J. WEAVER
CLERK OF THE COURT

/s/A. Chubb
DEPUTY CLERK

**11**



Positive
As of: February 9, 2018 4:59 PM Z

## *North Face Apparel Corp. v. Moler*

United States District Court for the Southern District of New York

July 16, 2015, Decided

12 Civ. 6688 (JGK) (GWG)

**Reporter**
2015 U.S. Dist. LEXIS 93133 *; 2015 WL 4385626

THE NORTH FACE APPAREL CORP., Plaintiff, -against- REBECCA MOLER et al., Defendants.

**Subsequent History:** Adopted by, Injunction granted at, Judgment entered by *North Face Apparel Corp. v. Moler, 2015 U.S. Dist. LEXIS 124257 (S.D.N.Y., Sept. 16, 2015)*

## Core Terms

Counterfeit, Products, infringing, Marks, trademark, default, permanent injunction, damages, com, defendants', eBay, Bui, Authenbag, websites, default judgment, activities, injunction, allegations, distributed, citations, internal quotation marks, statutory damages, email address, advertising, services, profits, willful, amended complaint, injunction order, monetary damages

**Counsel:** [*1] For The North Face Apparel Corp., Plaintiff: Lisa Debin Keith, LEAD ATTORNEY, Charles Albert LeGrand, George Pearson Wukoson, Davis Wright Tremaine LLP (NYC), New York, NY USA; G. Roxanne Elings, Greenberg, Traurig, L.L.P., New York, NY USA.

For Presco, Inc., Cross Claimant: Jura Christine Zibas, Wilson Elser Moskowitz Edelman & Dicker LLP (NY), New York, NY USA.

**Judges:** GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**Opinion by:** GABRIEL W. GORENSTEIN

## Opinion

## REPORT AND RECOMMENDATION

**GABRIEL    W.    GORENSTEIN,    United    States**

**Magistrate Judge:**

The North Face Apparel Corp. ("North Face") brought this action alleging claims arising out of the unauthorized manufacturing and sale of goods bearing copies of North Face's registered trademarks. The defendants are Arthur F. Moler (d/b/a SC Liquidations, Inc. and Authenbag), Rebecca Moler (d/b/a SC Liquidations, Inc. and Authenbag), To Phuc Hau (a/k/a Steven and/or Pham The Quang), Calvin Bui (d/b/a North Face Initiative, LLC and North Face Depot), Son Tran (d/b/a North Face Initiative, LLC, and North Face Depot), Phan Kim Dong, Web Coast Concepts, Inc. (d/b/a TNF Deals, 70Cut, and *www.tnfdeals.com* ) ("Web Coast"), John Melwak, and Presco, Inc. ("Presco"). Three of the defendants, [*2] Hau, Bui, and Dong (collectively, the "defendants"), have defaulted and the case is before the Court for a calculation of damages.

## I. BACKGROUND

North Face filed the original complaint in this action on August 31, 2012. See Complaint, dated Aug. 31, 2012, and filed Nov. 27, 2012 (Docket # 14) (previously filed under seal as Docket # 3). On September 4, 2012, North Face was granted a Temporary Restraining Order, Seizure Order, Expedited Discovery Order, and Order to Show Cause for Preliminary Injunction (Docket # 13) ("TRO") (previously filed under seal as Docket # 2). Hau was served on September 7, 2012, along with a copy of the TRO. See Affidavit of Service, filed Apr. 17, 2013 (Docket # 41). On November 30, 2012, North Face filed an amended complaint naming additional defendants, including Bui. See Amended Complaint, filed Nov. 30, 2012 (Docket # 28). Bui was served on December 18, 2012. See Affidavit of Service, filed Dec. 19, 2012 (Docket # 29). On May 3, 2013, North Face filed a second amended complaint naming additional defendants, including Dong. See Second Amended Complaint, filed May 3, 2013 (Docket # 46) ("Compl."). Dong was served on May 9, 2013. See Affidavit of

2015 U.S. Dist. LEXIS 93133, *2

Service, [*3] filed May 14, 2013 (Docket # 53).

North Face alleges claims for federal trademark counterfeiting, see Compl. ¶¶ 31-35, federal trademark infringement, id. ¶¶ 36-39, unfair competition and false designation of origin, id. ¶¶ 40-45, common law trademark and trade name infringement, ¶¶ 46-51, unfair competition under New York state common law, id. ¶¶ 52-58, and unlawful deceptive acts and practices under N.Y. Gen. Bus. L. § 349, id. ¶¶ 59-63. Defendants failed to respond to the complaints, and the Clerk has issued certificates of default. See Clerk's Certificate of Default, filed Oct. 4, 2013 (Docket # 84); Clerk's Certificate of Default, filed Oct. 7, 2013 (Docket # 85); Clerk's Certificate of Default, filed Nov. 14, 2013 (Docket # 91).

On March 13, 2015, Judge Koeltl issued an Order to show cause why judgment by default should not be entered against defendants. See "[Proposed] Order to Show Cause for a Default Judgment and Permanent Injunction Order," filed Mar. 16, 2015 (Docket # 111), at 2-3. Defendants' answering papers were required to be filed by March 25, 2015, id. at 3, but they failed to respond. North Face filed papers in support of an entry of default judgment and permanent injunction. See Affidavit of Charles [*4] A. LeGrand in Support of Order to Show Cause for Default Judgment and Permanent Injunction, filed Mar. 26, 2015 (Docket # 113) ("LeGrand Aff."); Declaration of Randall Rabenold in Support of Order to Show Cause for Default Judgment and Permanent Injunction, filed Mar. 26, 2015 (Docket # 114) ("2015 Rabenold Decl."). Defendants sought a judgment of $22,000,000 and a permanent injunction. LeGrand Aff. ¶¶ 64, 69. On March 27, 2015, Judge Koeltl issued an Order finding that North Face is entitled to a default judgment against defendants.[1] See Order,

---

[1] Judge Koeltl's Order refers to a default judgment against "the remaining defendants." Hau, Bui, and Dong are the only remaining defendants. See Permanent Injunction and Final Judgment on Consent as to Defendant Presco, Inc., filed Jan. 8, 2014 (Docket # 94); Permanent Injunction and Final Judgment on Consent as to Defendants Arthur F. Moler (d/b/a SC Liquidations, Inc. and Authenbag) and Rebecca (née Harper) Moler (d/b/a SC Liquidations, Inc. and Authenbag), [*5] filed Mar. 4, 2014 (Docket # 98); Permanent Injunction and Final Judgment on Consent as to Defendants Web Coast Concepts, Inc. (d/b/a TNF Deals, 70Cut and www.tnfdeals.com ) and John Melwak, filed Mar. 4, 2014 (Docket # 99); Permanent Injunction and Final Judgment on Consent as to Defendant Son Tran (d/b/a North Face Initiative, LLC and North Face Depot), filed Dec. 4, 2014 (Docket # 109).

filed Mar. 27, 2015 (Docket # 116). The matter has been referred to the undersigned for an inquest as to damages. See Order of Reference to a Magistrate Judge, filed Mar. 27, 2015 (Docket # 115).

On March 30, 2015, the Court gave defendants until May 14, 2015, to oppose North Face's request for a judgment in the amount of $22,000,000 against them, see Scheduling Order, filed Mar. 30, 2015 (Docket # 117) ("March 30 Order"), ¶¶ 1-2, but they never filed a response.

Because the default order entered in this case establishes defendants' liability, see Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995) (citation omitted), the only remaining issue is whether North Face has supplied adequate support for the relief it seeks. See Kuruwa v. Meyers, 823 F. Supp. 2d 253, 256 (S.D.N.Y. 2011), aff'd, 512 F. App'x 45 (2d Cir. 2013); accord GAKM Res. LLC v. Jaylyn Sales Inc., 2009 U.S. Dist. LEXIS 128595, 2009 WL 2150891, at *2 (S.D.N.Y. July 20, 2009). The Second Circuit has held that a damages inquest may be held on the basis of documentary evidence alone "as long as [the court has] ensured that there was a basis for the damages specified in [the] default judgment." Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); accord Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991). The March 30 Order notified the parties that the Court would conduct the inquest [*6] based upon the written submissions of the parties unless a party sought an evidentiary hearing. See March 30 Order ¶ 3. No party has requested an evidentiary hearing. Moreover, because North Face's submissions provide a basis for an award of damages, no hearing is required.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

In light of defendants' default, North Face's properly pleaded allegations, except those related to damages, are accepted as true. See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint.") (quoting Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004)); Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) ("In light of [defendant's] default, a court is required to accept all . . . factual allegations as true and draw all reasonable inferences in [plaintiff's] favor.") (citation omitted). Thus, the Court's findings of fact are based on the allegations in North Face's second amended complaint regarding liability

and the admissible evidence regarding damages contained in its submissions.

A. Facts Relating to Liability

North Face is a Delaware corporation with its principal place of business in Wilmington, Delaware. Compl. ¶ 1. Hau is an individual [*7] believed to be doing business or residing in Ho Chi Minh City, Vietnam. Id. ¶ 4. Bui is an individual whose physical address is unknown. Id. ¶ 5. Dong is an individual believed to reside and/or do business from Vietnam. Id. ¶ 7.

North Face is the owner of federally registered trademarks and service marks and owns common law rights in these and other marks for use in connection with apparel, backpacks, and other products, and common law rights in various marks consisting of or incorporating the letters "TNF." Id. ¶¶ 18-19 (collectively, "North Face Marks"). North Face sells "high quality technical and casual outdoor apparel, equipment, including backpacks, and other products" (the "North Face Products") using its North Face Marks. Id. ¶ 20. The North Face Marks are "widely promoted," id. ¶ 21, and North Face "maintains control standards for all" North Face Products, which are distributed through a "worldwide network of authorized licensees, distributors, and retailers," id. ¶ 22. "In 2010 alone, . . . North Face spent many millions of dollars advertising and promoting the North Face Products, which prominently bear the . . . North Face Marks." Id. ¶ 23.

Defendants have "manufactured, [*8] imported, distributed, offered for sale and/or sold counterfeit goods . . . bearing counterfeits of the North Face Marks" (the "Counterfeit Products"), and "they continue to do so." Id. ¶ 25. Bui operates "at least two retail websites, using domain names that infringe the North Face Marks, and purporting to sell genuine . . . North Face® branded goods, but which in fact sell Counterfeit Products." Id. ¶ 26. Dong also "owns and uses [a] domain name . . . in connection with her infringing activities." Id. Defendants also offer Counterfeit Products for sale on "pages set up on online retail marketplaces such as eBay and Amazon." LeGrand Aff. ¶ 23; see Compl. ¶ 27. The Counterfeit Products sold by defendants are not genuine North Face Products, and North Face did not "manufacture, inspect or package the Counterfeit Products and did not approve the Counterfeit Products for sale or distribution." Id. ¶ 29. Defendants' use of the North Face Marks "on or in connection with the advertising, marketing, distribution, offering for sale and sale of the Counterfeit Products is likely to cause and has caused confusion, mistake and deception by and among consumers and is irrevocably harming [North [*9] Face]." Id. ¶ 30.

B. Facts Relating to Damages

North Face has purchased samples from defendants that North Face subsequently determined to be Counterfeit Products. Declaration of Rick Griffin, filed Nov. 27, 2012 (Docket # 16), ¶¶ 12-13; Declaration of Brandon Blucher, dated Nov. 8, 2012 and filed July 15, 2015 (Docket # 119) ("Nov. 8 Blucher Decl."), ¶¶ 9-11. North Face has also identified "no less than eleven counterfeit mark/goods combinations." LeGrand Aff. ¶ 64; see 2015 Rabenold Decl. ¶ 4.

Defendants have been operating since at least as early as late 2009 to early 2010. See Exs. H and L to Supplemental Declaration of Charles LeGrand, filed June 3, 2013 (Docket # 74) ("LeGrand Decl."); Declaration of Randall Rabenold, filed May 6, 2013 (Docket # 45) ("2013 Rabenold Decl."), ¶¶ 6-9; Ex. C to Nov. 8 Blucher Decl. When North Face originally became aware of defendants' infringing activities, Hau was selling Counterfeit Products on the website www.authenbag.com and on eBay under the user name "Authenbag." See LeGrand Aff. ¶ 41; see Declaration of Brandon Blucher, dated Aug. 31, 2012 and filed Nov. 27, 2012 (Docket # 17) ("Aug. 31 Blucher Decl."), ¶¶ 4-22; 2013 Rabenold Decl. ¶ 6. The [*10] Counterfeit Products were also advertised through a variety of social media websites, including Twitter, Blogspot, Facebook, and Squidoo, see Aug. 31 Blucher Decl. ¶ 26 & Exs. J-N, and were offered for sale around the world, see id. ¶ 25 & Ex. I; Ex. F to LeGrand Decl. Following the Court's injunctive orders, Dong and Hau continued to sell Counterfeit Products on eBay under the user name "Authenbiz." LeGrand Aff. ¶¶ 8, 43; see 2013 Rabenold Decl. ¶¶ 7-8, 11, & Exs. A-C. Additionally, Hau was involved with the sale and distribution of Counterfeit Products by Web Coast and Melwak. See id. ¶¶ 10, 13-26. Web Coast and Melwak sold Counterfeit Products on additional eBay selling pages, LeGrand Aff. ¶ 43; see Exs. C and M to LeGrand Decl.; 2013 Rabenold Decl. ¶¶ 13-17, through Amazon.com and Bonanza.com, Exs. C and E to LeGrand Decl., and on the website www.tnfdeals.com, 2013 Rabenold Decl. ¶¶ 18-26.

Bui and Tran operated at least two retail websites that purported to sell genuine North Face goods but actually sold Counterfeit Products. Nov. 8 Blucher Decl. ¶¶ 8-11. Bui is also associated with at least some of Hau's infringing activities. In an email conversation with Arthur Moler, who was [*11] using the email address

Case 4:17-cv-10964-LVP-APP ECF No. 201-3, PageID.3504 Filed 01/22/19 Page 120 of 135

Page 4 of 8
2015 U.S. Dist. LEXIS 93133, *11

scliquidations@aol.com , Bui discussed the potential sale of a variety of North Face Products, stating, "At the moment we have 2010 Hot Shot in various colors. . . . The same goes for 2010 Surges. . . . If you are looking for 2009, we have ton [sic] of them in our warehouse. . . ." Ex. A to Nov. 8 Blucher Decl. (ellipses in original). Prior to the Court's injunctive orders, Arthur Moler had aided Hau in his operation of the www.authenbag.com website and the "Authenbag" eBay account. 2013 Rabenold Decl. ¶ 6; see also Aug. 31 Blucher Decl. ¶ 4 (noting that the PayPal account information for the "eBay Authenbag store" is associated with SC Liquidations, Inc. and the email address scliquidations@aol.com ).

The Counterfeit Products were sold in the range of approximately $46 to $80 each. See Exs. B, C, and E to 2013 Rabenold Decl. Comments on the "Authenbiz" eBay selling page alone demonstrate that Hau sold hundreds of Counterfeit Products since the entry of the Court's injunctive orders. See 2013 Rabenold Decl. ¶ 6. One PayPal account — which was used by Hau for payments while doing business under the "Authenbag" user name, see id. ¶ 8, Aug. 31 Blucher Decl. ¶ 20, [*12] was in Dong's name, Ex. L to LeGrand Decl.; see 2013 Rabenold Decl. ¶ 11; Blucher Decl. ¶ 20, and was associated with the email addresses authenbag@gmail.com and authenbiz@gmail.com — reflects receipt of $356,873.06, see Ex. L to LeGrand Decl. In an email between Hau and Presco, Hau represented that he "was in this business for 3 years and . . . sold over 1.5 million US on Ebay." Ex. H to LeGrand Decl.; see LeGrand Decl. ¶ 3.

North Face ultimately sought and obtained a contempt order against Hau for violation of the Court's prior injunctive orders. See Order for Contempt as to Defendant To Phuc Hau, filed July 25, 2013 (Docket # 80) ("Contempt Order"), at 4.

B. Statutory Damages

1. Applicable Law

North Face seeks monetary damages under the Lanham Act, which provides:

In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, [*13] or distribution of goods or services in the amount of—

(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c). Section 1117(c) was enacted to address the difficulty of calculating actual damages caused by counterfeiters. See, e.g., Pitbull Prods., Inc. v. Universal Netmedia, Inc., 2007 U.S. Dist. LEXIS 82201, 2007 WL 3287368, at *3 (S.D.N.Y. Nov. 7, 2007); Rodgers v. Anderson, 2005 U.S. Dist. LEXIS 7054, 2005 WL 950021, at *2 (S.D.N.Y. Apr. 26, 2005) ("The rationale for this section is the practical inability to determine profits or sales made by counterfeiters.") (citations omitted); Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004) ("Congress added the statutory damages provision of the Lanham Act in 1995 because 'counterfeiters' records are frequently nonexistent, inadequate, or deceptively kept . . . , making proving actual damages in these cases extremely difficult if not impossible.'") (quoting S. Rep. No. 104-177, at 10 (1995))), amended in part, 328 F. Supp. 2d 439 (2004), overruled on other grounds by Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 106, 111 (2d Cir. 2012); Tiffany (NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003) (same).

Section 1117(c), however, "does not provide guidelines for courts to use in determining an appropriate award as it is only limited by what the court considers [*14] just." Gucci Am., 315 F. Supp. 2d at 520 (internal citation and quotation marks omitted). Many courts have looked to an analogous provision in the Copyright Act for guidance, see 17 U.S.C. § 504(c), and have considered the following factors in setting statutory damage awards under the Lanham Act: (1) "the expenses saved and the profits reaped;" (2) "the revenues lost by the plaintiff;" (3) "the value of the copyright;" (4) "the deterrent effect on others besides the defendant;" (5) "whether the defendant's conduct was innocent or willful;" (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced;" and (7) "the potential for discouraging the defendant." Philip Morris USA Inc. v. A & V Minimarket, Inc., 592 F. Supp. 2d 669, 673 (S.D.N.Y. 2009) (citations and internal quotation marks

Case 4:17-cv-10964-LVP-APP   ECF No. 201-3, PageID.3505   Filed 01/22/19   Page 121 of 135

Page 5 of 8
2015 U.S. Dist. LEXIS 93133, *14

omitted); accord Ermenegildo Zenga Corp. v. 56th St. Menswear, Inc., 2008 U.S. Dist. LEXIS 77013, 2008 WL 4449533, at *1, 5 (S.D.N.Y. Oct. 2, 2008); Malletier v. WhenU.Com, Inc., 2007 U.S. Dist. LEXIS 6085, 2007 WL 257717, at *4 (S.D.N.Y. Jan. 26, 2007). "Where . . . a defendant is shown to have acted willfully, a statutory award should incorporate not only a compensatory, but also a punitive component to discourage further wrongdoing by the defendants and others." Malletier v. Carducci Leather Fashions, Inc., 648 F. Supp. 2d 501, 504 (S.D.N.Y. 2009) (citations omitted).

2. Analysis

North Face seeks damages in the amount of $2,000,000 "per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as authorized by 15 U.S.C. § 1117(c)(2)." LeGrand [*15] Aff. ¶ 63 (internal quotation marks omitted). North Face has identified 11 "counterfeit mark/goods combinations," id.; see 2015 Rabenold Decl. ¶ 4, and therefore seeks the "maximum statutory damages in the amount of 22 million dollars," LeGrand Aff. ¶ 64.

Defendants' violations of the trademark law are established by virtue of their failure to controvert the evidence of counterfeiting alleged in the complaint. These facts alone require an award of between $1,000 and $200,000 per counterfeit mark. 15 U.S.C. § 1117(c)(1). An award of up to $2,000,000 would be permitted if the Court finds the violations to be willful. 15 U.S.C. § 1117(c)(2).

"[B]y virtue of their default [defendants] are deemed to be willful infringers."[2] Lane Crawford LLC v. Kelex Trading (CA) Inc., 2013 U.S. Dist. LEXIS 170239, 2013 WL 6481354, at *3 (S.D.N.Y. Dec. 3, 2013) (collecting cases); Burberry Ltd. v. Euro Moda, Inc., 2009 U.S. Dist. LEXIS 113407, 2009 WL 4432678, at *3 (S.D.N.Y. Dec. 4, 2009); Luban, 282 F. Supp. 2d at 124; Fallaci v. New Gazette Literary Corp., 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983). Defendants' failure to respond either to the complaint or to the papers seeking a default judgment has left the Court with no information as to any of the factors relating to defendants' circumstances.

Thus, the Court draws every reasonable inference on these points against defendants, and finds that defendants' infringement was willful. Accordingly, North Face are entitled to an amount the Court considers "just," not to exceed $2,000,000 per counterfeit mark per type of goods or services sold, [*16] offered for sale, or distributed. 15 U.S.C. § 1117(c)(2).

As to the first two factors, the record fails to show the full extent of the expenses saved and profits reaped by defendants and the revenues lost by North Face. However, "defendants have declined to participate in this lawsuit, and have thus deprived [North Face] of the opportunity to make a meaningful assessment of the extent of their business, including volume of sales and profits earned." Polo Ralph Lauren, L.P. v. 3M Trading Co., Inc., 1999 U.S. Dist. LEXIS 7913, 1999 WL 33740332, at *6 (S.D.N.Y. Apr. 19, 1999). Moreover, the Court can "infer that defendants were earning more than minimal profits, as reflected by their persistence in continuing this business over a period of years." Id. Additionally, there is significant evidence that the counterfeiting by these defendants was extensive, inasmuch as Hau represented that he "was in this business for 3 years and . . . sold over 1.5 million US on Ebay." Ex. H [*17] to LeGrand Decl.; see LeGrand Decl. ¶ 3. Also, defendants used numerous websites, in addition to popular online marketplaces such as eBay and Amazon. See Aug. 31 Blucher Decl. ¶¶ 4-22; Nov. 8 Blucher Decl. ¶¶ 8-11 & Ex. A; 2013 Rabenold Decl. ¶ 6-8, 10-11,13-26 & Exs. A-C; Exs. C, E, and M to LeGrand Decl.; LeGrand Aff. ¶ 43. These websites provided Hau and Dong "with a 'virtually limitless number of customers,' which counsels in favor of higher damages," Rolex Watch, U.S.A., Inc. v. Pharel, 2011 U.S. Dist. LEXIS 32249, 2011 WL 1131401, at *5 (E.D.N.Y. Mar. 11, 2011) (citation omitted).

As to the third factor, the record does not indicate the monetary value of North Face's trademarks. However, it shows that North Face sells "high quality technical and casual outdoor apparel, equipment, including backpacks, and other products," Compl. ¶ 20, and that the North Face Marks have been "widely promoted" and are "among the world's most famous and widely-recognized trademarks," id. ¶ 21. Thus, we can "'infer from the well-known reputations of most or all of the trademarks and the sea of advertising that presses them on the consciousness of the buying public that they are indeed valuable.'" Lane Crawford, 2013 U.S. Dist. LEXIS 170239, 2013 WL 6481354, at *4 (quoting Polo Ralph Lauren, 1999 U.S. Dist. LEXIS 7913, 1999 WL 33740332 at *6) (additional citation omitted); see also

---

[2] Similarly, courts applying the treble damages provision for trademark infringement under 15 U.S.C. § 1117(b) of the Lanham Act have found that "[w]illfulness may be established by a party's default because an innocent party would presumably have made an effort to defend itself." Chloe v. Zarafshan, 2009 U.S. Dist. LEXIS 84133, 2009 WL 2956827, at *7 (S.D.N.Y. Sept. 15, 2009) (citations omitted).

2015 U.S. Dist. LEXIS 93133, *17

*Louis Vuitton Malletier, S.A. v. LY USA, 2008 U.S. Dist. LEXIS 107592, 2008 WL 5637161, at \*2 (S.D.N.Y. Oct. 3, 2008)* (finding the plaintiff's trademarks "highly valuable" because [*18] the plaintiff "actively promoted" its "logo, its accompanying motifs, and the composite mark without interruption for over 150 years"), aff'd, *676 F.3d 83 (2d Cir. 2012)* and *472 F. App'x 19 (2d Cir. 2012)*.

The remaining factors also weigh in favor of North Face. A substantial award is necessary to further the "goal of deterring similar conduct by other enterprises." *2008 U.S. Dist. LEXIS 107592, [WL] at \*2* (citation omitted); *see also Coach, Inc. v. O'Brien, 2012 U.S. Dist. LEXIS 52565, 2012 WL 1255276, at \*14 (S.D.N.Y. Apr. 13, 2012)* ("Although nothing in the record demonstrates whether [plaintiff] lost any revenue from [defendant's] infringement, the goal of deterring similar conduct generally requires a significant award."). As to the fifth factor, we find that defendants' activity was willful, as discussed above. Sixth, defendants have failed to participate in this litigation, and thus have deprived North Face of any records from which to assess the value of the infringing materials. Finally, a substantial award is necessary to discourage defendants from continuing to engage in their illicit conduct. Defendants' willful misconduct and failure to appear in this litigation merits a finding that "a slight damage award is unlikely to deter them from continuing their illegal business." *Louis Vuitton Malletier, 2008 U.S. Dist. LEXIS 107592, 2008 WL 5637161, at \*2* (citations omitted).

As a result of the above analysis, we find that "a fairly substantial financial [*19] award is appropriate, if for no other reason, to ensure adequate deterrence against the continuation of this conduct by these defendants." *Polo Ralph Lauren, 1999 U.S. Dist. LEXIS 7913, 1999 WL 33740332, at \*6*. In light of the fact that there is evidence of sales of $1,500,000 worth of goods, and that there is no reason to believe that this number represents the full extent of defendants' operations, we find that an award of $1,000,000 for each of the eleven combinations of counterfeit marks and goods is appropriate in this case and sufficient to both compensate North Face for the damages caused by these defendants and to further the goals of specific and general deterrence. See generally *Tiffany (NJ) LLC v. Dong, 2013 U.S. Dist. LEXIS 114986, 2013 WL 4046380, at \*6-7 (S.D.N.Y. Aug. 9, 2013)* (awarding $1,000,000 for each of the nine types of goods where the defendants "actively operated numerous websites," and offered more than 10,000 counterfeit items for sale, which suggested a "large-scale counterfeiting

enterprise"); *Nike, Inc. v. Top Brand Co., 2006 U.S. Dist. LEXIS 76543, 2006 WL 2946472, at \* (S.D.N.Y. Feb. 27, 2006)* (awarding $1,000,000 per mark per type of good for eight types of goods where evidence showed that defendants produced "millions of infringing goods" and took steps during the litigation to "conceal information about their infringing activities"). Accordingly, North Face should be awarded $11,000,000 in [*20] statutory damages.

## C. Injunctive Relief

In addition to monetary damages, North Face seeks a permanent injunction enjoining defendants from further infringing or otherwise violating North Face Marks. LeGrand Aff. ¶¶ 67-69. Specifically, North Face seeks to enjoin defendants from

(a) using the North Face Marks or any reproduction, counterfeit, copy or colorable imitation of the . . . North Face Marks in connection with the distribution, advertising, offer for sale and/or sale of merchandise not the genuine products of Plaintiff; and

(b) utilizing the infringing domain names northfaceinitiative.yolasite.com and northfacedepot.ecrater.com, or the email address northfacedepot949@yahoo.com; or registering and/or utilizing any additional domain names or email addresses that incorporate any of the . . . North Face Marks; and

(c) passing off, inducing or enabling others to sell or pass off any goods not the genuine products of Plaintiff as and for Plaintiff's authentic products; and

(d) shipping, delivering, holding for sale, distributing, returning, transferring or otherwise moving, storing or disposing of in any manner backpacks or other items falsely bearing the . . . North Face Marks, or any [*21] reproduction, counterfeit, copy or colorable imitation of same; and

(e) otherwise competing unfairly with Plaintiff, through the advertising, offering for sale, or sale of any product infringing . . . North Face Marks in any manner; and

(f) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (a) through (e).

[Proposed] Default Judgment and Permanent Injunction Order (annexed as Ex. C to LeGrand Aff.), at 4.

"A court may issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable

statute and (2) it meets the prerequisites for the issuance of an injunction." <u>Kingvision Pay-Per-View Ltd. v. Lalaleo</u>, 429 F. Supp. 2d 506, 516 (E.D.N.Y. 2006) (citation and internal quotation marks omitted). To obtain a permanent injunction, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction..

<u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) [*22] ; accord <u>Rovio Entm't. Ltd. v. Allstar Vending, Inc., 97 F. Supp. 3d 536, 2015 U.S. Dist. LEXIS 43781, 2015 WL 1508497, at *6 (S.D.N.Y. Apr. 1, 2015)</u> (citations omitted); <u>Laboratorios Rivas, SRL v. Ugly & Beauty, Inc., 2013 U.S. Dist. LEXIS 161188, 2013 WL 5977440, at *11 & n.11 (S.D.N.Y. Nov. 12, 2013)</u>; <u>Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co. Inc., 2012 U.S. Dist. LEXIS 68117, 2012 WL 1414872, at *5 (E.D.N.Y. Jan. 20, 2012)</u>; <u>U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 539 & n.16 (S.D.N.Y. 2011)</u> ; see also <u>Salinger v. Colting, 607 F.3d 68, 77-78 n.7 (2d Cir. 2010)</u> (suggesting that the standard articulated by the Supreme Court in <u>eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)</u>, applies to all applications for injunctions).

Here, the first requirement is met inasmuch as "the Lanham Act expressly provides that federal courts have the power to 'grant injunctions, according to the principles of equity' in trademark infringement cases."[3] <u>Dong, 2013 U.S. Dist. LEXIS 114986, 2013 WL 4046380, at *8</u> (quoting <u>15 U.S.C. § 1116(a)</u>).

As to the requirements for a permanent injunction, the

---

[3] We note that while North Face alleges a claim for trademark counterfeiting under the Lanham Act, see Compl. ¶¶ 31-35, "the Lanham Act does not provide for a separate cause of action for counterfeiting; rather, it provides for specific kinds of relief for trademark infringement claims based on the sale of counterfeit goods," <u>Rovio Entm't, 2015 U.S. Dist. LEXIS 43781, 2015 WL 1508497, at *5 n.2</u> (citing <u>Car-Freshener Corp. v. Excellent Deals, Inc., 2011 U.S. Dist. LEXIS 101302, 2011 WL 3846520, at *2 (E.D.N.Y. Aug. 1, 2010)</u>; <u>Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc., 702 F. Supp. 104, 114 (E.D.N.Y. 2010))</u>.

<u>eBay</u> factors weigh in favor of issuing the requested injunction. "In a trademark case, irreparable injury is established where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." <u>Lobo Enters., Inc. v. Tunnel, Inc., 822 F.2d 331, 333 (2d Cir. 1987)</u> (citation and internal quotation marks omitted); see <u>Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005)</u> ("In trademark disputes, a showing of likelihood of confusion establishes . . . irreparable harm.") (citation and internal quotation marks omitted). [*23] Accepting its allegations as true, North Face has alleged likelihood of confusion and thus also has established irreparable injury. See Compl. ¶ 30 ("Defendants' use of [North Face's] . . . North Face Marks . . . is likely to cause and has caused confusion, mistake and deception by and among consumers and is irrevocably harming [North Face]); see also <u>Laboratorios Rivas, 2013 U.S. Dist. LEXIS 161188, 2013 WL 5977440, at *11</u> ("As noted above, [defendant's] default constitutes an admission of liability as to the trademark infringement claim such that Plaintiff has established a likelihood of confusion from which irreparable harm is presumed.").

Defendants past behavior, including their extensive operations and at least one defendant's violation of the Court's prior injunctive orders, see Contempt Order at 4, suggests that defendants "might continue to engage in infringing activities and counterfeiting unless enjoined by the Court, demonstrating the danger that monetary damages will fail to fully provide [North Face] with relief," <u>Rovio Entm't, 2015 U.S. Dist. LEXIS 43781, 2015 WL 1508497, at *7</u>; see also <u>Laboratorios Rivas, 2013 U.S. Dist. LEXIS 161188, 2013 WL 5977440, at *11</u> ("The second <u>eBay</u> factor, no adequate remedy at law, is satisfied where the record contains no assurance against defendant's continued violation of Plaintiff's trademark," and "[w]here default is entered, [a] court may infer [*24] from a defendant's default that it is willing to, or may continue its infringement.") (citations and internal quotation marks omitted). Moreover, "[a]s a result of defendants' infringement, plaintiff stands to lose its accumulated good will and reputation for quality— losses that are not easily remedied by monetary damages." <u>Koon Chun Hing Kee Soy & Sauce Factory, 2012 U.S. Dist. LEXIS 68117, 2012 WL 1414872, at *5</u> (citing <u>Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd., 808 F. Supp. 952, 957 (E.D.N.Y. 1992))</u>.

"As to the balance of hardships, '[i]t is axiomatic that an infringer . . . cannot complain about the loss of ability to

2015 U.S. Dist. LEXIS 93133, *24

offer its infringing product.'" *Rovio Entm't, 2015 U.S. Dist. LEXIS 43781, 2015 WL 1508497, at *7* (quoting *WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 287 (2d Cir. 2012)*) (alteration in original). Finally, "'the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.'" *Id.* (quoting *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010)*).

Accordingly, the Court should enter the permanent injunction requested by North Face as set forth above.

III. CONCLUSION

For the foregoing reasons, North Face should be awarded a judgment against defendants To Phuc Hau, Calvin Bui, and Phan Kim Dong in the amount of $11,000,000, and a permanent injunction should be entered as described above. North Face shall send a copy of this Report and Recommendations to any known email addresses of defendants and shall file proof [*25] of service.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also *Fed. R. Civ. P. 6(a)*, *(b)*, *(d)*. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. John G. Koeltl at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Koeltl. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010)*.

Dated: July 16, 2015

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

End of Document

# 12

 Positive

As of: February 9, 2018 4:59 PM Z

# *Otter Prods., LLC v. Berrios*

United States District Court for the Central District of California

October 10, 2013, Decided; October 10, 2013, Filed

CV 13-4384 RSWL (AGRx)

**Reporter**

2013 U.S. Dist. LEXIS 147139 *; 2013 WL 5575070

Otter Products, LLC, a Colorado Limited Liability Company, Plaintiff, v. Angel Luis Berrios, Jr., an Individual, Defendants.

**Prior History:** *Otter Prods. v. Berrios, 2013 U.S. Dist. LEXIS 107917 (C.D. Cal., July 31, 2013)*

## Core Terms

Marks, products, counterfeit, infringement, trademark, default judgment, statutory damages, advertising, weighs, default, damages, willful, awards, trademark infringement, permanent injunction, marketing, factors, courts, famous, requirements, distributed, manufacture, dilution, likelihood of confusion, confusingly, merchandise, injunction, eBay, registered, storefront

**Counsel:** [*1] For Otter Products LLC, a Colorado Limited Liability Company, Plaintiff: Ani Sakalian Garibyan, Christopher Dain Johnson, Christopher Q Pham, Marcus F Chaney, LEAD ATTORNEYS, Johnson and Pham LLP, Woodland Hills, CA.

**Judges:** HONORABLE RONALD S.W. LEW, Senior United States District Judge.

**Opinion by:** RONALD S.W. LEW

## Opinion

**ORDER Re: Plaintiff's Motion for Default Judgment Against Defendant Angel Luis Berrios, Jr. [22]**

On August 23, 2013, Plaintiff Otter Products, LLC ("Plaintiff") filed the present Motion for Default Judgment [22]. The Court, having reviewed all papers submitted pertaining to this Motion and having considered all arguments presented to the Court, **NOW FINDS AND RULES AS FOLLOWS:**

Plaintiff's Motion for Default Judgment is hereby **GRANTED**.

## I. Background

Plaintiff is a leading retailer and distributor of high quality protective cases, peripherals, and accessories for portable electronic devices and computers. Compl. ¶ 13. Plaintiff develops and manufactures these cases for a wide range of devices and products. Id. at ¶ 14. In particular, Plaintiff claims that its OTTERBOX® branded products have received extensive media coverage and achieved an extraordinary reputation. Id. at ¶ 16. Moreover, Plaintiff has [*2] received local and national accolades for its products, such as being named "The Best Mobile Case Brand" in 2011 by About.com Reader's Choice. Id. at ¶ 17.

Plaintiff is the exclusive owner of six trademarks for its OTTERBOX® and DEFENDER SERIES® branded products and product packaging (the "Marks"). Id. at ¶¶ 19-21; see Garibyan Decl. ¶ 2, Exs. A-F. Plaintiff claims that it has spent substantial time, money, and effort in developing consumer recognition and awareness of its marks and has spent an enormous amount of money on print and internet advertising to inform customers of the benefits of its products. Compl. ¶ 18.

Plaintiff claims that at some point, without the Plaintiff's consent, Defendant Angel Luis Berrios, Jr. ("Defendant") began offering for sale and selling goods that were neither made by or consented to by Plaintiff using reproductions, counterfeits, copies, and colorable imitations of one or more of Plaintiff's marks. Id. at ¶ 24. Plaintiff claims that Defendant maintains and operates a storefront on eBay under the username "wirelessexpressions." Id. at ¶ 25. Through this storefront, Defendant regularly advertised and sold products bearing the Marks. Garibyan Decl. ¶ 4, [*3] Ex. G.

Case 4:17-cv-10964-LVP-APP   ECF No. 201-3, PageID.3511   Filed 01/22/19   Page 127 of 135

Page 2 of 10
2013 U.S. Dist. LEXIS 147139, *3

On April 10, 2012, in its ongoing investigation of counterfeit sales of OTTERBOX® branded products, Plaintiff purchased an "IPHONE 4 4S 4G OTTERBOX DEFENDER CASE COVER + HOLSTER BELT CLIP WHITE NEW IN BOX" (Item #220998879310) from Defendant for $19.95, paid through Plaintiff's PayPal account. Compl. ¶ 27, Ex. G. According to Plaintiff, the package arrived bearing a shipping label identifying Defendant's home address, 13536 Lakes Way, Orlando, Florida 32828. Garibyan Decl. ¶¶ 3, 7, Ex. O. The product purchased from Defendant clearly displayed marks identical to the Marks. Garibyan Decl. ¶ 8, Ex. P. Plaintiff confirmed that the item Defendant sold to Plaintiff was a counterfeit after inspecting the item using security measures. Compl. ¶ 28; Garibyan Decl. ¶ 9.

On May 28, 2012, Plaintiff sent Defendant a cease and desist letter along with a draft complaint to the e-mail address identified on the PayPal purchase receipt; Defendant failed to respond. Garibyan Decl. ¶ 10, Ex. Q. On May 30, 2012, Plaintiff sent a second cease and desist letter to Defendant at his home address via certified mail; Defendant received and signed for the correspondence. Garibyan Decl. ¶ 11, Ex. R. On May [*4] 7, 2013, U.S. Customs and Border Protection seized a shipment of 300 counterfeit OTTERBOX® branded products en route from China to Defendant's home address for Defendant's resale. Garibyan Decl. ¶ 13, Ex. S.

Plaintiff filed its Complaint against Defendant on June 18, 2013, and Defendant was personally served, with a copy of the Summons and Complaint on June 27, 2013, at his home address. Garibyan Decl. ¶ 14; Dkt. #18. Defendant failed to respond to Plaintiff's Complaint. Garibyan Decl. ¶ 14.

Plaintiff requested entry of default against Defendant on August 8, 2013, and the Clerk of the Court entered default on Defendant on August 9, 2013. Garibyan Decl. ¶ 15, Dkts. ##19-20. Plaintiff filed the present Motion for Default Judgment against Defendant on August 23, 2013 [22].

## II. Discussion

As a matter of initial concern, the Court finds that it has proper subject matter and personal jurisdiction in this case. Pursuant to 28 U.S.C. §§ 1331 and 1338, the Court has subject matter jurisdiction because this Action was brought, in part, under the Lanham Act. Personal jurisdiction arises from Defendant's commercial activities within California.

### A. Procedural Requirements for Default Judgment

The Court [*5] finds that Plaintiff has met all local procedural requirements for default judgment. First, default was entered by the Clerk of the Court against Defendant on August 8, 2013 [20]. Second, default was entered as to the Complaint filed in this proceeding. Third, Defendant is not an infant or an incompetent person. Garibyan Decl. ¶ 16. Fourth, Defendant is not in the military service of the United States of America. Id. Fifth, Plaintiff has attached proof of service to its Motion stating that notice of the Motion has been served [22].

Thus, the Court finds that the procedural requirements of Local Rule 55-1 (a-e) are met in this case.

### B. Substantive Requirements for Default Judgment

For the reasons set forth below, the Court finds that Plaintiff has met the substantive requirements for a default judgment as set forth by Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

#### 1. Possibility of Prejudice to Plaintiff

The first factor in granting default judgment looks at the possibility of prejudice to the plaintiff if default judgment were not entered. See Eitel, 782 F.2d at 1471-72. Here, this factor weighs in favor of Plaintiff as Defendant has failed to appear. If default is not entered, [*6] Plaintiff cannot be compensated for its losses. Furthermore, without injunctive relief, Plaintiff will continue to suffer harm from Defendant's violation of Plaintiff's trademark rights. Prejudice has been found in analogous situations. See e.g. Sennheiser Elec. Corp. v. Eichler, No. CV 12-10809 MMM (PLAx), 2013 U.S. Dist. LEXIS 105319 at *8 (C.D. Cal. July 19, 2013) (finding prejudice where plaintiff alleged that defendants infringed on its trademark name by selling counterfeit products bearing trademark name through their online storefronts). As such, the Court finds that this factor weighs in favor of granting default judgment.

#### 2. Merits of Plaintiff's Case and Sufficiency of Plaintiff's Complaint

The second and third factors concern the merits of Plaintiff's case and the sufficiency of Plaintiff's complaint. Eitel, 782 F.2d at 1471. Courts commonly analyze these two factors together, as this Court does

2013 U.S. Dist. LEXIS 147139, *6

as well. _F.D.I.C. v. Quest, F.S., Inc., SACV 10-0710-DOC(RNBx), 2011 U.S. Dist. LEXIS 69210, at *6 (C.D. Cal. June 27, 2011)._

Plaintiff has alleged five causes of action in its Complaint against Defendant: (1) Trademark Infringement under _15 U.S.C. § 1114_; (2) False Designation of Origin [*7] under _15 U.S.C. § 1125(a)_; (3) Trademark Dilution under _15 U.S.C. § 1125(c)_; (4) Unfair Competition under _California Business & Professions Code § 17200 et seq._; (5) Declaratory Relief. Compl. ¶¶ 35-58.

a. _Plaintiff's Trademark Infringement, False Designation of Origin, and Unfair Competition Claims_

A claim for false designation of origin under _15 U.S.C. § 1125_ requires proof of the same elements as a claim for trademark infringement under _15 U.S.C. § 1114_. _Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1047 n.6 (9th Cir. 1999)_. Additionally, actions pursuant to _California Business & Professions Code § 17200_ are "substantially congruent" to claims made under the Lanham Act. _Cleary v. News Corp., 30 F.3d 1255, 1263 (9th Cir. 1994)_. In other words, the Court should analyze Plaintiff's trademark infringement, false designation of origin, and unfair competition claims together.

To prove a claim of trademark infringement, a plaintiff must show that: (1) it has a valid, protectable trademark and (2) that Defendant's use of the mark is likely to cause confusion. _Applied Info. Scis. Corp. v. eBay, Inc., 511 F.3d 966, 970 (9th Cir. 2007)_.

"Registration of a mark 'on the Principal [*8] Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark on the goods and services, specified in the registration.'" _Id._ (quoting _Brookfield, 174 F.3d at 1047_). Because Plaintiff alleges that it owns federal registration of the Marks in its Complaint (and because Plaintiff attached the registrations to the Complaint), Plaintiff has adequately shown the validity of the Marks and its ownership of the Marks.

Courts typically apply the eight factors set out in _AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979)_ to determine whether a defendant's use of a mark or name creates a likelihood of confusion. See _Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1199 (9th Cir. 2012)_; _Lahoti v. Vericheck, Inc., 636 F.3d 501, 507 (9th Cir. 2011)_. Those factors are: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting its mark; and (8) likelihood of expansion [*9] into other markets. _Sleekcraft, 599 F.2d at 348_.

i. _Strength of the Mark_

The first _Sleekcraft_ factor looks at the strength of the mark. "Trademark law offers greater protection to marks that are 'strong,' i.e., distinctive." _E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992)_. "Arbitrary and fanciful marks have no intrinsic connection to the product with which the mark is used; the former consists of words commonly used in the English language, whereas the latter are wholly made-up terms." _Brookfield, 174 F.3d at 1058 n.19_ (citations omitted). Additionally, "[m]arks may be strengthened by extensive advertising, length of time in business, public recognition, and uniqueness." _Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1179 (9th Cir. 1988)_.

The Court finds that the Marks here are strong. Other than being associated with the products at issue, the word "OTTERBOX" and the pictographic marks stemming therefrom do not connote anything of meaning. Moreover, Plaintiff has been using the Marks in commerce since 2007. Compl. ¶¶ 19-21, Exs. A-F. Plaintiff's products have achieved an extraordinary reputation and have been recognized both locally and nationally, [*10] winning many awards in the process. _Id._ at ¶¶ 16-17. Plaintiff has coupled this public recognition with extensive advertising, investing substantial time, money, and effort in developing consumer recognition and awareness of its marks. _Id._ at ¶ 18. The Court thus finds that the Marks are strong, thereby weighing toward a finding of a likelihood of confusion.

ii. _Proximity or Relatedness of Goods_

The second _Sleekcraft_ factor looks to the proximity or relatedness of the goods on which the mark is used. "Where goods are related or complementary, the danger of consumer confusion is heightened." _Gallo Cattle, 967 F.2d at 1291_. Here, both Plaintiff's and Defendant's products are form-fit protective cases for cellular phones. Both Plaintiff's and Defendant's products bear the Marks. Garibyan Decl. ¶ 8, Ex. P. As both Plaintiff's and Defendant's products are identical, the Court finds that this factor weighs heavily in favor of a finding of

likelihood of confusion.

iii. *Similarity of the Marks*

The third Sleekcraft factor looks to the similarity of the marks. "Three general principles help determine whether marks are similar. First, '[s]imilarity is best adjudged by appearance, sound, and meaning.' [*11] Second, the 'marks must be considered in their entirety and as they appear in the marketplace.' Third, 'similarities are weighed more heavily than differences.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., 618 F.3d 1025, 1032 (9th Cir. 2010)* (citations omitted).

The Court finds that the marks on Defendant's goods are highly similar to Plaintiff's Marks. The photographs Plaintiff submitted show that Defendant's goods use the Marks in an identical manner on practically identical goods to Plaintiff's products. As such, the Court finds that the marks are similar and that this factor weighs toward a finding that Defendant's use of the Marks is likely to cause confusion.

iv. *Evidence of Actual Confusion*

The fourth Sleekcraft factor looks to evidence of actual confusion. While "[e]vidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely . . . failure to prove instances of actual confusion is not dispositive." *Sleekcraft, 599 F.2d at 352-53* (citing *Plough, Inc. v. Kreis Labs., 314 F.2d 635, 639-40 (9th Cir. 1963)*; *Drexel Enters., Inc. v. Hermitage Cabinet Shop, Inc., 266 F. Supp. 532, 537 (N.D. Cal. 1967)*).

Here, Plaintiff [*12] has presented evidence of Defendant's sale of at least 4,100 counterfeit products. Garibyan Decl. ¶ 5, Exs. H-M. That so many consumers purchased Defendant's counterfeit products evidences actual consumer confusion. As such, the Court finds that this factor weighs in Plaintiff's favor.

v. *Marketing Channel Convergence*

The fifth Sleekcraft factor looks to whether the marketing channels used by Plaintiff and Defendant converge or are identical. Plaintiff alleges that Defendant operates a storefront on eBay.com, an online marketplace, through which Defendant advertised, marketed, distributed, and sold products bearing the Marks. Compl. ¶ 25; Garibyan Decl. ¶ 4, Ex. G. Plaintiff also alleges that it sells its products at third party retailers and online through its website. Garibyan Decl. ¶ 12. Plaintiff thus contends that it and Defendant's

marketing channels overlap because they both sell products over the Internet. Mot. 13:3-8.

While this may be true, "[g]iven the broad use of the Internet today . . . this factor merits little weight." *Playboy Enters. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1028 (9th Cir. 2004)*.

As such, this factor neither weighs in favor nor against a finding of likelihood [*13] of confusion.

vi. *Type of Good*

The sixth Sleekcraft factor examines whether the good is one in which buyers are likely to exercise greater care in their purchase. "When goods are expensive, it is assumed that buyers will exercise greater care in their purchases." *Gallo Cattle, 967 F.2d at 1293*. Conversely, "when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Brookfield, 174 F.3d at 1060*.

Here, Plaintiff alleges that the goods in question are fairly inexpensive. For example, Plaintiff purchased one of Defendant's items for $19.95. Garibyan Decl. ¶ 6. Because the goods at issue are relatively inexpensive, this factor weighs in favor of finding a likelihood of confusion.

vii. *Defendant's Intent*

The seventh Sleekcraft factor looks at the defendant's intent in selecting the mark. "When the alleged infringer knowingly adopts a mark similar to another's, [the court] must presume that the public will be deceived." *M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1085 (9th Cir. 2005)* (citing *Sleekcraft, 599 F.2d at 354*).

Plaintiff has alleged that Defendant intentionally chose Plaintiff's Marks to confuse consumers and aid in the [*14] promotion and sales of its unauthorized and counterfeit products. Compl. ¶ 29. Defendant continued to do this even after Plaintiff attempted to contact Defendant prior to the instigation of the instant lawsuit. Garibyan Decl. ¶¶ 10-11, Exs. Q-R. Defendant continued to engage in the sale of the infringing goods even after notice of the lawsuit. Id. at ¶¶ 13-14, Ex. S.

Furthermore, the failure of a party to defend itself against allegations of trademark counterfeiting is indicative of willful trademark infringement. See *Philip Morris U.S.A. Inc. v. Castworld Products, Inc., 219 F.R.D. 494, 500 (C.D. Cal. 2003)* (finding that a party's failure to comply with the judicial process or to participate in litigation indicates willful use of a

2013 U.S. Dist. LEXIS 147139, *14

counterfeit mark).

Thus, the Court finds that Defendant knowingly adopted marks similar to Plaintiff's Marks. As such, the Court finds that this factor weighs in favor of finding a likelihood of confusion.

viii. *Expansion of Product Lines*

The eighth Sleekcraft factor concerns whether Defendant will expand the product line to include other products. Plaintiff has not alleged any facts or raised any arguments regarding this factor. As such, the Court finds that [*15] this factor is neutral.

ix. *Conclusion*

Because all of the Sleekcraft factors either weigh in favor of a finding of a likelihood of confusion or are neutral, the Court finds that Defendant's use of the marks was likely to cause confusion.

The Court thus finds that Plaintiff has adequately alleged both elements necessary for a trademark infringement claim.

b. *Plaintiff's Trademark Dilution Claim*

"In order to prove a violation of the Federal Trademark Dilution Act, a plaintiff must show that (1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services."

Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1316, 1324 (9th Cir. 1998).

i. *Famousness of Plaintiff's Marks*

The first element of a trademark dilution claim requires the plaintiff to establish that the mark is famous. In determining whether a mark is famous, courts may consider several factors, including: (1) the degree of inherent or acquired distinctiveness; (2) the duration and extent of use; [*16] (3) the duration and extent of advertising and publicity; (4) the geographical extent of the market; (5) the channels of trade; (6) the degree of recognition in the trading areas and channels of trade; (7) the nature and extent of use of the same or similar marks by third parties; and (8) whether the mark is registered. Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1013 (9th Cir. 2004) (citing 15 U.S.C. §

1125(c)(1)).

The Court finds that the Marks are famous under *15 U.S.C. § 1125(c)(1)*. Plaintiff's Mark is highly distinct; as discussed above, Plaintiff's OTTERBOX® Mark does not connote anything of meaning other than Plaintiff's products. Furthermore, Plaintiff has been using these Marks extensively since 2007. Compl. ¶¶ 19-21, Exs. A-F. Plaintiff has spent substantial time, money, and effort in advertising and publicity. Id. at ¶ 18. Additionally, Plaintiff's Marks and products are highly recognized both locally and nationally, indicating a national market. Id. at ¶ 17. Finally, the Marks are registered. Id. at ¶¶ 19-21, Exs. A-F. As nearly all of the statutory factors weigh in Plaintiff's favor, the Court finds that the Marks are famous.

ii. *Defendant's Commercial Use [*17] of Plaintiff's Famous Marks*

The Court finds that Defendant has made a commercial use of Plaintiff's Marks.

First, Defendant operates and maintains an eBay storefront under the name "wirelessexpressions," through which he regularly and systematically advertised, marketed, distributed, and sold products bearing unauthorized Plaintiff's Marks. Compl. ¶¶ 24-34; Garbiyan Decl. ¶ 4-13, Ex. G-S. In other words, Defendant routinely uses Plaintiff's Marks to market and sell its products.

Second, on April 10, 2012, Plaintiff purchased an "IPHONE 4 4S 4G OTTERBOX DEFENDER CASE COVER + HOLSTER BELT CLIP WHITE NEW IN BOX" (Item #220998879310) from Defendant for $19.95, paid through Plaintiff's PayPal account. Compl. ¶ 27, Ex. G. The product purchased from Defendant was inspected for authenticity and determined to be a counterfeit. Compl. ¶ 28; Garibyan Decl. ¶¶ 8-9, Ex. P.

Given Defendant's extensive marketing and sales of his counterfeit products using Plaintiff's Marks, the Court finds that Defendant has made commercial use of Plaintiff's Marks.

iii. *Defendant's Use Began After Plaintiff's Marks Were Famous*

Plaintiff has been using the Marks since as early as 2007. Compl. ¶¶ 19-21, Exs. A-F; Garibyan [*18] Decl. ¶ 2, Exs. A-F. Defendant has, according to Plaintiff's monitoring software, sold counterfeit "OTTERBOX" products from August 2011 to March 2013 through his "wirelessexpressions" eBay storefront. Garibyan Decl. ¶

5, Ex. H-M. Accordingly, the Court finds that Defendant used the Marks after they became famous.

iv. *Defendant's Use Tarnishes the Quality of Plaintiff's Marks*

The final element for a trademark dilution claim is that Defendant's use of the Marks has tarnished the quality of Plaintiff's Marks. "Tarnishment occurs 'when a famous mark is improperly associated with an inferior or offensive product or service.'" *Playboy Enters., 354 F.3d at 1033* (quoting *Panavision, 141 F.3d at 1326 n.7*).

Defendant has associated Plaintiff's Marks with counterfeit versions of Plaintiff's products by selling counterfeits bearing the Marks. Compl. ¶¶ 22-34, 45-50; Garibyan Decl. ¶¶ 4-14, Exs. G-S. As such, the Court finds that Defendant tarnished Plaintiff's Marks.

c. *Conclusion*

The Court thus finds that Plaintiff has adequately alleged the elements necessary for a trademark dilution claim. Because Plaintiff has adequately pled and established all the elements and factors necessary for its trademark [*19] infringement and trademark dilution claims, the Court finds that the second and third <u>Eitel</u> factors weigh in favor of granting default judgment.

3. Sum of Money At Stake

The fourth factor in granting default judgment looks at the amount of money at stake in the action. See *Eitel, 782 F.2d at 1471-72*.

The Lanham Act, *15 U.S.C. § 1117(c)*, authorizes statutory damages of up to "$2,000,000 per counterfeit mark per type of good or services sold, offered for sale, or distributed" where "the use of the counterfeit mark was willful". *15 U.S.C. § 1117(c)(2)*. A "counterfeit mark" is "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services." *15 U.S.C. § 1116(d)(1)(B)(i)*.

Plaintiff seeks statutory damages in the amount of $4,000,000 for willful trademark infringement and trademark dilution pursuant to *15 U.S.C. § 1117(c)(1)* for Defendant's intentional infringement of Plaintiff's Marks. Mot. 20:15-18.

Plaintiff has alleged that Defendant has sold thousands of counterfeit versions of Plaintiff's products bearing the Marks for hundreds of thousands of dollars. Garibyan Decl. ¶ 5, Exs. H-M. Given that Plaintiff's Marks

[*20] were registered for the duration of Defendant's activities, these facts indicate that Defendant has knowingly, willfully, and intentionally used counterfeit marks. As such, pursuant to *15 U.S.C. § 1117(c)(1)*, this Court finds that Plaintiff is authorized to seek statutory damages of up to $12,000,000.

The significant amount of money at stake here outweighs the egregiousness of Defendant's conduct, weighing against awarding default judgment.

4. Possibility of Dispute Over Material Facts

The fifth factor in granting default judgment looks at whether there is a possibility of dispute concerning material facts. *Eitel, 782 F.2d at 1471-72*.

There is nothing to suggest the possibility of a dispute over material facts here because Defendant has not filed a responsive pleading to the Complaint. Furthermore, where a plaintiff has filed a well-pled complaint, the possibility of a dispute concerning material facts is remote. *Landstar Ranger, Inc. v. Parth Enters., Inc., 725 F. Supp. 2d 916, 921-22 (C.D. Cal. 2010)*. Thus, this factor weighs toward granting default judgment.

5. Whether Default Due to Excusable Neglect

The sixth factor in granting default judgment looks at whether default was due to some [*21] excusable neglect. *Eitel, 782 F.2d at 1472*.

Here, there is no evidence that default was due to Defendant's excusable neglect. Defendant was personally served with a copy of the Summons and Complaint on June 27, 2013 [18]. Garibyan Decl. ¶ 14. Defendant did not file an answer. Furthermore, Plaintiff filed this Motion for Default Judgment on August 23, 2013 and served notice of the Motion that same day [23]. Defendant has not appeared or filed a responsive pleading. As such, the Court finds that this factor weighs toward granting default judgment.

6. Strong Policy Favoring Decision on Merits

The seventh and last factor in granting default judgment considers the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel, 782 F.2d at 1472*. However, the preference of deciding a case upon its merits is not alone dispositive, given the existence of *Federal Rule of Civil Procedure 55(b)*. *PepsiCo, Inc. v. California Security Cans., 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002)*. In addition, a defendant's failure to answer a plaintiff's complaint

"makes a decision on the merits impractical, if not impossible." Id.; *Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005).* [*22] Here, Plaintiff's federal trademark claims are unopposed and Defendant has failed to appear in this Action. Therefore, this factor favors granting default judgment.

Accordingly, because Plaintiff meets both the substantive and procedural requirements, the Court **GRANTS** Plaintiff's Application for Default Judgment.

## C. Terms of the Judgment

After determining that entry of default judgment is warranted, the Court must next determine the terms of the judgment.

### 1. Statutory Damages

Plaintiff seeks $4,000,000 in statutory damages for Defendant's federal trademark violations as compensation for Plaintiff's damages, as a punishment for Defendant's willful conduct, and as a deterrent to future infringement by Defendant and other counterfeiters. Mot. 21:26-28.

"Several courts have found statutory damages are appropriate in default judgment cases because the information needed to prove actual damages is within the infringers' control and is not disclosed." *Microsoft Corp. v. Nop, 549 F. Supp. 2d 1233, 1238 (E.D. Cal 2008).* Pursuant to the Lanham Act, a plaintiff may recover statutory damages "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered [*23] for sale, or distributed, as the court considers just." *15 U.S.C. § 1117(c)(1).* Additionally, where a defendant's conduct is willful, a court may grant enhanced statutory damages for "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." *15 U.S.C. § 1117(c)(2).* Willfulness requires a connection between the defendant's awareness of its competitors and the defendant's actions at those competitors' expense. See *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., 658 F.3d 936, 944 (9th Cir. 2011); Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 1993).* However, willfulness can be inferred from a defendant's failure to defend. *Castworld Products, 219 F.R.D. at 501.* Moreover, in determining whether the amount of statutory damages sought is reasonable, courts will look to see if the amount is calculated to serve the purposes of awarding statutory damages, such as compensating

lost profits, punishing willful infringing conduct, and deterring infringing activity. See *id. at 501-02.*

Courts tasked with determining statutory damages awards under the Lanham Act often turn to the analysis [*24] developed for a similar provision within the Copyright Act. *Phillip Morris USA Inc. v. Shalabi, 352 F. Supp. 2d 1067, 1076 (C.D. Cal. 2004); Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp. 2d 161, 166-167 (S.D.N.Y. 1999).* Based on the factors considered for the award of statutory damages under the Copyright Act, some courts applying the Lanham Act have looked to estimates of actual damages when making statutory damages awards, requiring a "plausible relationship" between plaintiff's actual damages and the requested statutory damages award. See *Adobe Sys v. Tilley, No. C-09-01085 PJH (JCS), 2009 U.S. Dist. LEXIS 123438, at *12 (N.D. Cal. Dec. 23, 2009);* see also *Sara Lee, 36 F. Supp. 2d at 170.*

Defendant's unwillingness to participate in the legal process in spite of his knowledge of the suit, as well as his significant infringing activity indicates that his infringement was willful. Plaintiff is thus entitled to up to $12,000,000 in statutory damages pursuant to *15 U.S.C. § 1117(c)* given that Defendant has willfully infringed on Plaintiff's six Marks.

However, the Court hereby finds that Plaintiff's requested $4,000,000 is unreasonable as it is not "plausibly related" to Plaintiff's [*25] actual damages. Plaintiff provides evidence that it has been damaged in the amount of its lost profits, though the total amount cannot be ascertained. See Garibyan Decl. ¶ 5, Exs. H-M. In particular, Plaintiff provides tracking data for Defendant's "wirelessexpressions" eBay storefront showing that from August 2011 through March 2013, Defendant sold no less than 4,101 counterfeit OTTERBOX® products with gross receipts of no less than $88,812.00. Id. Defendant's infringing activity, then, is extensive and pervasive, continuing even after notice of this Action. See *id.* at ¶ 6, 10-11. However, an award of $4,000,000 here would go beyond deterring future infringement and would serve as a windfall for Plaintiff. See *Adobe Systems, Inc. v. Tilley, No. C 09-1085 PJH, 2009 U.S. Dist. LEXIS 123438, at *12, 2010 WL 309249 at *5-6 (N.D. Cal. Jan. 19, 2010)* ("while the plaintiff in a trademark or copyright infringement case is entitled to damages that will serve as a deterrent, it is not entitled a windfall.").

The Court has significant discretion to determine the amount of damages to be awarded. See *Rolex Watch,*

*U.S.A., Inc. v. Michel Co., 179 F.3d 704, 712 (9th Cir. 1999)*; *Moroccanoil, Inc. v. Allstate Beauty Prods., Inc., 847 F. Supp. 2d 1197, 1202 (C.D. Cal. 2012)*. [*26] Courts have been predictably varied in their damages awards for similar default judgments involving trademark counterfeiting. See *E.I. Du Pont de Nemours and Co. v. Drabek, No. CV 12-10574 DDP AJWX, 2013 U.S. Dist. LEXIS 63829, 2013 WL 4033630, at *7 (C.D. Cal. May 3, 2013)* (awarding $25,000 per product bearing plaintiff's mark for a total of $525,000 where plaintiff failed to present evidence regarding the extent of sales and evidence that defendant sold infringing products to a wide market); *Sweet People Apparel, Inc. v. Zipper Clothing, No. CV 12-02759-ODW (CWx), 2012 U.S. Dist. LEXIS 76045, 2012 WL 1952842 at *4-5 (C.D. Cal. May 31, 2012)* (awarding plaintiff $150,000 in statutory damages per infringed mark where plaintiffs alleged that their jeans retailed for about $100 and that sales of the jeans totaled tens of millions of dollars); *Beachbody, LLC v. Johannes, No. CV 11-1148 PSG RZX, 2011 U.S. Dist. LEXIS 90721, 2011 WL 3565226, at *3 (C.D. Cal. Aug. 12, 2011)* (rejecting plaintiff's request for $2,150,000 in statutory damages and instead awarding $35,000 per mark willfully infringed for a total of $105,000 where plaintiff could only show sales of 132 allegedly infringing DVDs); *Castword Products, 219 F.R.D. at 501* (awarding $2,000,000 in statutory damages where [*27] defendant imported 8,000,000 counterfeit cigarettes with a street value of millions of dollars). Given Defendant's serious infringing conduct and Plaintiff's evidence that it has been damaged at least in the amount of $88,812.00, the Court finds that Plaintiff is entitled to $100,000 per willfully infringed mark for a total of $600,000. The Court finds that such an award is reasonably calculated to deter further illegal conduct and compensate Plaintiff for any loss in reputation.

## 2. Injunctive Relief

Plaintiff asks the Court to issue a permanent injunction prohibiting Defendant from (1) manufacturing, advertising, distributing, offering for sale, selling, whether directly or indirectly, counterfeit merchandise bearing Plaintiff's Marks, including those bearing marks or names confusingly similar to Plaintiff's Marks, (2) using Plaintiff's Marks or any colorable imitation thereof on or in connection with the promotion, advertising, distribution, manufacture, or sale of Defendant's goods, and (3) ordering Defendant to cancel, withdraw, and recall all its promotions, advertisements, and merchandise bearing Plaintiff's Marks or any confusingly similar simulation to Plaintiff's Marks, which [*28] have

been published, placed, or shipped by Defendant or under Defendant's authority. Mot. 24:21-25:12. The Lanham Act gives courts the power to grant reasonable injunctions when necessary to prevent further violations of the statutes. See *15 U.S.C. § 1116(a)*. A plaintiff, however, is not automatically entitled to an injunction simply because it proves its affirmative claims. *Pyrodyne Corp. v. Pyrotronics Corp., 847 F.2d 1398, 1402 (9th Cir. 1988)*.

In order for a court to grant a permanent injunction, the plaintiff must show:

> (1) that it has suffered an irreparable injury;
>
> (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;
>
> (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and
>
> (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*.

Regarding the first element, when a plaintiff establishes in a trademark infringement or unfair competition action a likelihood of confusion, it is generally presumed that the plaintiff will suffer irreparable harm if an injunction is not granted. *Abercrombie & Fitch Co. V. Moose Creek, Inc., 486 F.3d 629, 633 (9th Cir. 2007)*; [*29] *Vision Sports, Inc., v. Melville Corp., 888 F.2d 609, 612 n.3 (9th Cir. 1989)*. The Ninth Circuit has found that an analogous presumption for preliminary injunctions in the copyright infringement context has effectively been overturned in light of *Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)* and *eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*. See *Flexible Lifeline Sys., Inc. V. Precision Lift, Inc., 654 F.3d 989, 994-98 (9th Cir. 2011)*. However, the Ninth Circuit has yet to address the effect upon the presumption of irreparable harm for permanent injunctions in the trademark infringement context. Accordingly, courts have continued to apply the irreparable harm presumption in trademark infringement cases for permanent injunctions, and this Court follows suit. See *Choice Hotels Intern., Inc. v. Kusum Vali, Inc., No. 11CV1277 BTM(WMc), 2012 U.S. Dist. LEXIS 95326, 2012 WL 2838183, at *3 (S.D. Cal. July 9, 2012)*; *T-Mobile USA, Inc. V. Terry, 862 F. Supp. 2d 1121, 1133 (W.D. Wash. 2012)*. Here, Plaintiff alleges

2013 U.S. Dist. LEXIS 147139, *29

that Defendant's use of the counterfeit OTTERBOX® mark in their manufacture, marketing, sale, and distribution of goods is likely to cause confusion, mistake, and deception among the general [*30] public. Compl. ¶ 31. Thus, the Court finds that Plaintiff is entitled to a presumption of irreparable harm.

However, even without the legal presumption afforded it by law, Plaintiff maintains that it will be irreparably harmed by Defendant's continued use and infringement of Plaintiff's trademark. Compl. ¶¶ 44, 49, 54. Thus, Plaintiff has satisfied the first element.

Plaintiff has also satisfied the second element concerning inadequate legal remedy. Plaintiff alleges that unless enjoined, Defendant will continue to infringe upon Plaintiff's trademark. Id. ¶¶ 44, 49, 54. Defendant's failure to respond or otherwise appear in this Action does not assure that Defendant has stopped infringing. See Jackson v. Sturkie, 255 F. Supp. 2d 1096, 1103 (N.D. Cal. 2003) (granting a permanent injunction as part of default judgment in part because "defendant's lack of participation in this litigation has given the court no assurance that defendant's infringing activity will cease"). Although an award of money damages may remedy Defendant's past wrongful acts, it will not adequately compensate for Defendant's future acts. Thus, the second element is satisfied.

The third element requiring a balance of hardships [*31] favors Plaintiff because if the injunction does not issue, Defendant is more likely to continue violating Plaintiff's rights, imposing a hardship on Plaintiff.

Finally, the public interest will not be disserved by a permanent injunction. To the contrary, if the injunction is not granted, continued infringement will discourage future innovative developments by failing to provide an adequate forum through which corporations, such as Plaintiff, may protect their ideas. See Amini Innovation Corp. v KTY Intern. Marketing, 768 F. Supp. 2d 1049, 1057 (C.D. Cal. 2011). Additionally, prohibiting Defendant from manufacturing, marketing, selling, and distributing counterfeit OTTERBOX® products will prevent the likelihood of future confusion to consumers.

Therefore, because Plaintiff has demonstrated the requisite facts necessary to satisfy the aforementioned four-part test, the Court GRANTS Plaintiff's request for a permanent injunction against Defendant: (1) enjoining and permanently restraining Defendant from manufacturing, advertising, distributing, offering for sale, or selling, whether directly or indirectly, counterfeit merchandise bearing Plaintiff's Marks, including any merchandise of any [*32] kind bearing Plaintiff's Marks or names that are confusingly similar to the trademarks, trade names, designs or logos of Plaintiff; (2) enjoining and permanently restraining Defendant from using Plaintiff's Marks or any copy, reproduction, or colorable imitation, or confusingly similar simulation of Plaintiff's Marks on or in connection with the promotion, advertising, distribution, manufacture, or sale of Defendant's goods; and (3) ordering Defendant to cancel, withdraw, and recall all its promotions, advertisements, and merchandise bearing Plaintiff's Marks or any confusingly similar simulation of Plaintiff's Marks, which have been published, placed, or shipped by Defendant or under Defendant's authority.

3. Attorneys' Fees

The Lanham Act permits attorneys' fees to be granted in "exceptional" cases in which the defendant's behavior has been malicious, fraudulent, deliberate, or willful. 15 U.S.C. § 1117(a)-(b); Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1384 (9th Cir. 1984). Willful infringement can be inferred from a defendant's failure to defend. eAdGear, Inc. v. Liu, No. CV-11-05398 JCS, 2012 U.S. Dist. LEXIS 86364, 2012 WL 2367805, at *19 (N.D. Cal. June 21, 2012); Ringcentral, Inc. v. Quimby, 711 F. Supp. 2d 1048, 1065 (N.D. Cal. 2010) [*33] (citing Castworld Products, 219 F.R.D. at 500).

As Defendant has failed to defend this Action, his willful infringement of Plaintiff's Marks can be inferred. Moreover, Plaintiff has alleged Defendant's willful exploitation of Plaintiff's Marks multiple times in its Complaint, further showing Defendant's willful infringement. See Compl. ¶¶ 25-26, 29.

According to Local Rule 55-3, the amount of attorney's fees that a plaintiff may recover from a default judgment hinges on the amount of judgment awarded to the plaintiff, exclusive of costs. Pursuant to the Local Rule 55-3 schedule, Plaintiff is entitled to $5,600 plus 2% of the damages award over $100,000, or $15,600. The Court thus awards Plaintiff $15,600 in attorneys' fees.

4. Costs

Plaintiff also requests costs under 15 U.S.C. § 1117(a) in the amount of $639.90. Mot. 23:21-24. Under the Lanham Act, a plaintiff that prevails on a claim under 15 U.S.C. § 1125(a) or on a willful violation under 15 U.S.C. § 1125(c) is entitled to costs of the action. See § 1117(a). Here, Plaintiff has prevailed on its claims under § 1125(a) and also prevailed on a willful violation under

§ 1125(c). As such, the Court awards Plaintiff $639.90 in costs.

## IV. [*34] Conclusion

The Court **GRANTS** Plaintiff's Motion for Default Judgment and awards Plaintiff $600,000 in statutory damages; $15,600 in attorney's fees; and $639.90 in costs. The Court also **GRANTS** Plaintiff's request for a permanent injunction, the details of which to be outlined in the Judgment.

**IT IS SO ORDERED.**

DATED: October 10, 2013

/s/ RONALD S.W. LEW

**HONORABLE RONALD S.W. LEW**

Senior, U.S. District Court Judge

## Judgment

Having granted Plaintiff's, Otter Products, LLC, Motion for Default Judgment Against Defendant Angel Luis Berrios, Jr. ("Defendant"), judgment is hereby entered against Defendant and in favor of Plaintiff as follows:

1. Defendant is hereby ordered to pay statutory damages under 15 U.S.C. § 1117(c) to Plaintiff in the amount of $600,000.00.

2. Defendant is also ordered to pay Plaintiff's attorneys' fees pursuant to Local Rule 55-3 in the amount of $15,600.00 and costs incurred in this suit in the amount of $639.90.

3. In sum, Defendant is liable to Plaintiff for the total award of $616,239.90.

In addition, the Court enters a permanent injunction as follows:

1. Defendant is enjoined and permanently restrained from manufacturing, advertising, distributing, offering for sale, or selling, [*35] whether directly or indirectly, counterfeit merchandise bearing Plaintiff's Marks, including any merchandise of any kind bearing Plaintiff's Marks or names that are confusingly similar to the trademarks, trade names, designs or logos of Plaintiff;

2. Defendant is enjoined and permanently restrained from using Plaintiff's Marks or any copy,

reproduction, or colorable imitation, or confusingly similar simulation of Plaintiff's Marks on or in connection with the promotion, advertising, distribution, manufacture, or sale of Defendant's goods; and

3. Defendant is ordered to cancel, withdraw, and recall all its promotions, advertisements, and merchandise bearing Plaintiff's Marks or any confusingly similar simulation of Plaintiff's Marks, which have been published, placed, or shipped by Defendant or under Defendant's authority.

**IT IS SO ORDERED.**

DATED: October 10, 2013

/s/ RONALD S.W. LEW

**HONORABLE RONALD S.W. LEW**

Senior, U.S. District Court Judge

---

End of Document